THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| KEITH TAYLOR,<br>7914 Fox Lair Court<br>Clinton, Maryland 20735,<br><br>    Plaintiff,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br>D/B/A FANNIE MAE,<br>3900 Wisconsin Avenue, NW<br>Washington, D.C. 20016,<br><br>Serve Registered Agent:<br><br>    The Company Corporation<br>    2711 Centerville Road, Suite 400<br>    Wilmington, Delaware 19808,<br><br>DAVID MAGIDSON,<br>11633 Greenspring Ave.<br>Lutherville Timonium, MD 21093-1444,<br><br>    Defendants. | Case No. _____ |

## CIVIL COMPLAINT FOR DECLARATORY, EQUITABLE AND MONETARY RELIEF AND DEMAND FOR JURY TRAIL

    1.    Plaintiff Keith Taylor files this Complaint pursuant to the Dodd-Frank Wall Street and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(B)(i), the District of Columbia common law wrongful discharge exception to the at-will employee doctrine, and, in the alternative, the First Amendment of the United States Constitution.

    2.    If Fannie Mae is considered a private employer, Mr. Taylor has claims for wrongful termination in violation of the Dodd-Frank Wall Street and Consumer Protection Act,

as well as for common law wrongful discharge. If, in the alternative, Fannie Mae is considered to be a government employer, Mr. Taylor has a claim regarding the violation of his constitutional rights under the First Amendment.

3. Specifically, Taylor avers that Defendants Fannie Mae and Magidson illegally retaliated against Taylor by wrongfully terminating his employment because he reported the fraudulent use of data to federal regulators and because he opposed the continued use of and reliance on the misleading and unsupported data to federal regulators and other entities.

### Parties

4. Taylor is a resident of the State of Maryland and until his termination on May 6, 2011, was an Operational Risk Analyst III in Fannie Mae's Remediation Management Office.

5. Defendant Fannie Mae is a government-sponsored entity located at 3900 Wisconsin Avenue, N.W., Washington, D.C. 20016.

6. Defendant David Magidson is a citizen of the State of Maryland who currently resides at 11633 Greenspring Ave., Lutherville Timonium, MD 21093-1444. Mr. Magidson served as Vice President of Risk and Controls at Fannie Mae during the period at issue. At all times relevant to this Complaint, Mr. Magidson was doing and transacting business in the District of Columbia.

### Jurisdiction and Venue

7. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, the Dodd-Frank Wall Street and Consumer Protection Action, 15 U.S.C. § 78u–6, *et seq.* and, in the alternative, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

8. This Court has supplemental jurisdiction over the state law wrongful discharge in violation of public policy claim pursuant to 28 U.S.C. § 1367(a), as the wrongful termination claim forms part of the same case and controversy as the violation of the 15 U.S.C. § 78u–6 *et seq.*

9. This Court has personal jurisdiction over the Defendants because they have substantial contacts and conduct business within the District of Columbia. Moreover, Fannie Mae has its headquarters is located in the District of Columbia, and Magidson works in Fannie Mae's headquarters in the District of Columbia.

10. Venue is in this District is appropriate pursuant to 28 U.S.C. § 1391 because the acts that form the basis of this complaint occurred in this District.

## Factual Background

11. Taylor began working for Fannie Mae on or about March 15, 2010, as an Operational Risk Analyst III in its Remediation Management Office (RMO) under the direct supervision of the RMO Director, Jill Oliver.

12. The RMO is comprised of Director Oliver, and six full-time employees, and it monitors and tracks Fannie Mae's internal controls including remediation plans, it assesses the risk, impact, and cost of compliance regarding various Fannie Mae processes and systems, and it creates reports of this data for executives and gives presentations and workshops when requested.

13. Oliver, as Director of the RMO, reports directly to David Magidson, Fannie Mae's Vice President of Risk and Controls, and Magidson reports directly to his supervisor, Joe Giunta, Fannie Mae's Senior Vice President.

