UNITED STATES DISTRICT COURT
OF THE DISTRICT OF COLUMBIA
<u>CIVIL DIVISION</u>

| | |
|---|---|
| KEITH TAYLOR, )<br>)<br>    Plaintiff, )<br>)<br>    v. )<br>)<br>FANNIE MAE, and DAVID )<br>MAGIDSON )<br>)<br>    Defendants. )<br>) | Civil Action No.  11-1189 (RCL) |

**<u>DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Defendants Fannie Mae and David Magidson submit this Statement of Undisputed Facts in Support of its Motion for Summary Judgment.  This factual statement is supported by the testimony and exhibits offered in support of the Parties' claims and defenses which were tried before a neutral arbitrator at JAMS, Alternative Dispute Resolution, in December, 2012.  *See* Blonder Declaration, attached as Exhibit 1.  Fannie Mae will refer to the arbitration transcript in the following manner: Tr: Pg: line (Witness) and such transcripts are attached as Exhibit 2. Fannie Mae states that the following facts are undisputed or cannot be disputed:

    1.    Keith Taylor ("Plaintiff") was originally hired by Fannie Mae in a single family oversight position in 2006. *See* Ex. 2, Tr. 168:19-169:7 (Taylor).  During his initial stint as a Fannie Mae employee, Taylor received feedback from his managers for his consistent failure to effectively communicate with managers and co-workers.  Indeed, his communication problems were so severe that in 2008 he was rated by his manager as in the bottom 25% "of all level 1 through 5 contributors" throughout the company.  Plaintiff's review specifically stated that

"[c]communication, in general, has been one of the most significant deterrents to [Plaintiff]'s overall performance." In light of these pervasive problems communicating, Mr. Taylor's employment with Fannie Mae was terminated in 2009. *See* Ex. 2, Tr. 169:8-178:4 (Taylor).

2. In the spring of 2010, Fannie Mae gave Mr. Taylor another opportunity and hired him as an Operational Risk Analyst III. Mr. Taylor was a member of the Remediation Management Office ("RMO") and was supervised by Jill Oliver. The RMO was an organization within Fannie Mae's Operations and Technology Division and it was generally tasked with monitoring the remediation of activities in the risk and controls space. *See* Ex. 2, Tr. 88:10-89:11 (Taylor). More specifically, the RMO was responsible for providing reports up through their reporting chain with accurate and understandable analysis regarding Fannie Mae's efforts within Operations and Technology to correct errors in controls. *See* Ex. 2, Tr: 91:13-92:4 (Taylor).

3. Shortly after Plaintiff was re-hired by Fannie Mae, Ms. Oliver's supervisor, Ray Vazquez left the company. He was replaced in August 2010 by David Magidson, a Vice President from the Technology division who "did not have training in the Risk and Controls function." *See* Ex. 2, Tr: 777:20-778:6 (Magidson).

4. During the time that Plaintiff was rehired by Fannie Mae, the organization was implementing a process called the software development life-cycle ("SDLC"). The SDLC project was spearheaded by Executive Vice-President Edward Watson and Senior Vice President Joseph Guinta.[1] The purpose of the SDLC was to completely reorient the culture of Fannie Mae with regard to the development of technology for business purposes with the end goal of ensuring that the business would have "buy-in" and accountability in the early stages of software

---

[1] Fannie Mae technically had an SDLC in place prior to the hire of Mr. Watson, however it was "gathering dust on a shelf" and significantly below industry standards. Tr. 38:8-22 (Watson).

development. *See* Ex. 2, Tr. 65:5-70:5 (Watson). This early input from the business (i.e., other divisions of the Company such as Single Family, Multi-family, Legal, etc.) in creating and developing software would be critical in reducing costs and operational incidents because it is orders of magnitude more expensive to change an application or the design of an application after it has already been implemented. *See* Ex. 2, Tr. 307:3-308:21 (Guinta).