14. On or about September 27, 2010, Magidson asked Taylor for information regarding operational incidents, a subject that the RMO had previously reported on in an August

2010 Executive Summary Report presented to Executive Vice President Edward Watson.

15. In that Executive Summary Report Taylor and his colleagues in the RMO provided data related to a trending analysis of operational incident data in the Mortgage Operations area. This analysis showed a reduction in the number of incidents comparing 2009 and 2010. The Executive Summary Report did not review or report on technology based incidents.

16. When Magidson requested the information from Taylor, Taylor copied the information directly from the August 2010 Executive Summary Report and conferred with a colleague about the data to ensure its accuracy. Taylor then sent it to Magidson in an e-mail on or about September 27, 2010, and copied Oliver on the e-mail.

17. In or about early October 2010, Magidson made at least three presentations wherein he reported a sixty percent (60%) reduction in overall technology based operational incidents from 2009 to 2010, and he further claimed the sixty percent decrease was the result of the Software Development Life Cycle 2.0 project ("SDLC 2.0").

18. The SDLC 2.0 project is the governing structure for application and information system releases and changes to the software development process to achieve a level of control and consistency on technology projects.

19. Magidson's facts were not supported by the RMO data supplied by Taylor, and Magidson was materially overstating Fannie Mae's effectiveness and efficiency of internal controls, misrepresenting the impact the SDLC 2.0 project was having at Fannie Mae.

20. Magidson made these material misrepresentations to a Fannie Mae Vice Presidents Group and then again to representatives of Fannie Mae's government regulator, the Federal Housing Finance Agency ("FHFA"), in order to falsely represent substantial and

material progress on aspects of certain MRAs (Matters Requiring Attention) issued by FHFA that Magidson was charged with resolving.

21. The FHFA is the federal regulator and conservator of Fannie Mae and Freddie Mac. The FHFA is charged with overseeing and regulating the nation's secondary mortgage markets, and it issues MRAs when Fannie Mae has issues that cause FHFA to be concerned about the propriety, legality or functionality of Fannie Mae's operations.

22. Magidson's annual bonus, as well as Fannie Mae's performance for its federal regulator, are quantified in part based on the timely and successful resolution of MRAs issued by the FHFA.

23. Upon learning that Magidson had made these material misrepresentations regarding the status of addressing certain MRAs issued by FHFA, Taylor became very concerned because he believed that the misrepresentations violated the Sarbanes–Oxley Act of 2002 because he knew that the data he supplied to Magidson did not support the sixty percent reduction and there was no data to link any reduction to the SDLC 2.0 project.

24. Accordingly, although it was not within the scope of his regular job duties and responsibilities to do so, Taylor approached Oliver and reported his concern about Magidson's material misrepresentations regarding decrease in technology-related incidents, the correlation to the SDLC 2.0 project, and the RMO data Taylor provided.

25. Oliver responded that she shared the same concerns about Magidson's material misrepresentations and that she had already expressed those concerns to Magidson verbally and in writing prior to Magidson's initial presentation.

26. However, Magidson gnored Oliver's concerns and instead knowingly articulated material misrepresentations to the Fannie Mae Vice Presidents Group and later to the FHFA.

27. Following Magidson's presentations Oliver assigned three members of the RMO to review the data Magidson was relying upon in order to determine if Magidson's claims of a sixty percent reduction could be supported by the data that had been provided, as Oliver and the RMO were uncertain as to how Magidson was reaching his conclusions.

28. On or about November 4, 2010, Oliver and Taylor both met with Magidson to discuss the data, e-mails, documentation, the August 2010 Executive Summary Report, and the results of the RMO staff's review.

29. After reviewing the documents and data, Magidson admitted to Oliver and Taylor that he had "made a mistake" in misrepresenting that there was a sixty percent reduction and that there was a link between any reduction and the SDLC 2.0 project.

30. In or about November 2010 the FHFA began to question the material misrepresentations Magidson had made in his presentation to the FHFA.

31. Accordingly, on or about November 16, 2010, Magidson instructed the RMO staff to develop talking points for an upcoming meeting with the FHFA. In this upcoming meeting with the FHFA Magidson, along with his supervisor, Senior Vice President Joe Giunta, would retract Magidson's misleading claims of a sixty percent reduction in technology-related incidents and the correlation to the SDLC 2.0 project, explain how it happened, and assure the FHFA that it would not happen again.