     5.     In order to implement the SDLC, Fannie Mae created a Project Quality Office ("PQO") which would set up "toll gates" that would require the business to provide information about the quality of work that had been done, testing that had been completed, business involvement and other facts about the process of software development. *See* Ex. 2, Tr. 305:12-306:10 (Guinta). In the early stages of this process, Fannie Mae did not have robust internal controls so it was necessary to overcompensate by testing every project every step of the way in a manner analogous to pulling over every car in the freeway to inspect it. *See* Ex. 2, Tr: 48:13-49:18 (Watson). As such, the SDLC was initially viewed within Fannie Mae as just "another layer of bureaucracy" and the business "resisted the regimentation that [it] was" trying to put into place. *See* Ex. 2, Tr. 307:3-308:3 (Guinta).

     6.     In light of the intense resistance within Fannie Mae to the arduous processes mandated by the SDLC, senior executives within Operations and Technology began a campaign to "sell" the program within Fannie Mae so that internal members of the business could understand the benefits that could potentially be traced to the SDLC and the PQO. As part of that campaign, on September 24, 2010, Communication Director Lynn Rykowski created a draft e-mail message to Mr. Guinta and Fannie Mae's Chief Information Officer, Pascal Boillat which was to be eventually sent out to officers within Fannie Mae. Mr. Boillat responded to the e-mail by stating that "we need [Fannie Mae officers] support to ensure continued success in reducing

operational incidents." He also stated that they needed a "bit of marketing" to show that the SDLC is working and important. *See* E-mail chain dated September 24, 2010 attached as Ex. 3.

7. Mr. Guinta responded to Mr. Boillat with the suggestion that the team add an explanation that things had improved but there is still a long road ahead with regard to the SDLC. Mr. Magidson responded by adding Ms. Oliver to the e-mail and stating that he and his team would "work to include data showing how SDLC 2.0 and PMAP efforts have reduced operational incidents…" *See* Ex. 3.

8. Ms. Oliver responded to Mr. Magidson on September 24, 2010 by stating, "David, we would have to look at the data to determine if this conclusion can be supported." *See* Ex. 3.

9. Based on this e-mail, Mr. Magidson understood that Ms. Oliver and her team would look into the data and evaluate if operational incidents had dropped with the implementation of SDLC 2.0 and PMAP. *See* Ex. 2, Tr. 792:2-793:17 (Magidson).

10. Ms. Oliver also forwarded the string of e-mails to her team on September 24, 2010 with the statement that "FYI, we would have to look at the data to determine improvement but based on what we've seen, I'm not sure this conclusion can be supported. ***Please advise***." *See* E-mail chain dated September 24, 2010 attached as Ex. 4 (emphasis added).

11. Despite Ms. Oliver's request that the team, including the Plaintiff, look at the data regarding trending of operational incidents and advise her as to the results, the Plaintiff did not interpret the e-mail as asking him to look at the data in question. *See* Ex. 2, Tr. 194:1-9 (Taylor).

12. In August 2010, the RMO had developed an Executive Summary which was presented at a risk forum to senior management with the Operations and Technology Division as well as Technology Risk Leads. *See* Ex. 2, Tr. 634:13-635:5 (Oliver).

13.     This meeting took place approximately 30 days after Mr. Magidson had been moved from the Technology space to his new Risk and Controls position, a job which oversees all the activities in Operations and Technology which constitutes around 2,000 people. It was the first risk forum which Mr. Magidson had ever attended and the Executive Summary presented by the RMO was the first Executive Summary which he had ever reviewed. *See* Ex. 2, Tr. 6354:18-636:10 (Oliver); 782:5-783:20 (Magidson).

14.     The first page of the Executive Summary stated that the RMO had reviewed operational incidents logged by **both** Operations and Technology from 2008 through 2010. In the upper right hand corner of the report was a heading that stated "Operations and Technology." On page 3 of the report the RMO presented an analysis of the trending of operational incidents from January through August of 2009 as well as the number of operational incidents during that same time period in 2009 and 2010. On the top of the page was a heading that stated "RMO Historical Trending of Operational Incidents." Below that heading was the following statement in bold: "Operational Incident Review, January 2008 through August 2010." Nothing in either of those two headings stated or in any way indicated that the RMO's review was limited to Fannie's Mae's Operations department and did not include a review of technological operational incidents. *See* Ex. 2, Tr. 210:6-212:2 (Taylor), and RMO Executive Summary attached as Ex. 5.