32. On that same day Oliver e-mailed Magidson to request clarification about his instructions, specifically Oliver wanted to know how Magidson had arrived at the sixty percent reduction and how he linked the reduction to the SDLC 2.0 project so that she could provide thorough and accurate talking points.

33. The following day Magidson responded to Oliver's e-mail reporting that his claims of a sixty percent reduction came from the RMO data provided by Taylor. Magidson also misrepresented that he and Oliver had reviewed Taylor's numbers on or about November 4, 2010, and they agreed that Taylor's numbers were incorrect.

34. On that same day Oliver responded to Magidson, vehemently disagreeing with Magidson's portrayal of the RMO data provided by Taylor and the November 4, 2010 meeting. In her response Oliver clarified that the RMO data Taylor sent in September only related to certain operational incidents and that Taylor implied no correlation to the SDLC 2.0 project. Oliver stated that the RMO data provided by Taylor had been used beyond its intended scope and out of context.

35. The RMO team completed the talking points that Magidson requested. In these talking points the RMO team explained that the data Magidson relied upon was not sufficient to represent an entire population of operational incidents and therefore could not support the sixty percent decrease that had been claimed. Also, the RMO included talking points explaining that the assumed sixty percent decrease was erroneously linked to the SDLC 2.0 project.

36. In or about late November 2010 Magidson and Giunta addressed the FHFA and retracted Magidson's material misrepresentations, using the talking points provided by the RMO.

37. On November 5, 2010, Oliver instructed the RMO staff to complete their 2010 self assessments by the close of business in order to prepare for the upcoming employee evaluations, known as Calibration Sessions, in which Fannie Mae managers must rank their employees against each other.

38. Fannie Mae policy mandates that twenty percent (20%) of their employees must receive low rankings on a scale of 1 to 5, 1 being the highest and 5 the lowest.

39. On or about November 8, 2010, Magidson told Oliver that because the RMO had not been in place for all of 2010, the staff members of the RMO were not eligible for high rankings, such as 1s and 2s.

40. However, members of other teams formed in mid-2010 had received "Exceeding Expectations" rankings, a 2 on Fannie Mae's scale.

41. In early 2011 Magidson began to expand the RMO's duties but gave little direction as to the scope or purpose of the new duties.

42. On or about April 21, 2011, Magidson informed Taylor that his position was being eliminated due to budgetary considerations in a companywide reduction in force. Taylor was the only RMO employee to be laid off, and contrary to Fannie Mae protocols Oliver was neither consulted about nor informed of Taylor's selection for termination prior to its occurrence.

43. Fannie Mae's standard protocol for reductions in force mandate that an employee's direct supervisor be consulted about any upcoming layoffs, and the supervisor then takes part in the process to determine which employee should be laid off.

44. Magidson did not consult with Oliver, Taylor's immediate supervisor, before Taylor was terminated. Oliver was informed of the decision to terminate Taylor only forty minutes before Magidson met with Taylor. Even though Taylor was not the highest paid member of the RMO, his termination was justified by Magidson due budgetary concerns.

45. Other employees in the Risk and Controls Department received lower 2010 performance appraisals than Taylor, including some that did not meet expectations.

46. Of the forty-six total employees that were terminated in the reduction in force, six of the employees were members of the Risk and Control Department and Taylor was the only member of the RMO to be terminated.

47. Taylor's official termination date was on or about May 6, 2011, and Magidson has subsequently authorized the RMO to hire another employee to replace Taylor.

## COUNT I
### Retaliation in Violation of
### The Dodd-Frank Wall Street & Consumer Protection Action
### 15 U.S.C. § 78u–6 *et seq.*
### Against All Defendants

48. Plaintiff incorporates and realleges the allegations in the preceding paragraphs as though fully set forth herein.

49. For purposes of this claim, Fannie Mae is considered a private employer, in light of the fact that it is a publicly traded corporation that is now in conservatorship.