15.     As noted above, Mr. Magidson had instructed Ms. Oliver that he would be looking for her team to analyze data to determine if there had been a reduction in operational incidents to help the internal efforts to market the SDLC. Three days after giving that instruction, he contacted the Plaintiff, a member of Ms. Oliver's team, to request information regarding the trending of operational incidents. The Plaintiff cut and pasted a chart which provided the number of operational incidents from the August Executive Summary from January

through August for 2008, 2009 and 2010. Crucially, *nothing* in the Plaintiff's response to Mr. Magidson directly informed Mr. Magidson that the information the Plaintiff was providing was limited to Fannie Mae's Operations space and did not include any analysis of technological operational incidents. *See* Ex. 2, Tr. 783:15-785:21 (Magidson).

16. Despite the fact that three days before Mr. Magidson's request to Plaintiff Ms. Oliver had specifically informed her team, including Plaintiff, that Mr. Magidson was looking for analysis regarding the trending of operational incidents relating to the SDLC efforts, Mr. Taylor did not connect "in any way" Mr. Magidson's request to Ms. Oliver's e-mail. *See* Ex. 2, Tr. 195:16-20 (Taylor).

17. Mr. Magidson responded to Plaintiff's e-mail with a response that was copied to Ms. Oliver and which stated, "Thanks, Keith. Can you give me a count of technology and nontechnology issues for the 'same time last year' 122 and the 68 OITs this year." *See* E-mail chain dated September 24, 2010 attached as Ex. 6.

18. The Plaintiff did not ask Mr. Magidson what he meant in asking for a breakdown of technology versus nontechnology operational incidents. He also did not ask Ms. Oliver what she understood Mr. Magidson to be asking for in this request. Instead, he simply responded by providing a breakdown of manual versus systems operational incidents which was also pulled from the August Executive Summary. *See* Ex. 2, Tr. 213:22-217:9 (Taylor).

19. Mr. Taylor responded with a breakdown of manual versus system because he "was not focused on technology versus nontechnology" – despite the fact that Mr. Magidson had directly and specifically requested that this distinction be the focus of Plaintiff's response. *See* Ex. 2, Tr. 220:6-221:1 (Taylor).

20.     In light of the requests he had made to Mr. Oliver and Plaintiff, Mr. Magidson testified during the arbitration that understood that he had been provided with a full set of data for the entire company. *See* Ex. 2, Tr. 791:20-793:17 (Magidson)

21.     Ms. Oliver had discussions with Mr. Magidson in which she questioned whether there was a correlation between the reduction in operational incidents and the SDLC.  In order to address this concern, Mr. Magidson followed up with a fellow Fannie Mae officer to determine if change volumes had dropped from 2009 to 2010, which would be an alternative explanation for the drop in operational incidents.  The officer confirmed that change volumes had not dropped which indicated that there was at least a correlation between the SDLC and the number of operational incidents.  *See* Ex. 2, Tr. 750:14-751:14 (Magidson).

22.     As such, Mr. Magidson used the information provided by the RMO to calculate that technology-related operational incidents had dropped 60% from 2009 to the same time period in 2010.  He then added that statistic, to a draft of the e-mail being developed by Ms. Rykowski, Mr. Guinta and Mr. Boillat to go out internally within Fannie Mae.  *See* Id.

23.     On October 1, 2010, Mr. Guinta reviewed the draft e-mail edited by Mr. Magidson and sent a response to a large group working on the matter including Mr. Magidson and Ms. Oliver.  Mr. Guinta suggested removing a statistic which applied only to the Operations and Technology because he wanted to be certain that the recipients of the e-mail throughout Fannie Mae would not simply view the issue as only relating to O&T.  He also specifically stated that the "relevant statement is that Technology-related operational incidents are down 60 percent."  *See* Ex. 2, Tr. 326:1-327:2 (Guinta), Ex. 5.

24.     Mr. Guinta then asked the entire distribution list, including Ms. Oliver, if there was any disagreement with his suggestion to keep the 60% statistic in the company-wide

communication. Ms. Oliver did not respond with an e-mail calling into question the accuracy of the statistic or alerting anyone on the e-mail chain that she had a concern about the operational risk trending information. *See* Ex. 2, Tr. 327:4-17 (Guinta); Tr. 621:7-17 (Oliver).