50. Dodd-Frank mandates that no employer may discharge a whistleblower because of any lawful act done by the whistleblower in making disclosures that are required or protected under the Sarbanes-Oxley Act ("SOX"), the Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*), or any other law, rule, or regulation subject to the jurisdiction of the Commission.

51. Fannie Mae is a company with a class of securities registered under 15 U.S.C. § 78a *et seq.* and is required to file reports with SEC, and is therefore within the scope SOX.

52. Taylor reported to Oliver information concerning Magidson's deliberate and material misrepresentations regarding the effectiveness of Fannie Mae's internal controls to the FHFA.

53. Taylor refused to support the misappropriation of his data to prop up Magidson's fabricated report to the FHFA, which provided a false correlation between the RMO data provided by Taylor and the SDLC 2.0 project.

54. Taylor reasonably believed that Magidson's reporting of false data to the FHFA was violation of the Sarbanes–Oxley Act of 2002.

55. Taylor assisted Oliver in reviewing and researching Magidson's deliberate and material misrepresentations to the FHFA, and, together with the RMO team, they determined that Magidson's deliberate and material misrepresentations were baseless.

56. On November 4, 2011, Taylor met with Magidson and Oliver to discuss the findings of RMO team and Magidson admitted the error was his own.

57. On November 17, while preparing to retract his deliberate and material misrepresentations to the FHFA, Magidson placed the blame squarely on Taylor for providing the RMO data.

58. Following the retraction to the FHFA Taylor received a performance rating of 3, "Meets Expectations," which disqualified him for bonuses that are available to Fannie Mae employees who earn 1 or 2 on their evaluations.

59. Defendants also significantly increased Taylor's and the RMO's workload with little direction on the scope or purpose of the new duties being assigned.

60. Defendants then willfully and intentionally discharged Taylor in retaliation for opposing Magidson's deliberate and material misrepresentations to, *inter alia*, the FHFA.

61. The justification for terminating Taylor for budgetary reasons is mere pretext.

62. As a result of Defendants' violation of Dodd-Frank whistleblower provisions, Taylor has suffered damages and entitled to relief to be determined at trial.

## COUNT II
### Wrongful Discharge in Violation of Public Policy
### *Carl v. Children's Hosp.*, 702 A.2d 159, 163-64 (D.C. 1997)
### Against All Defendants

63. Plaintiff incorporates and realleges the allegations in the preceding paragraphs as though fully set forth herein.

64. For purposes of this claim, Fannie Mae is considered a private employer, in light of the fact that it is a publicly traded corporation that is now in conservatorship.

65. At all times relevant to this complaint 18 U.S.C.A. § 1001(a) was in full force and effect.

66. 18 U.S.C.A. § 1001(a) prohibits an individual from knowingly and willfully falsifying, concealing, or covering "up by any trick, scheme, or device a material fact; or makes any materially false, fictitious, or fraudulent statement or representation . . . ."

67. At all times relevant to this complaint the common law of the District of Columbia has recognized a public policy exception to the at-will employment doctrine. The District of Columbia public policy exception makes it unlawful for an employer to discharge an employee if that employee's termination contravenes public policy embodied in a statute, regulation, or the Constitution. *See, e.g., Liberatore v. Mellville Corp.,* 168 F.3d 1326, 1331 (D.C. Cir. 1999); *Carl v. Children's Hosp.,* 702 A.2d 159, 163-64 (D.C. 1997).

68. At all time mentioned in this complaint, the common law of the District of Columbia has recognized that internal complaints regarding illegal activity are protected by the public policy exception. *See Washington v. Guest Services Inc.,* 718 A.2d 1071, 1077 (D.C. 1998).

69. Defendants' intentional and fraudulent reporting to federal regulators is a violation of 18 U.S.C.A. § 1001(a).

70. Defendants' intentional, wrongful termination of Taylor is contrary to the public policy embodied in 18 U.S.C.A. § 1001(a).

71. As a result of Defendants' intentional, wrongful termination Taylor has suffered damages and is entitled to relief to be determined at trial.