25.     Mr. Magidson then responded to Mr. Guinta's e-mail by agreeing with the proposed suggestion to keep the 60% number. Again, Ms. Oliver did not respond with an e-mail to Mr. Magidson, Mr. Guinta or anyone else disputing the use of that number. *See* Ex. 5.

26.     In early October 2010 Mr. Guinta and Mr. Boillat developed a presentation regarding the status of the SDLC to be presented to Fannie Mae's Senior Management Group ("SMG"). On page 7 of a 12 page PowerPoint presentation was a reference to the 60% reduction in operational incidents noted above. *See* SMG presentation attached as Ex. 7. (*see* Slide 7). On October 11, 2010 Mr. Magidson sent the presentation to Ms. Oliver and her team, including the Plaintiff. *See* E-mail chain dated October 11, 2010 attached as Ex. 8.

27.     The Plaintiff responded to Mr. Magidson by correcting a different statistic within the presentation, stating "We cannot tie out to the 300 number in the attached deck, we were able to validate 169 reported incidents in that time frame with the total net loss of over $3 million." *See* Ex. 7; Ex. 2, Tr. 182:1-183:5 (Taylor).

28.     The Plaintiff did not, however, dispute or question in any way the 60% statistic contained in that same presentation. *See* Ex. 2, 185:16-186:22 (Taylor). Similarly, Ms. Oliver did not question the use of the 60% statistic for the SMG presentation. *See* Ex. 2, Tr. 798:11-17 (Magidson).

29.     On October 20, 2010, Mr. Magidson and Ms. Oliver had a conversation where she asked Mr. Magidson where he had obtained the 60% number. Mr. Magidson responded by forwarding her the September 27, 2010 e-mail from Mr. Taylor. Ms. Oliver did not question the

number, instead she responded by stating, "Thanks. I did have this info. This is general information about ops incident volumes. You must have derived the 60 percent number from the information. I understand. Jill." *See* E-mail chain dated October 20, 2010 attached as Ex. 9., *See* Ex. 2, Tr. 754:12-755:17 (Magidson).

30. The day after receiving confirmation from Ms. Oliver that she understood the basis for the 60% reduction in operational incidents, Mr. Magidson participated in a regular meeting with representatives of FHFA, Fannie Mae's regulator. The meeting was also attended by Ms. Oliver and members of the RMO. During this meeting, Fannie Mae referenced the 60% statistic as one part of a general update to FHFA about the progress of the SDLC project. *See* Ex. 2, Tr. 802:8-804:8 (Magidson). The goal of the update to FHFA was to convey that Fannie Mae was communicating with employees and management about the SDLC and seeing positive results. *See* Ex. 2, Tr. 803:2-11 (Magidson).

31. On October 20, 2010, Mr. Magidson, Ms. Oliver and Mr. Guinta participated in a risk forum in which the team discussed potentially reclassifying some operational incidents. In light of these reclassifications, Mr. Guinta asked Ms. Oliver to "reconcile the OI's related to tech to the 60 percent reduction of tech related issues we spoke about with the SMG…" *See* E-mail chain dated October 20, 2010 attached as Ex. 10.

32. On November 3, 2010, Ms. Oliver provided the requested report to Mr. Magidson and Mr. Guinta. The report included a statement that technological-related operational incidents had dropped 35% from January through September 2009 when compared to the same time period in 2010. *See* E-mail chain dated November 3, 2010 attached as Ex. 11. Upon receiving the report, Mr. Magidson responded by stating, "Jill, I am having trouble mapping these numbers

back to Keith's prior analysis (see attached). Anastasia, please schedule time to for (sic) Jill and Keith to take me through their analysis, David." *See* Ex. 10.

33. In response to Mr. Magidson's e-mail, Ms. Oliver stated that "[t]he numbers you are referencing only represent a subset of operational incidents. The numbers were used for our analysis in the August report that only focused on operational incidents reported by Operations." This message, sent on November 3, 2010, is the first e-mail sent by Ms. Oliver, Mr. Taylor or anyone else from the RMO informing Mr. Magidson that the 60% statistic only related to a subset of the data. *See* Ex. 10.