## COUNT III
## BIVENS FIRST AMENDMENT ACTION
## AGAINST DEFENDANT MAGIDSON

72. Plaintiff incorporates and realleges the allegations in the preceding paragraphs as though fully set forth herein.

73. For purposes of this claim, Fannie Mae is considered a federal government entity, since it is now in conservatorship under the direct control and supervision of the federal government, which owns eighty percent of its stock. Fannie Mae is, therefore, a government entity and Mr. Taylor was an employee of a government entity. Fannie Mae's employment of Mr. Taylor was in the best interests of the agency and the American taxpayers.

74. As an employee of a federal employer, Mr. Taylor has a right guaranteed by the First Amendment to the United States Constitution to speak freely on matters of public concern. Mr. Taylor's right to speak on matters of public concern was clearly established under the First Amendment and by judicial precedent at all times relevant to this Complaint. Defendant Magidson knew, or should have known, that retaliation against a current or former public employee for disclosing matters of public concern is illegal.

75. Mr. Taylor lawfully exercised his First Amendment right to speak on the following matters of public concern to Treasury: Magidson's and Fannie Mae's violation of their fiduciary duty to the United States government and their pursuit of economic motives to the disadvantage of the United States government by materially misrepresenting the progress Fannie Mae had made on MRAs issued by its regulator, the FHRA.

76. Mr. Taylor's disclosures were outside the scope of his job duties at Fannie Mae. These are matters of social and political concern to the public because the Agency is tasked with working for the public benefit in matters of great national importance.

77. Defendant Magidson retaliated against Mr. Taylor because of his speech by terminating his employment.

78. By retaliating against Mr. Taylor for his speech, Defendant Magidson exhibited an extreme reckless disregard of, and callous indifference to, Mr. Taylor's constitutionally protected First Amendment rights.

79. Defendant Magidson was an officer of the United States government at the times of the actions ascribed to him in this Complaint.

80. Mr. Taylor's interest in exercising his First Amendment rights, and the public's right to be informed about the misconduct of public officials exposed by Mr. Taylor, far outweigh any interest of Fannie Mae in suppressing his speech on a matter of public concern.

81. Defendant Magidson's actions described above have injured Mr. Taylor by causing him great public embarrassment, pain and suffering and public humiliation; damaging his professional reputation, and inflicting extreme emotional distress.

82. Defendant Magidson's actions described above were in willful and wanton disregard of Mr. Taylor's rights, and were taken maliciously to injure him.

83. Defendant Magidson's actions described above directly and proximately caused Mr. Taylor injury, including loss of economic opportunities, pain and suffering, damage to his professional reputation, and loss of future income and benefits.

84. As a result of Defendant Magidson's intentional, wrongful termination Taylor has suffered damages and is entitled to relief to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Taylor respectfully requests that this Court grant him the following relief:

1. Issue a declaratory judgment declaring that Defendants wrongfully discharged Mr. Taylor in violation of the public policy of the District of Columbia;

2. Issue a declaratory judgment declaring that Fannie Mae officials retaliated against Mr. Taylor in violation of his First Amendment right to free speech;

3. Award Mr. Taylor compensatory and consequential damages to redress injuries suffered as a result of his termination from Fannie Mae, including back pay for lost wages and benefits, front pay for denial of Plaintiff's expected future earnings, pain and suffering, emotional distress, public humiliation, and damage to his professional reputation, in an amount appropriate to the proof presented at trial;

4. Award Mr. Taylor punitive damages for Defendants' reckless disregard of, and callous indifference to, his rights in an amount appropriate to the proof presented at trial.

5. Award Mr. Taylor the attorneys' fees and costs he has incurred in bringing this action; and

6. Grant such other relief as this Court deems just and necessary.

## DEMAND FOR JURY TRIAL

Plaintiff Taylor demands a trial by jury for any and all issues proper to be so tried.

Respectfully submitted,

_____
R. Scott Oswald, Esq.
Washington, DC Bar No. 458859
Nicholas Woodfield, Esq.
Washington, DC Bar No. 471801
THE EMPLOYMENT LAW GROUP, PC
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
*Attorneys for Plaintiff*

15