34. On November 4, Ms. Oliver and Mr. Taylor met with Mr. Magidson, as requested by Mr. Magidson in his November 3, 2010 e-mail. *See* Ex. 2, Tr. 838:21-841:1 (Magidson).

35. Mr. Magidson recalls the Plaintiff being very quiet during this conversation and he did not remember the Plaintiff saying very much. Instead, most of the conversation was with Ms. Oliver. *See* Ex. 2, Tr. 838:21-841:1 (Magidson).

36. From the Plaintiff's perspective, the main purpose of the meeting was to make sure "that it was understood from my boss [Oliver] and my boss's boss [Magidson] that I was cleared of doing anything wrong." Excerpts of Plaintiff's Deposition are attached as Ex. 12 156:18-157:16.

37. The Plaintiff's testimony regarding this meeting was limited to stating that Mr. Magidson admitted that he had made a mistake in that he had misunderstood the data at issue. *See* Ex. 2, Tr. 118:13-22 (Taylor). The Plaintiff also stated that Magidson "really wanted to get to the bottom of what occurred." *See* Ex. 2, Tr. 116:11-16 (Taylor).

38. Ms. Oliver testified that the Plaintiff did not participate until the tail end of the conversation. *See* Ex. 2, Tr. 513:19-514:11 (Oliver).

39.     During a post-hearing oral argument before the arbitrator on the topic of the Plaintiff's alleged protected activity, Plaintiff's counsel stated "[w]hat he -- what they [Taylor and Oliver] simply said was the numbers [Magidson] gave are incorrect and here is why. That is sufficient under Sarbanes-Oxley to engage in protected activity." *See* Tr. 1151:19-1152:8.

40.     Fannie Mae's SOX Business team was the designated internal organization which had subject matter expertise to determine whether or not an identified risk had SOX implications. The Plaintiff made no effort to notify the SOX Business Team about Magidson's use of the 60% statistic. *See* Ex. 2, Tr. 223:20-224:6 (Taylor); Tr. 876:12-886:6 (Oliver)

41.     Fannie Mae's policy & practice requires operational risk professionals who suspect that they are confronted with an operational incident that has SOX and/or financial reporting implications, to follow the corporate process and log the incident into the operational incident database ACCORD, so that the SOX Team could assess whether the incident has SOX implications. The Plaintiff did not report Magidson's use of the 60% statistic in the ACCORD database. *See* Ex. 2, Tr. 200:13-201:4, 224:7-13 (Taylor); Operational Incident Tracking Policy, attached as Ex. 13.

42.     Plaintiff failed to notify Fannie Mae's Compliance and Ethics department of any privately-held suspicions that Magidson was violating the law. In this regard, the Code of Conduct requires all employees to report any their suspicions about potential violations of law. Plaintiff admitted that he certified his compliance with the Code every year of his employment with Fannie Mae, including 2010 (the year in which Magidson allegedly used the 60% statistic). *See* Ex. 2, Tr. 221:15-222:8 (Taylor).

43.     Ms. Oliver, like Plaintiff, was an operational risk professional at Fannie Mae. *See* Tr. 570:20-22 (Oliver). She was aware that operational risk is an umbrella consisting of many

11

types of risk faced by Fannie Mae, one of which was financial reporting risk, i.e., SOX risk. *See* Ex. 2, Tr. 876:12-879:10 (Oliver). And, she was aware that the SOX Business team had the expertise to evaluate whether an operational risk issue had the potential to also be a SOX risk. *See* Ex. 2, Tr. 881:19-886:6 (Oliver). Yet, Oliver viewed Mr. Magidson's continued use of the 60% statistic to be a "management issue" and that it was not a SOX issue.

> Q. Let me ask it to you this way. When you and Mr. Taylor were discussing this issue in or around October/November 2010, did you consider that Mr. Magidson's use of that 60% figure violated any securities law?
>
> A. No. I just at that point could not understand why he continued to use that figure when he was advised it was inaccurate.
>
> Q. And did you consider it to be a violation of mail fraud or wire fraud, securities fraud or any SEC rule or violation?
>
> *          *          *          *
>
> A. I was going to say, I wouldn't necessarily have familiarity with all of that. And I wasn't a SOX expert either so, quite frankly, I just knew that there was incorrect information being shared.
>
> Q. And isn't that why you passed them along on to the SOX team, so that they can determine whether this concern rises to that level?
>
> A. That's if you suspect that it was a SOX issue. At that point, I suspected it was just a management issue so I needed to run it up the flagpole. Thereafter I saw there was a correlation with the MRA, the SDLC MRA.

*See* Ex. 2, Tr. 887:17-889:7 (Oliver).

44.     Because Oliver believed that Mr. Magidson's behavior was "just a management issue" and she had absolutely no suspicion that it constituted a potential SOX issue, she did not report the matter to Fannie Mae's SOX business team. *See* Ex. 2, Tr. 886:9-14 (Oliver). Indeed, Ms. Oliver didn't even view Mr. Magidson's behavior as an operational incident, which is

broadly defined as a failure or breakdown in people, process, technology, or external event that results in financial, reputational, or other impacts for Fannie Mae. *See* Ex. 2, Tr. 576:5-18; 895:16-896:22 (Oliver). Ms. Oliver testified that she never viewed Mr. Magidson's use of the 60% figure as anything other than a management/integrity issue which bore no relation to SOX. *See* Ex. 2, Tr. 897:1-17 (Oliver).

45. Several months later, in early 2011, Mr. Magidson was instructed by his manager, Mr. Guinta and his second level supervisor, Mr. Watson, that he needed to "shape-shift" his organization. Fannie Mae's organizational structure in early 2011 resembled a diamond in which there were relatively few employees in leadership or managerial roles in the organization and relatively few employees in the lower levels of Fannie Mae but a large "bulge" of mid-level employees. Mr. Watson instructed his team to change the shape of the organization to more closely resemble a pyramid with larger numbers of employees at the lower ranks. *See* Ex. 2, Tr. 77:8-78:13 (Watson).

46. In order to carry out the instructions from his leadership team to change the shape of his organization, Mr. Magidson decided to engage in a reduction-in-force ("RIF") in which he would terminate two of the four Directors that he supervised, as well as four "Level III" positions within the Risk and Controls space which reported to Mr. Magidson. These terminations were a small part of a larger RIF which impacted positions on the other teams that reported to Mr. Magidson and throughout other areas of Fannie Mae. The Plaintiff was included in the RIF. *See* Ex. 2, Tr. 830:19-831:16; 831:17-19. (Magidson).

47. Subsequent to his termination, the Plaintiff filed a claim alleging that Mr. Magidson had violated Fannie Mae's Code of Conduct with the company's independent investigations unit. This was the first time that either the Plaintiff or Ms. Oliver had alleged any

violation of the Code against Mr. Magidson.  *See* Ex. 2, Tr. 858:11-859:6 (Magidson); 1004:2-14 (Arrington).

48.     The Plaintiff subsequent filed a suit in the District Court for the District of Columbia against Fannie Mae.  The claim was remanded by Chief Judge Royce Lamberth to arbitration.  A full evidentiary hearing was conducted over the course of four days in December 2012 before a neutral and impartial arbitrator (Linda Singer) from JAMS Resolution, Inc.  On May 15, 2013, the Arbitrator entered a Final Award finding that Plaintiff failed to establish that he engaged in protected activity under SOX or Dodd-Frank and rejecting his ancillary public policy and Bivens claims.[2]  *See* Final Award attached as Exhibit 14.

**Dated:**  December 30, 2013                  Respectfully submitted,


                                        By /s/ Seth Blonder_____
                                                Damien G. Stewart
                                                Seth J. Blonder

                                                **Counsel for Fannie Mae and David Magidson:**

                                                Damien G. Stewart
                                                Seth J. Blonder
                                                Legal Department/Fannie Mae
                                                3900 Wisconsin Avenue, N.W.
                                                Washington DC  20016-2892

---

[2] The Award also determined that even if the Plaintiff had engaged in protected activity, such activity did not play a contributing factor in his termination.