```
 1                      JAMS ARBITRATION

 2    - - - - - - - - - - - - - -  X

 3    KEITH TAYLOR,                     :

 4         Claimant,                    :

 5              v.                      :   Reference No.

 6    FEDERAL NATIONAL MORTGAGE         :   1410005919

 7    ASSOCIATION (FANNIE MAE), et      :

 8    al,                              :

 9         Respondents.                :

10    - - - - - - - - - - - - - -  X

11                          Washington, D.C.

12                          Monday, December 10, 2012

13              Arbitration before ARBITRATOR LINDA R.

14    SINGER, in the above-entitled matter, the witnesses

15    being duly sworn by MARY GRACE CASTLEBERRY, a Notary

16    Public in and for the District of Columbia, taken at

17    the offices of Alderson Reporting Company, 1155

18    Connecticut Avenue, N.W., Washington, D.C., at

19    9:35 a.m., Monday, December 10, 2012, and the

20    proceedings being taken down by Stenotype by MARY

21    GRACE CASTLEBERRY, RPR, and transcribed under her

22    direction.
```

Page 38

1   developed.
2       Q.   What's an operational incident?
3       A.   That's another -- well, we had one before
4   where we couldn't get the audio to work.  That's an
5   operational incident.  It's anything that happens
6   within your daily operations that potentially could
7   cause a business obstruction.
8       Q.   Now, when you were at Fannie Mae, were you
9   in charge of overseeing a program called the S-L-D-C?
10      A.   It's SDLC.
11      Q.   Forgive me.
12      A.   Software development life cycle, which is
13  an industry term.  Fannie Mae had a formal policy on
14  the SDLC when I was there.  However, the policy was
15  gathering dust on a shelf.  One of Joe Giunta's
16  original mandates was to take the SDLC, him along
17  with my technology manager, and mature it into an
18  industry standard.
19          We actually created an SDLC maturity model
20  that showed us where we stood against the industry.
21  And our SDLC was very immature vis-à-vis what we
22  would consider industry peers.

Page 39

1       Q.   What if ever -- do you recall in 2010
2   whether the RMO reported on the efficacy of the SDLC
3   to the vice presidents, in the executive summary
4   report?
5       A.   Vice presidents of the executive -- I'm
6   not sure I'm familiar with that term, but if I recall
7   correctly, we might have had an MRA on our SDLC
8   process and clearly I never -- in my career, I have
9   never done anything that purely plays to a regulator.
10          I always made sure that there was a
11  business reason for doing something and then, you
12  know, my relationship with the regulator -- and with
13  the regulator, we would determine whether or not that
14  met their requirements.  And if it did, we would have
15  an open dialogue about it.
16          Now, basically with the software
17  development life cycle, it's broken down into four
18  pieces.  You have business requirements.  You want to
19  build a spreadsheet for something, you've got to
20  write out what your business requirements are.  Then
21  they have to go to somebody who actually knows how to
22  use Excel, for example, assuming you don't, in this

Page 40

1   example; and somebody has to write that.
2           Now when it comes back to you, somebody
3   has to test it.  Right?  And you could go to Gartner
4   Group, which is an industry standard group, and it
5   will tell you the later you catch something in that
6   software development life cycle -- that is, writing
7   requirements, writing the code, doing a system test
8   on the code and doing a user acceptance test on a
9   code -- each of those are very discrete steps in an
10  SDLC.  And what we put in place were measurement
11  tools to see how we were doing against each of those
12  steps.  And again, almost any industry group such as
13  Gartner, or Boston Consulting Group, or McKinsey,
14  will tell you that the earlier you catch an issue,
15  the less expensive it is to remediate.
16          We didn't have any of those measurements
17  in place.  So we made sure there was absolute
18  discrete accountability in each of those steps, and
19  we developed over the course of a number of years
20  discrete measurements for each of those steps because
21  we wanted to demonstrate to ourselves that the money
22  we're investing in our remediation effort was in fact

Page 41

1   paying off.
2       Q.   Did the RMO report to you in an executive
3   summary report in August of 2010 on any operational
4   incidents or MRAs having to do with the SDLC?
5       A.   Well, I don't recall exactly but I'll tell
6   you every month I reviewed where we were with every
7   MRA, and I don't recall exact dates.  They all bleed
8   into one, and I don't remember how many MRAs we had
9   open at any point in time, but the MRA and the SDLC
10  was probably one of many MRAs that we had open at any
11  point in time, which is again normal business
12  practice.  You never have zero MRAs outstanding.
13      Q.   Do you recall whether the RMO ever
14  provided data on a trending analysis of operational
15  incident data within the mortgage operations area?
16      A.   Most likely, yes.  I mean, that's one of
17  the things we looked for.  We wanted to make sure we
18  knew what our office incidents were, what the impact
19  was, who was responsible for remediation and that we
20  did it on time and within budget.  But you can't --
21  they're discrete terms that can be used in different
22  contexts.

Arbitration Day 1                                December 10, 2012

Washington, D.C.

Page 46

1  correct.  And if we find a material weakness in our
2  process, we're going to correct it and we're going to
3  disclose it to everybody we need to disclose it to.
4          And if I recall correctly, any incident
5  that we went back to the regulator on, I would say
6  the key indicator of whether or not the regulator was
7  concerned was whether or not they closed that MRA.
8  And if I recall correctly, our MRA on the SDLC
9  process was closed.
10     Q.   It wasn't closed immediately upon the
11  retraction, was it, sir?
12     A.   I don't recall.  I just know that was
13  closed.  So depending on the time, if we went back to
14  them and said -- if it was closed, we went back to
15  them and said we made a mistake with this and we have
16  to redo it and here's the more correct number, if
17  they were concerned, they would have reissued another
18  MRA.
19          Conversely, if it hadn't been closed and
20  we reported the fact that we are redoing a metric and
21  making it more accurate, they would have extended it
22  and said we're not going to close it.  So to me as an

Page 47

1  executive, my indicator around the regulator, did
2  they close the MRA or did they not close the MRA?  If
3  they closed the MRA, did they reopen it, did they
4  reissue it -- didn't give us any other concerns,
5  they're satisfied.
6      Q.   Now, do you recall who produced the
7  revised data to the FHFA?
8      A.   No.  Somebody with Joe and David's team.
9  Not specifically.
10     Q.   I'm going to represent to you that Joe
11  Giunta gave the revised data when Mr. Magidson had
12  given the original data.  Do you know why that is?
13     A.   No, I have no recollection.  I don't run a
14  very hierarchical organization.  When David was
15  reporting to Joe, there was a very good chance I had
16  conversations with David directly.  So I don't
17  recall.
18     Q.   When if ever did you hear any reports that
19  Ms. Oliver was making allegations that Mr. Magidson
20  was retaliating against her or anyone else in the
21  RMO?
22     A.   I vaguely recall having some conversations

Page 48

1  about that.  And issues like that, I engaged my human
2  resources partner and engaged anybody else who needs
3  to be engaged, and if I recall correctly, there was
4  nothing that came of it, nothing that could be
5  substantiated, nothing that I became overly concerned
6  about.
7      Q.   Did you have any personal knowledge of any
8  retaliation or lack of retaliation?
9      A.   No.
10     Q.   When did you hear the complaints of
11  retaliation by Ms. Oliver?
12     A.   I don't recall.
13     Q.   Do you recall any instructions to
14  Mr. Giunta or Mr. Magidson about downsizing the RMO?
15     A.   Absolutely.  I mean, basically if you go
16  back to what I said earlier, we didn't have a robust
17  SDLC process.  So what happens, when you don't have a
18  robust internal controls structure, you
19  overcompensate by putting a lot of resources on top
20  of it.
21          And in the beginning, we looked at every
22  project that was going through the SDLC, you know,

Page 49

1  whether it was a -- I'm making this up to give you
2  sort of a flavor for materiality and direction --
3  whether it was a $100,000 project or it was a $3
4  million project, we were reviewing every project
5  along every step of the gate, from the requirements
6  gate to the development gate to the system test gate
7  to the UAT gate.
8          Now, clearly, if you're reviewing -- as,
9  for example, pulling over every car on the freeway to
10  inspect it, that's going to cost you a lot of time
11  and money and resources but you're doing it because
12  you don't have any controls at the gate.  As you gain
13  more controls, you make them more pointed from the
14  point of view -- you drive accountability down to
15  individual managers, and as you drive accountability
16  down to individual managers, you begin to look at
17  things that went wrong in retrospect and find out who
18  was accountable.
19          So therefore there'll be initial reviewing
20  everything at every gate and -- began to lighten up
21  on that.  So now instead of having 5,000 state
22  troopers pulling over every car, you have 50 state

13 (Pages 46 to 49)

Page 62

1  interrelated in a way, but you're not making
2  decisions one off the other.
3       MR. WOODFIELD:  I have no further
4  questions for this witness.
5       ARBITRATOR SINGER:  Thank you.
6  Mr. Blonder, would that be you?
7       MR. BLONDER:  Yes.  Thank you.
8    EXAMINATION BY COUNSEL FOR RESPONDENTS
9       BY MR. BLONDER:
10      Q.   Good morning, Mr. Watson.  This is Seth
11  Blonder on behalf of Fannie Mae.  Thank you so much
12  for coming in this morning and helping us out.  And
13  please let me know if you're having trouble hearing
14  me.
15      A.   I'm having lots of free coffee.
16      Q.   That's a very clear-colored coffee you
17  have there.  That's pretty weak-looking coffee.
18           Picking up on the line of questioning
19  surrounding calibration, you talked about the
20  calibration process.  And in your opinion, if a
21  manager receives information subsequent to the
22  calibration process that reverses the order of

Page 63

1  employees calibrated against each other, should that
2  information be considered in making RIF decisions
3  down the road?
4       A.   Well, you're always going to use the best
5  information that you have as well as the latest
6  information that you've had.  So I think the short
7  answer to that, the hypothetical, is yes.
8       Q.   So if you have three employees -- I think
9  that was the hypothetical that Mr. Woodfield used on
10  direct, and he talked about the fact that in a RIF,
11  assuming all other things being equal, you would RIF
12  the lowest rated employee.
13      A.   Yes.
14      Q.   But if you had three employees rated 1, 2
15  and 3 in calibration but later received information
16  that indicated to you that ordering was no
17  longer accurate, would it be proper for a manager to
18  use that subsequent information in making the RIF
19  decision?
20      A.   The short answer is yes but not without a
21  fairly rigorous process of making sure -- it depends
22  on what the information is, quite frankly; but yes.

Page 64

1       Q.   You talked about the bonuses I was
2  the term we used at Fannie Mae.  They called it LTI,
3  correct?
4       A.   Yes, Long Term Incentive.
5       Q.   At Fannie Mae, long term incentive
6  payments, they're made based as pay for performance,
7  is that right?
8       A.   That's correct.  It's a performance based
9  culture.  That's correct.
10      Q.   Now, you gave your title while you were at
11  Fannie Mae on direct.  Could you just describe
12  briefly what your responsibilities were in your
13  position at Fannie Mae?
14      A.   Sure.  Briefly, I was responsible to make
15  sure that the infrastructure of the organization was
16  functioning properly.  Everything from the
17  approximately $1.2 trillion in cash and securities
18  that we settled annually to making sure that the
19  coffee machine is working in the company cafeteria.
20           So I was responsible for all the
21  technology, the development of new capabilities
22  around our technology and responsible for items like

Page 65

1  security, information security, continuity of
2  business.  So again, my job -- the easiest way to put
3  it was making sure all trains were running and that
4  they run well and efficiently.
5       Q.   You talked about the fact that Fannie Mae
6  had an SDLC process in place and it was gathering
7  dust.
8       A.   Yes.
9       Q.   Can you tell us what you meant by that?
10      A.   What I meant by that was there was a
11  policy that sat on the shelf and it was a fairly
12  robust policy as far as policies go, but like
13  anything else, what goes on in practice is what
14  matters.
15           And I'll give you an example.  In August
16  of 2009, we had put in place a piece of code.  I had
17  been there at that point for about five months or so.
18  We had put in place a piece of code that did cause us
19  to have an operational incident, and when we reviewed
20  that operational incident -- and at this point, the
21  RMO didn't even exist; as a matter of fact, Joe
22  Giunta wasn't even employed yet and I think David

Arbitration Day 1                                                    December 10, 2012

Washington, D.C.

Page 66

1    Magidson was in a technology role at that point in
2    time.
3            We found out that a piece of code that had
4    a material impact had been put in place without a
5    system test, without a user acceptance test that
6    caused us to bear reputational risk.  And so after
7    that occurred, I was actually on holiday, I put an
8    order in place to freeze all new production changes.
9    No new production changes.  And this is one of a
10   number of incidents that occurred over my first few
11   months there.
12           So I became convinced that the SDLC
13   process at that point was just a policy and was not
14   in fact being practiced.  So I put in place a freeze
15   and over the course of the next six months or so, I
16   hired Mr. Giunta who came in as my head of controls
17   and we built out -- I don't remember the time frame
18   but we built out a more robust SDLC process with this
19   office.  I don't remember -- the SDLC quality office
20   sitting on top of that, to make sure that we were in
21   fact doing what we said we were doing within the
22   policy.

Page 67

1            And as I mentioned earlier, we made it
2    very overbearing in the beginning because we
3    literally had to change the behaviors of the people
4    and drive accountability to each of those four
5    discrete gates of business requirements,
6    developments, system test and user acceptance test.
7            And that's when we began to measure
8    certain things and when you begin to measure
9    something initially, it takes a little while to
10   calibrate that and it was a journey that we took and
11   it ended up becoming very effective.
12       Q.   Was that the Project Quality Office?  Was
13   that the office that you were referring to that
14   evaluated --
15       A.   Yes, PQO, that's right, Project Quality
16   Office.
17       Q.   And you talked about this process being, I
18   think you called it overbearing at least at the
19   outset.
20       A.   Necessarily so.
21       Q.   Can you describe what the impact was of
22   putting these processes in place on the culture at

Page 68

1    Fannie Mae?
2        A.   It was a tremendous culture impact upon
3    the organization.  I mean, as I mentioned earlier, we
4    literally had to change behaviors and to have
5    long-ingrained behavior in an organization, it's like
6    jumping in front of a flood and holding it back.
7    There were some really bad behaviors that came out of
8    that.
9            But it also allowed me -- because I had
10   modeled the behaviors that were expected from folks,
11   and it allowed me to really assess who had the model
12   behavior and who didn't have and nor would they ever
13   get to the model behavior.
14           So we actually took a number of both
15   management actions against that, if you will, but
16   yes, for lack of a better term, it caused a ruckus in
17   the organization.  I had the full support of the
18   regulator, the board and my CEO.
19       Q.   And were there steps that your team took
20   from an information perspective to try to help
21   mitigate against the ruckus that was being caused to
22   assure people within Fannie Mae that this process was

Page 69

1    working?
2        A.   Sure.
3        Q.   And can you describe what those were?
4        A.   We spent a lot of time with something I
5    call stakeholder management, making sure people
6    understand why we're doing something and why it's
7    important.
8            I remember very specifically presenting to
9    what was called the senior management group, which I
10   don't recall the number exactly, 50 to 60 of the SVPs
11   and EVPs that got together periodically, and my CIO
12   and Joe Giunta might have been in the room.  I don't
13   recall.  We walked through some industry statistics
14   of the SDLC process and best practices and where we
15   stood against in those best practices within the
16   industry, and it demonstrated that we were far behind
17   the best practices in the industry.
18           And this is all planned to close the gap,
19   create the remediation -- sorry, the Project Quality
20   Office, which again, at the beginning, was very
21   overbearing.  It was like checking every car before
22   it goes into the tunnel.  Very extensive and

18 (Pages 66 to 69)

Page 70

1    disruptive. But we did that purposefully to gather
2    the information that we needed to model the behaviors
3    that needed to be demonstrated and then to make sure
4    that those behaviors are demonstrated; and we
5    lightened up the process over time.
6        Q.   As the process was being implemented, did
7    you also try to provide information to people within
8    Fannie Mae to show that there was support for the
9    idea that the process was working?
10       A.   Absolutely. And using information from,
11   for example, the Gartner Group where we used, if I
12   recall correctly, we used their SDLC maturity model.
13   There was a series of metrics that we developed out
14   of that.
15       And as I had mentioned earlier, when you
16   first begin to count something, you don't put a lot
17   of reliance on the absolute quantitative measure of
18   that particular metric because you know it's going to
19   evolve over time. But what you're looking for is
20   something that's directionally correct, and if you
21   find an error in it or a way of fine-tuning to make
22   it more accurate, you re-baseline the data at that

Page 71

1    point in time.
2        So, for example, if we found that there is
3    a way to improve a metric and it took it from a --
4    I'm just making this up -- a number of 50 to a number
5    of 30, you would go back and restate everything you
6    did prior to that to make sure that you're not
7    misleading people and saying I went from a 50 to a
8    30, look at the great job I did.
9        You've got to say, listen, we measured at
10   this baseline for a while, we found a way to improve
11   this performance indicator. The way we're doing it
12   now, it's a 30 -- and let's restate history. So
13   you're looking at a releveled baseline.
14       And again, that's normal prudent business
15   practice and that's what Peter Drucker, the
16   management guru of -- financial metrics, would
17   recommend.
18       Q.   Did you provide guidance to people on your
19   team suggesting or informing them of your position
20   that revising data was part of -- metrics was part of
21   the normal business process?
22       A.   Absolutely. The regulator was aware of

Page 72

1    that because the regulator -- again, I took them on a
2    journey with me in a very open, transparent way. The
3    regulator -- it was a criticism of us that we did not
4    have -- the operational transparency as measured by
5    metrics, key productivity indicators, or key risk
6    indicators, KPIs and KRIs.
7        And knowing that as you institute these
8    measurements, as you calibrate over time, the
9    measurements become finer, if you will.
10       Now, I could tell you from, again, 30
11   years of experience, you never have an exact
12   quantitative measurement of any process. What you
13   have is something that models what that process is,
14   and you're looking at, again, baselining and
15   trending. Like, for example, I can't tell you right
16   now what the cost per hour is in that room, but if I
17   were to measure it, I wouldn't say, you know, if it's
18   a thousand bucks an hour, I wouldn't say it should be
19   500. I would say to get more efficient, next month
20   let's try to make it 998.
21       So it's that process of continuous process
22   improvement that you use these metrics to drive more

Page 73

1    efficiency and greater control without relying on
2    what the absolute number says, but the trends of the
3    numbers.
4        Q.   Did you judge managers in the organization
5    on their ability to self identify issues with metrics
6    that they put forth?
7        A.   Absolutely. And there were a number of
8    areas where you would find issues to remediate.
9    That's one of the reasons we created the Remediation
10   Management Office. Issues are raised by, number one,
11   your managers themselves through a risk control
12   self-assessment process, an RCSA. So a manager or a
13   supervisor would self-assess their own process, say I
14   have a weakness in my structure here, and I'm going
15   to remediate that by this date using these resources
16   and using RMO to track that.
17       That's one source of remediation. The
18   second source of remediation would be your internal
19   audit group, and basically my management philosophy
20   is that if I as a manager self-identify the issue
21   that is also raised by internal audit as an issue,
22   that's a gold star. That's making you self-aware,

| Page 74 | Page 76 |
|---|---|

**Page 74**

1  you found the issue, you have a plan to remediate it.

2       Where internal audit comes in, raises an

3  issue the manager is not aware of, that's a

4  performance issue.  The risk control self-assessment

5  process was not robust enough.

6       Additionally, we tracked all MRAs on

7  issues that were ranked by the regulator and, through

8  the RMO, we drove accountability, we drove timelines

9  and we drove the results of remediating the issues.

10  So yes, absolutely my managers were rating based upon

11  how well they self-identified, how well they

12  remediated on time and on plan and having a no

13  surprises culture.

14      Q.   Now, you talked on direct about a

15  statistic that was clarified to FHFA.  If FHFA had a

16  high concern about that statistic, were there steps

17  that they could take to show their concern?

18      A.   Sure.  And those steps could have been a

19  conversation with me which I don't recall having.

20  That would have been the lightest piece, to either

21  extending that MRA or reopening that MRA.  And just

22  for background, all MRAs were reported to the board

**Page 76**

1      A.   Well, the initial MRA, again, there is

2  normally a discussion that occurs before an MRA is

3  handed over and the MRA is normally discussed with

4  the most senior management responsible or maybe a

5  level below.

6       Secondly, it is normally discussed with

7  our head of compliance or one of their senior

8  officers, and if it's an MRA that the regulator deems

9  serious, they have a discussion with the CEO as well.

10  And we do normally see drafts of MRAs to make sure

11  there were no fatal flaws within the MRA and the

12  regulator gives feedback.  At the end of the day,

13  they're their piece of work.

14      And normally an EVP or an SVP with a copy

15  to the head of compliance would receive the MRA in a

16  formal letter.  And we would take them -- the big

17  "we" -- compliance on point would take all these

18  MRAs, they would summarize them into what the issues

19  are.

20      And there was a metrics package that was

21  given to the board of directors at every board

22  meeting, if I remember correctly.  We had probably

| Page 75 | Page 77 |
|---|---|

**Page 75**

1  at every board meeting, the status of them.  Any ones

2  that are new, any ones that are open, any ones that

3  are accepted.

4       They could have had a conversation with my

5  CEO or they could have reported it directly to our

6  board of directors in closed door sessions like they

7  did at every board meeting.  So there were a number

8  of ways that the regulator could have come back to us

9  as an organization or to our board and said we're not

10  happy about this, and that did not occur.

11      Q.   Could they have also opened up a separate

12  MRA on this particular issue?

13      A.   Absolutely.

14      Q.   And to your knowledge, did FHFA take any

15  of those steps with regard to the --

16      A.   To my knowledge, they did not.

17      Q.   Now, talking about MRAs, are MRAs reported

18  in any financial disclosures that Fannie Mae

19  releases?

20      A.   No, they are not.

21      Q.   Who learns about MRAs and the status of

22  MRAs?

**Page 77**

1  about seven board meetings per year.  So within --

2  the internal audit committee always got a copy of

3  what the open MRAs are, who was responsible, when are

4  they going to get it remediated and always reported

5  to the board any MRA that had to be reopened or any

6  MRA that had been extended for whatever reason.  So

7  complete transparency.

8      Q.   And you talked about the, sort of, shape

9  of your organization.  When you came aboard at Fannie

10  Mae, did you take specific steps to transform the

11  shape of the parts of Fannie Mae that you had

12  influence over?

13      A.   Yes.  That was a very specific tactic that

14  we took.  If you look at the shape of Fannie Mae when

15  I had arrived, it was shaped like a diamond, if my

16  geometry is right.  It was shaped with a big bulge in

17  the middle, where a normal distribution, an

18  organization looks like a diamond.

19      And the reason Fannie Mae looked like a

20  diamond as opposed to a pyramid, excuse me, was that

21  we generally had very long tenured employees and that

22  there was very low turnover within the organization.

Page 78

1   And like most organizations, we didn't manage
2   attrition.  And we put in place a series of metrics
3   that measured spans and layers and the overall shape
4   of the organization to redistribute jobs that were
5   being held by more senior people but could be done by
6   more junior people.
7       Q.   So did you give instructions to your staff
8   to try to transform their organization from more of a
9   pyramid shape to more of a triangle -- I mean, sorry,
10  from a diamond to a triangle?
11      A.   Yes.  We absolutely gave -- it's always a
12  longer term process to transform an organization from
13  a diamond shape to a pyramid shape, just like it's a
14  longer term process to increase your spans and
15  decrease your layers.  But it was something we
16  measured on a monthly basis.  And there are many
17  different ways of achieving that.
18      Q.   Can you describe what those ways are?
19      A.   Sure.  There are really three ways.  One
20  is through -- involuntary -- attrition.  For example,
21  if someone in the bulge of that diamond shaped
22  organization left, we replaced them at the more

Page 79

1   junior level.  Right?  That's one way of doing it.
2   So using your own attrition to your advantage, your
3   own voluntary attrition.
4           The second way is involuntary attrition,
5   is restructuring, to eliminate some of the --
6   increase the spans, decrease the layers.  We did a
7   number of restructurings at the time that I was
8   there.  Additionally, you would look at your weak
9   performers and you would manage out your weak
10  performers, you know, in doing that.
11      Q.   And would a reduction in force, would that
12  be an example of the second category that you
13  mentioned?
14      A.   Absolutely, yes.
15          MR. BLONDER:  Thank you.  I have no
16  further questions.
17          ARBITRATOR SINGER:  Thank you.  Do you
18  have anything else, Mr. Woodfield?
19          MR. WOODFIELD:  A couple of very brief
20  questions.
21          EXAMINATION BY COUNSEL FOR CLAIMANT
22          BY MR. WOODFIELD:

Page 80

1       Q.   On just a slightly different note, in
2   terms of standard business practices, you talked
3   about how it was standard business practice to
4   continually correct data, both data internally and ex
5   -- who you're reporting out to.  If you found that --
6       A.   The matter I was talking about would never
7   be externally reported.
8       Q.   But I'm just saying if the data -- if it's
9   constantly -- like, for example, if you found out
10  that your earnings were wrong, you would restate
11  externally, correct?
12      A.   Absolutely.  Well, it depends on
13  materiality.  I'm not an accountant but yes.
14      Q.   And so if you found that a manager inside
15  was producing fraudulent numbers, and that's not the
16  case here, but if someone was producing fraudulent
17  numbers, it would be standard operating practice to
18  correct the earnings or the documents retrospectively
19  and then report those to whom it had relevance to,
20  correct?
21      A.   Well, two things.  I would say three
22  things.

Page 81

1           One, everything we're talking about with
2   respect to software development life cycle and
3   metrics on top of that had little impact to earnings,
4   unless something goes into production that causes an
5   error that could impact earnings.  However, clearly
6   there are controls against that, but in theory, it
7   could happen.  The key risk indicators and the key
8   productivity indicators --
9           MR. BLONDER:  You just went out.
10          BY MR. WOODFIELD:
11      Q.   Can you repeat your answer?
12      A.   Okay.  How far back?
13          MR. BLONDER:  The last thing you talked
14  about was the fact that we had controls in place to
15  prevent this impact on earnings.
16          THE WITNESS:  Correct.
17          BY MR. WOODFIELD:
18      Q.   My question is a little different.  If you
19  found out that a manager had been reporting
20  fraudulent numbers, and I'm not saying that's the
21  case here, but if you had a manager reporting
22  fraudulent numbers, as a standard operating practice,

21 (Pages 78 to 81)

Arbitration Day 1                                                    December 10, 2012

Washington, D.C.

Page 86

1  Holdings, and in the mortgage industry, a few years
2  back, it switched over from paper and people going to
3  county courthouses.  Now that process is electronic
4  so it saves time, money.
5       A lot of the documents in the various
6  mortgage companies' names as you know use this
7  service so it helps assignments, it helps transfers
8  from one lender to another and helps streamline the
9  process.
10      Q.   And how much are you earning with MERS now
11  per year, roughly?
12      A.   About 120,000 per year.
13      Q.   And by whom were you last employed before
14  MERS?
15      A.   Fannie Mae.
16      Q.   When did you start working with Fannie
17  Mae?
18      A.   The first time, October of 2006.
19      Q.   And how many times have you worked for
20  Fannie Mae?
21      A.   Twice.
22      Q.   And what was your job the first time?

Page 87

1      A.   I was a senior business manager.  I
2  believe that was my title.
3      Q.   And how did your first employment end?
4      A.   I was laid off.  Our department that I
5  worked in at the time laid off most of the
6  department.
7      Q.   And when was that roughly?
8      A.   July 8th in 2009.
9      Q.   And what did you do after you were laid
10  off?
11      A.   Looked for a job.
12      Q.   For how long?
13      A.   I was out of work about nine months.
14      Q.   And where did you eventually find a job?
15      A.   Fannie Mae.
16      Q.   And I'm going to show you what I've got
17  marked in your notebook as Plaintiff's Exhibit 22
18  which is combined Exhibit 100.  Can you tell me what
19  Exhibit 100 is?
20      A.   My resume.
21      Q.   And was this the resume that you submitted
22  to Fannie Mae the second time around?

Page 88

1      A.   As far as I know, yes.
2      Q.   And obviously, since we're going under the
3  caveat that everything is presumptively in, I won't
4  be offering them from now on.
5           ARBITRATOR SINGER:  Okay.
6           BY MR. WOODFIELD:
7      Q.   When did your second employment with
8  Fannie Mae end?
9      A.   April 21st, 2011.
10      Q.   What was your job title during your second
11  period of employment with Fannie Mae?
12      A.   Operational risk analyst III.
13      Q.   And what is an operational risk analyst
14  III?
15      A.   I was working in the RMO.  Is that what
16  you're asking?
17      Q.   Yes.
18      A.   In the RMO, we were tasked with working on
19  monitoring the remediation of activities in the risk
20  and controls space.
21      Q.   Let me ask you -- let me go back a little
22  bit.  Where did you physically work for Fannie Mae in

Page 89

1  2010 and 2011?
2      A.   The building was 4000 Wisconsin Avenue,
3  Northwest, Washington, D.C.
4      Q.   And during the tenure -- and I'll just
5  call it from 2010 to 2011.  In that tenure, who was
6  your supervisor?
7      A.   Jill Oliver.
8      Q.   Was that the entire time?
9      A.   Yes.
10      Q.   And do you know what her job title was?
11      A.   Director of the RMO.
12      Q.   And during that time you were working
13  there, do you know who -- the RMO was comprised of
14  how many people, besides you and Ms. Oliver?
15      A.   Yes.
16      Q.   Who else?
17      A.   From the beginning, there were several
18  contractors.  Then we hired on additional staff,
19  myself, full-time staff of Jennifer Ray, Chris Baer,
20  Corey Verron.  Toward the end, Jorge Hidalgo, Genise
21  Patterson.
22      Q.   So if we can draw an organizational chart

23 (Pages 86 to 89)

Page 90

1   just sort of speaking, there is Ms. Oliver at the
2   top, and then who is number two?
3       A.   I think it was equal at that point.
4       Q.   When you say at that point, throughout the
5   whole tenure was it equal?
6       A.   Yes.  Jorge Hidalgo had a manager title so
7   by virtue of his title, he had manager but he was not
8   manager of the RMO.
9       Q.   And so there was Jorge Hidalgo and his
10  title was manager of what?
11      A.   He just came over with manager.  He came
12  from a different department and kept his title.
13      Q.   And then who were the operational risk
14  analyst IIIs besides you?
15      A.   Jennifer Ray and Chris Baer.
16      Q.   And so how many other employees were there
17  besides Ms. Hidalgo, Ms. Ray, Mr. Baer and you?
18      A.   At the time I left Fannie Mae, two others.
19      Q.   And who were they?
20      A.   Corey Verron and Genise, G-e-n-i-s-e,
21  Patterson.
22      Q.   And what did Mr. Verron do?

Page 91

1       A.   He was a campus hire, junior level
2   employee and worked on various data, normalizing
3   data, a lot of spreadsheets and things of that
4   nature.  He was maybe a year or so out of college at
5   the time.
6       Q.   And you said, was it Genise Patterson?
7       A.   Uh-huh.
8       Q.   What did Ms. Patterson do?
9       A.   She was just learning at the time I left
10  Fannie Mae.  I don't know how long she was there.  I
11  would say no more than one, maybe two months, if that
12  long.
13      Q.   Now, during the tenure that you were
14  working for the RMO, was its job purpose, was it -- I
15  don't have sort of the management consultant-speak,
16  but what was its reason for existence?
17      A.   Within the risk and controls space that Ed
18  Watson oversaw, our role was to monitor the
19  remediation progress in correcting various errors in
20  the performance of the controls and the activities
21  around clearing those controls.
22      Q.   In the most lay terms possible, what does

Page 92

1   that mean?
2       A.   We were responsible for making sure
3   everything was operating properly and reporting what
4   we saw.
5       Q.   And just sort of reiterating things, do
6   you know who Jill Oliver reported to at Fannie Mae
7   during the time period that you were employed?
8       A.   When I was hired, it was Ray Vasquez who
9   left sometime summer of 2010, and eventually toward
10  the end of that summer, Mr. Magidson came into that
11  role.
12      Q.   And who did Magidson report to at Fannie
13  Mae during this time period?
14      A.   Joe Giunta, senior vice president, I think
15  was his title.
16      Q.   And then he reported to Mr. Watson?
17      A.   Yes.
18      Q.   And then I'm going to ask you to take a
19  look at Plaintiff's Exhibit 20 which is a Joint
20  Exhibit Number 76.
21      A.   Okay.
22      Q.   And I'll let everyone get there.  Can you

Page 93

1   tell me what Joint Exhibit Number 76 is?
2       A.   The job summary for the operational risk
3   analyst III role.
4       Q.   That was your job in 2010-2010?
5       A.   Yes.
6       Q.   Does it accurately and fairly set forth
7   your job duties and responsibilities?
8       A.   Yes.
9       Q.   Does it say anywhere on your job duties
10  and responsibilities any responsibility you had for
11  monitoring Magidson's reporting to either FHFA or to
12  the board of vice presidents at Fannie Mae?
13          MR. BLONDER:  Objection, leading.
14          ARBITRATOR SINGER:  Sustained.  Rephrase,
15  please.
16          BY MR. WOODFIELD:
17      Q.   Was it one of your job duties and
18  responsibilities to monitoring anything that
19  Mr. Magidson said to anybody?
20      A.   No.
21      Q.   Were you responsible for at any time
22  verifying the accuracy or the propriety of the

Page 114

1   Mr. Giunta.

2       Q.   What if anything did she tell you about

3   her own concerns?

4       A.   She agreed.  She had concerns that there

5   was no data that supports the 60 percent reduction in

6   technology-based incidents.

7       Q.   When if ever did she tell you she had

8   discussed the matter with Magidson already?

9       A.   I found out later that she had discussed

10  it during one-on-ones with Mr. Magidson.

11      Q.   Let me ask you to take a look at

12  Plaintiff's Exhibit Number 7 which is combined

13  Exhibit Number 2.  Are you looking at it?

14      A.   Yes.

15          MR. BLONDER:  I'll just object that the

16  witness isn't on this e-mail.

17          MR. WOODFIELD:  Let me cure that for you.

18          BY MR. WOODFIELD:

19      Q.   At the time, did Ms. Oliver show you this

20  e-mail?

21      A.   I saw it, yes.

22      Q.   And what were you discussing with

Page 115

1   Ms. Oliver when she showed you this e-mail chain?

2       A.   That we don't know how he got the

3   information at this time.

4       Q.   And what was Ms. Oliver telling you when

5   she showed you this e-mail chain?

6       A.   That he's trying to represent SDLC in a

7   better position.  Trying to create a good news story.

8          MR. BLONDER:  Objection.  That's hearsay

9   and speculation from a third party.

10          MR. WOODFIELD:  I'm not offering it for

11  the truth of the matter asserted.  This goes to his

12  intent in making this protected conduct in his

13  statement or his outlook, because that goes to his

14  good faith here.  So it doesn't matter if it's true

15  or false; thus it's not hearsay.

16          ARBITRATOR SINGER:  Overruled.  Would you

17  like me to read this e-mail chain?

18          MR. WOODFIELD:  No, just very briefly -- I

19  mean, the e-mail chain --

20          BY MR. WOODFIELD:

21      Q.   Let me ask you to briefly summarize.  What

22  was it she showed you this for, to your knowledge?

Page 116

1       A.   Well, from my recollection, we talked

2   about this after he made his initial statements of

3   the 60 percent reduction in technology incidents.

4   She had raised the concerns that the RMO had not

5   validated this information and wasn't sure how you

6   can come to this conclusion or what you use to come

7   to this conclusion.

8          Maybe that's a better way to say it.

9       Q.   And let me also refer you to Exhibit

10  Number 12 which is combined Exhibit Number 1.  When

11  you were talking with Ms. Oliver about your concerns

12  about Mr. Magidson's reporting, were you shown by

13  Ms. Oliver Exhibit Number 1?

14      A.   Yes.  It was part of a longer e-mail

15  string.

16      Q.   Let me ask you -- actually, yes.  We have

17  this one here right now, but did she tell you why she

18  was showing you number 1?

19      A.   She was just expressing that she had

20  raised the concern.  She had already had the same

21  concerns and was raising them up to Joe and to David.

22  Excuse me, Mr. Magidson and Mr. Giunta.

Page 117

1       Q.   And so what if anything did you all do in

2   response at this time, did the RMO do at this time?

3       A.   I know there was some time after where

4   Corey, Chris, Jorge, Jennifer really wanted to --

5   they were involved in doing the research to find out

6   what the true reduction in technology-based incidents

7   was.

8       Q.   And were you involved in any report that

9   was produced by them?

10      A.   Other than to proofread, no.

11      Q.   But you proofread the report and you saw

12  it before it went out?

13      A.   Yes.

14      Q.   Let me get you to flip to Exhibit Number

15  13 which is number 38, combined Exhibit Number 38.

16  What is Exhibit Number 38?

17      A.   It is the report prepared by the RMO on

18  November 2nd of 2010 to analyze the SDLC impact on

19  operational incidents.

20      Q.   And what did you all determine the SDLC

21  impact on operational incidents to be with regard to

22  technology-based incidents?

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                          December 10, 2012

Washington, D.C.

---

Page 118

1     A.   On this report, it's a little less than
2   half.  It's 28 percent reduction of SDLC volumes.
3     Q.   In terms of reporting, in terms of the
4   analysis that the RMO produced, how substantial is a
5   deviation of over 50 percent on a reported success
6   rate?
7     A.   It's major.  It's reporting inaccurate
8   information and not something that's off, you know,
9   1 percent here or 1 percent there.  It's more than
10  half.  That's significant.
11    Q.   Now, when you all produced this report,
12  what did you do next?
13    A.   Ms. Oliver and I met with Mr. Magidson.
14  He wanted to meet in his office to discuss not only
15  the results of this report but the e-mail that I sent
16  really to get to the bottom of what occurred.
17    Q.   And what if anything did Mr. Magidson say
18  to you or to Ms. Oliver in that meeting?
19    A.   He told us face to face that he had made a
20  mistake.
21    Q.   And did he say why he made a mistake?
22    A.   He said he misunderstood the data.

---

Page 119

1     Q.   I'm going to refer you to Exhibit
2   Number 16 which is number 40 in the exhibits.  After
3   Mr. Magidson told you that he had made a mistake and
4   had misunderstood the data, what if anything was the
5   office tasked with doing, the RMO office tasked with
6   doing?
7     A.   We were asked to prepare talking points
8   for him to deliver retracting the statements made to
9   FHFA.
10    Q.   And who told you to draft the retraction
11  talking points?
12    A.   I was told by Jill Oliver.
13    Q.   Now, did Jill Oliver show you what has
14  been marked as Exhibit Number 40 in November of 2010?
15  It's number 16 in your book.
16    A.   No, I had not seen that.
17    Q.   Had you discussed it with her at that
18  time?
19    A.   I discussed it with her, yes, but I hadn't
20  seen this e-mail.
21    Q.   Now I'm going to show you what has been
22  marked as Claimant's Exhibit Number 8 which is

---

Page 120

1   combined Exhibit Number 43.  Did you see this e-mail
2   in or about November of 2010?
3     A.   I knew about this.  I don't recall seeing
4   this specific e-mail.
5     Q.   What was this about?
6     A.   It was about getting access to all the
7   incidents from -- what was the name of the
8   department?  It was the compliance level department
9   where we would get access to all of the operational
10  incidents to really try to see what the true number
11  was.  We weren't able to determine it based on the
12  November 2nd report.
13    Q.   And so in the first e-mail, it says the
14  project will require the mobilization of the entire
15  team.  Was the entire team mobilized to try and find
16  out what the real number was?
17    A.   Yes.
18    Q.   And that included you?
19    A.   Yes.
20    Q.   Did anyone tell you why this was so
21  important such that the entire team would suddenly
22  have to focus its efforts on finding out the real

---

Page 121

1   number?
2     A.   We knew that the 60 percent reduction in
3   technology-based incidents was inaccurate.
4     Q.   I'm going to show you what is marked as
5   Plaintiff's Exhibit Number 14 but it's number 61 in
6   the combined exhibits.  What is number 60, Exhibit
7   Number 60?
8     A.   This is the report produced on November
9   10th --
10         ARBITRATOR SINGER:  60 or 61?
11         MR. WOODFIELD:  Is it 61?  Forgive me, 61.
12         ARBITRATOR SINGER:  Go ahead.  I'm sorry.
13         THE WITNESS:  This is a report produced on
14  November 10 which is the analysis on SDLC impact on
15  operational incidents.
16         BY MR. WOODFIELD:
17    Q.   And so did this determine what the actual
18  number was for the technology-based operational
19  incidents, the reduction, from 2009 to 2010?
20    A.   Yes.  The SDLC, if you go to key
21  take-aways, bullet point number 1 which reads, "The
22  main driver in the reduction of operational incidents

---

Alderson Reporting Company
1-800-FOR-DEPO

Page 154

1      A.   Not that I'm aware of.

2      Q.   Why did you bring this lawsuit?  If it's

3  only 20,000 bucks and you've got a better paying job

4  now, why are we all sitting in this room?

5      A.   At the end of the day, I didn't do

6  anything wrong.  I worked hard in my position, I

7  enjoined doing what we did building a model that

8  others within the firm were trying to replicate it,

9  to really drill down to make Fannie Mae a better

10 organization, get out of conservatorship, whatever

11 the end goal was going to be.

12         If I had never said anything, I might

13 likely still be employed there.  But when you see

14 something wrong and you raise your hand, Mr. Watson

15 talked about model behavior, you're being told within

16 the walls of Fannie Mae that's what they're looking

17 for.  If you see something wrong, you speak about it.

18 And I almost feel like if I had never said anything,

19 I would still have that job.

20         It was unfair, it was wrong.  I felt like

21 my reputation was damaged, I was embarrassed, being

22 walked out in front of your peers and with other

Page 155

1  people.  Second time.  First time, everybody in that

2  department was laid off.  Okay, you're going in a

3  different direction, okay, whatever.  But this time,

4  I went into it working extremely hard to make it

5  work, to prove the faith that they had in me in

6  bringing me back, that I showed value to somebody

7  that they would consider to re-employ and a certain

8  amount of integrity to prove that I am somebody

9  that's part of the solution versus somebody that adds

10 no value.

11         You want to build a career, move up within

12 the company, so you try to work, work hard, do

13 everything you're supposed to do as a steward of the

14 company because it's not just a job where you'll come

15 in at 8:00, leave at 5:00 or whatever the hours were.

16 Sometimes you come in early.  Sometimes you stay

17 late.  Sometimes you take work home.  That's what it

18 means when you're trying to put your best foot

19 forward.  And you're invested in that.

20         So getting let go, being told that you're

21 being let go for budgetary reasons, then they bring

22 in somebody to replace you or shortly after, it felt

Page 156

1  wrong, like you're penalizing me for doing my job.

2  And that's wrong.  I didn't lie.  I didn't

3  misrepresent data.  And the person who did is still

4  there and I don't have the job.  And that's unfair.

5      Q.   Who was brought in to replace you?

6      A.   I believe Yolanda Olivieri moved over from

7  another part of risk and controls into the RMO space.

8      Q.   And was that while Ms. Oliver was still

9  there?

10     A.   Yes.

11         MR. WOODFIELD:  At this time, we don't

12 have further questions.

13         ARBITRATOR SINGER:  Thank you.  Which one

14 of you –

15         MR. BLONDER:  I'll be doing cross.

16         MR. WOODFIELD:  And forgive me, I've got a

17 3 o'clock call with Judge Bennett from Baltimore in

18 the district court.

19         EXAMINATION BY COUNSEL FOR RESPONDENTS

20         BY MR. BLONDER:

21     Q.   Mr. Taylor?

22     A.   Yes, sir.

Page 157

1      Q.   Can you look at Exhibit 105?

2      A.   Okay.

3      Q.   Who filled this out?

4      A.   I don't remember.  I don't think I did.

5      Q.   There is no date on it.  Do you know when

6  it was filled out?

7      A.   No, sir.

8          MR. WOODFIELD:  Do you want me to explain

9  the form, unless you know what it is?

10         MR. BLONDER:  I don't know what it is.  I

11 just don't know what this stuff is talking about.

12         MR. WOODFIELD:  This form was filled out

13 in my office because he had a personal injury claim

14 and they wanted to know whether this was a PI claim

15 and so we to tell them whether there might be a lien

16 or not on the monies.  So he has to say what the

17 cause of the hospitalization is.  But it's produced

18 by the insurer.  This is our firm filling this out.

19         MR. BLONDER:  So it's your firm that's

20 making the claim that the stress is resulting out of

21 the wrongful termination by Fannie Mae?

22         MR. WOODFIELD:  Yes.  This is my firm's

Arbitration Day 1                                    December 10, 2012

Washington, D.C.

---

Page 166

1   work at the University of Pittsburgh?
2      A.   No, sir.
3      Q.   Now, turning back to Exhibit 100.
4      A.   Okay.
5      Q.   I believe on direct that you had called
6   this the resume you used when you applied to your
7   last position at Fannie Mae, but I think in looking
8   at it, it's actually what you used for your current
9   job.  If you look under professional experience, it
10  lists operational risk analyst III on there.
11            ARBITRATOR SINGER:  Where are we?  I'm
12  sorry.
13            MR. BLONDER:  This is Exhibit 100, Taylor
14  55.
15            ARBITRATOR SINGER:  Thank you.
16            BY MR. BLONDER:
17     Q.   And that's just to clarify the record.  So
18  on page 56, again there it lists bachelor of science,
19  accounting and business, University of Pittsburgh,
20  Pennsylvania, correct?
21     A.   Okay.  Yes.
22     Q.   And on page 55, under Professional

---

Page 167

1   Experience --
2      A.   55 or 56?
3      Q.   55.
4      A.   Okay.
5      Q.   -- it states that you worked for Fannie
6   Mae corporation in Washington, D.C.  It states you
7   worked there 2006 through 2011, correct?
8      A.   Yes, sir.
9      Q.   Now, it does not state that you were
10  terminated and not working for a portion of that
11  time, does it?
12     A.   No, sir, it does not.
13     Q.   And it would not lead anyone who reviewed
14  this resume to understand that there was a period of
15  nine months when you were out of work between the
16  time that you were a senior business manager and the
17  time that you were an operational risk analyst,
18  correct?
19     A.   No.  But it also doesn't show --
20     Q.   Just a yes or no question.
21            MR. WOODFIELD:  Hold on.  He's answering.
22  You just stopped him.  He's explaining.

---

Page 168

1            MR. BLONDER:  No, he doesn't have to --
2            MR. WOODFIELD:  Your Honor --
3            MR. BLONDER:  If you want --
4            MR. WOODFIELD:  And please, Your Honor,
5   he's halfway through the answer and the counsel is
6   telling him he's not interested in hearing the
7   answer.
8            ARBITRATOR SINGER:  I'll allow him to
9   explain.  Go ahead.
10           THE WITNESS:  I also didn't have any
11  additional employment there between those two
12  periods, either.
13           MR. BLONDER:  Now might be -- do you want
14  to stop?
15           MR. WOODFIELD:  Yes, if I could, very
16  briefly.  Thanks.
17           (Recess.)
18           BY MR. BLONDER:
19     Q.   Mr. Taylor, you talked about, on direct,
20  about your first stint with Fannie Mae?
21     A.   Uh-huh.
22     Q.   Talk about just generally what your job

---

Page 169

1   responsibilities were at that time.
2      A.   Initially when I was hired, I worked in
3   single family oversight, from 2006.  Sometime around
4   2008, the DRO was formed, Division Risk Office.  That
5   ended up becoming a centralized risk function, took
6   various people from across the company and formed a
7   centralized risk model.
8      Q.   Can you take a look at Exhibit 13?
9      A.   Okay.
10     Q.   This document is your 2007 midyear review,
11  is that right?
12     A.   Yes.
13     Q.   And is that a regular practice at Fannie
14  Mae, that you receive midyear reviews from your
15  manager?
16     A.   Yes.
17     Q.   And do you recall receiving this midyear
18  review?
19     A.   Yes.
20     Q.   Can you look at page FM 70?
21     A.   Okay.
22     Q.   The last sentence on the second paragraph

---

43 (Pages 166 to 169)

Page 170

1  on that page states that "I would like also Keith to
2  focus on communications, both with me and our DRO
3  business partners, in terms of being more inclusive
4  in those we communicate with and to be more out in
5  front of appraising on the status of efforts."
6      A.  Uh-huh.
7      Q.  Did I read that accurately?
8      A.  Yes.
9      Q.  And was that a review that was given to
10  you by your manager at that time?
11     A.  Yes.
12     Q.  And do you recall receiving that part of
13  the review?
14     A.  Yes.
15     Q.  And did you discuss that review with your
16  manager?
17     A.  Yes, probably.  Yes.
18     Q.  And could we then turn to Exhibit 14?
19     A.  Okay.
20     Q.  This is your 2007 year end review,
21  correct?
22     A.  Uh-huh.

Page 171

1      Q.  And again, do you recall that Fannie Mae,
2  as part of their performance process, gives each
3  employee a year end review in addition to the midyear
4  review that we just discussed?
5      A.  Yes.
6      Q.  And is this the year end review that you
7  received in 2007?
8      A.  It appears so, yes.
9      Q.  And you recall receiving a review at the
10  end of 2007 or the beginning of 2008?
11     A.  Yes.
12     Q.  Now, can you look at page FM 73?  At the
13  bottom of the page, there is a dash mark and it says,
14  "Work to improve communications on status of
15  initiatives to management and across the DRO."  Was
16  that statement a suggestion of something for you to
17  improve on from your manager?
18     A.  Yes.
19     Q.  And then below that, there is a quote and
20  it says, "Keith has done a good job in dealing with
21  most of his business partners.  He should continue to
22  work on his communications with business partners,

Page 172

1  over communicating with those who have been the most
2  challenging to deal with in the past."  Do you know
3  who that quote was from?
4      A.  No.
5      Q.  Is this part of an anonymous feedback
6  process that Fannie Mae has in place where you
7  receive feedback from people that you've worked with
8  throughout the year?
9      A.  I don't know about the anonymous part but
10  yes.
11     Q.  So your understanding is that you don't
12  know who specifically it was from but your
13  understanding is that it was a quote from somebody
14  that you had worked with about your work performance?
15     A.  For the most part, yes.
16     Q.  And then on page 74, the first full quote
17  there states, "Keith should work on communicating to
18  management his vision for where initiatives are
19  heading and where they stand."  Did I read that
20  correctly?
21     A.  Yes.
22     Q.  And then the next sentence below is, "He

Page 173

1  can improve his approach to difficult issues by
2  realizing that adversities and differing
3  personalities exist."  Did I read that correctly?
4      A.  Yes.
5      Q.  Do you recall receiving that feedback
6  during your first stint at Fannie Mae?
7      A.  I recall reading this, yes.
8      Q.  And did you discuss that feedback with
9  your manager at that time?
10     A.  Probably, yes.
11     Q.  And then if we could look at Exhibit 16,
12  this is your 2008 midyear review, is that right?
13     A.  Uh-huh.
14     Q.  And if you could look at FM 89.
15     A.  I don't know who Ralph Adams is.
16     Q.  Let me see that.
17     A.  86.
18     Q.  I'm guessing that's an error.  But the
19  heading is 2008 midyear check-in for Keith Taylor,
20  correct?
21     A.  That's what it says, yes.
22     Q.  And if there is something in here that you

Page 174

1    think might not have been directed to you, let me
2    know but I think that was probably a typo.
3        A.   Okay.
4        Q.   If you look at FM 89, there is a column
5    about two-thirds of the way down.  It's listing under
6    Opportunities to Improve/Grow/Change.  Do you see
7    that?
8        A.   Uh-huh.
9        Q.   Could you take a look at the fifth bullet
10   point down on that list?  It says, "Work to improve
11   overall communications and take the initiative to
12   ensure that there is clear accountability and
13   ownership" and then parentheses, "(e.g. on status of
14   initiatives to management and across the DRO... be
15   more proactive... don't wait to be asked where things
16   stand)."
17           Do you recall getting that feedback at
18   that time?
19       A.   Yes, sir.
20       Q.   And the next bullet point states, "Work to
21   improve relationships with teammates... some
22   teammates have expressed that they've found it at

Page 175

1    times difficult to work with Keith... sense he often
2    chooses to do the minimum required in order to check
3    the box."  Did I read that accurately?
4        A.   Yes.
5        Q.   And do you recall receiving that feedback
6    during your 2008 midyear?
7        A.   I recall reading the feedback.
8        Q.   And do you recall having a conversation
9    with that with your manager?
10       A.   My conversation I had was why is something
11   like this in my review.  I felt it was inaccurate.
12       Q.   But you did have a conversation with your
13   manager about it?
14       A.   Uh-huh.
15       Q.   And could we look at Exhibit 17?  Exhibit
16   17 is your 2008 year end review, correct?
17       A.   Okay.  Yes.
18       Q.   And do you recall receiving a 2008 year
19   end review?
20       A.   Yes, sir.
21       Q.   And if we could look at page 94, at the
22   bottom of the page is a listing of overall rating and

Page 176

1    the rating was FM minus, correct?
2        A.   Uh-huh.
3        Q.   And then slash R slash L minus.  Do you
4    recall what FM minus meant?
5        A.   That I did not meet my goals.
6        Q.   You did not meet your goals for the 2008
7    year?
8        A.   Yes.
9        Q.   And then if you turn the next page to FM
10   95, the first full paragraph states, "Overall,
11   Keith's accountability survey results place him in
12   the bottom 25 percent of all level 1 through 5
13   contributors across the company.  Feedback from
14   business colleagues and DRO peers was very
15   inconsistent... some praising his efforts and
16   partnership, and others suggesting the need for focus
17   on the quality of his work and addressing challenges
18   in dealing with communications."  Did I read that
19   accurately?
20       A.   Yes, you did.
21       Q.   Do you recall receiving this feedback
22   after your year end review in 2008?

Page 177

1        A.   That's accurate, after the year end
2    review.
3        Q.   And then the next paragraph states,
4    "Communication, in general, has been one of the most
5    significant deterrents to Keith's overall
6    performance.  There have been communication issues
7    regarding timeliness of his responses to me and to
8    Jordan Talmor, for whom he had reporting
9    responsibility to on specific initiatives.  Relative
10   to other DRO team members, Keith stood out for having
11   requests for information go unanswered past timelines
12   on many occasions.  We have discussed the issue and
13   established that in some circumstances he has reacted
14   negatively to the tone in which requests have been
15   made and has felt micromanaged.  In instances
16   regarding my requests, Keith's explanations have
17   generally been that he interpreted requests
18   differently than they were intended (goals not being
19   in the system, midyear not being approved, not
20   sending weekly hot topic updates when we were
21   reporting to the COO).  In many of these instances,
22   Keith turned out to be the sole or one of only a

Page 178

1  couple of SF DRO teams who did not follow up on
2  requests or respond in a timely manner." Do you
3  recall receiving that feedback?
4      A.  I recall reading this, yes.
5      Q.  And did you have a conversation with your
6  manager about that feedback?
7      A.  Yes.  I had problems with most everything
8  that's in there.  I did not have any reporting
9  responsibility to Jordan Talmor.  At the time he was
10  junior to me in this department.
11      Q.  And do you specifically recall the
12  feedback that generally you interpreted requests
13  differently than they were intended?
14      A.  Apparently, yes.
15      Q.  And then it was after receiving this 2008
16  midyear that your employment was terminated for the
17  first time at Fannie Mae, correct?
18      A.  A few months later.  Maybe four or five
19  months later.
20      Q.  You talk about your job responsibilities
21  for the RMO.  Can you take a look at Exhibit 76?  So,
22  for instance, one thing you referenced I believe on

Page 179

1  direct was that you would put together information on
2  operational incidents that would go to FHFA, correct?
3      A.  No.  Those are MRAs.  They go to FHFA.
4      Q.  Which part of what I said isn't correct?
5      A.  Operational incidents that go to FHFA.
6      Q.  So you put together reports on MRAs?
7      A.  Yes.  Deficiencies found with FHFA are
8  called MRAs.
9      Q.  Could you show me where on the job summary
10  in Exhibit 76 that responsibility is listed?
11      A.  In the first paragraph.  "Assess threats
12  to data integrity and security of networks and the
13  consequences of failures or breaches.  Recommend or
14  represent risk mitigation strategies or practices."
15      Q.  So in other words, sometimes things aren't
16  explicitly spelled out in a job description but it's
17  assumed to be part of the role, correct?  In other
18  words, nothing there specifically identifies MRAs, is
19  that correct?
20      A.  I disagree.  But MRA is a failure or
21  breach of controls and it's identified by the
22  regulator.

Page 180

1      Q.  An MRA is a failure or breach of controls?
2      A.  Yes.  That's why it's called a matter
3  requiring attention.
4      Q.  Was part of your responsibility to supply
5  data to Jill Oliver and people in her organizational
6  chain?
7      A.  Supply data?  For reporting purposes?
8  Yes.
9      Q.  And when you supplied data to Jill Oliver
10  or anyone else at Fannie Mae, would you agree that
11  you had an obligation to be certain that the data was
12  accurate?
13      A.  Yes.
14      Q.  And if you observed people incorrectly
15  utilizing that data that you had provided, did you
16  have an obligation as part of your job to help them
17  to understand the proper use of the data?
18      A.  Help them understand?  I would say no.
19      Q.  And why not?
20      A.  I don't know that that's part of my job
21  description to help you understand the data.
22  Gathering the data that I was responsible for, making

Page 181

1  sure it's accurate, absolutely.
2      Q.  What about the source of the data?  Let me
3  rephrase that.  What about the area in -- which the
4  data encompassed?
5          MR. WOODFIELD:  I'm going to just object
6  in that I don't know what the question means.
7          MR. BLONDER:  Well, you can answer it.
8          ARBITRATOR SINGER:  Instead of saying
9  that, why don't you ask it as a full question and
10  then we'll see if he can answer it.
11          BY MR. BLONDER:
12      Q.  If you provided a set of data to somebody
13  at Fannie Mae, was part of your job responsibilities
14  to be certain that they understood what exactly that
15  data encompassed?
16      A.  I would say no.
17      Q.  And so if you witnessed them using the
18  data incorrectly or referring to the data
19  incorrectly, you did not have a responsibility to
20  help them understand how they were wrong?
21      A.  I don't think that's my responsibility to
22  correct somebody's error in how they're wrong.

46 (Pages 178 to 181)

Page 182

1    Q. Can you get Exhibit 57? If you look at
2  the third e-mail down, there is an e-mail from David
3  Magidson to essentially the RMO team including you.
4  Do you see that e-mail?
5    A. Uh-huh.
6    Q. And the e-mail states, essentially asks
7  that you provide the dollars and number values for
8  slide 2 in the attached presentation in Jill's
9  absence, is that correct?
10   A. Okay.
11   Q. Do you recall receiving this e-mail?
12   A. Yes, I'm on the e-mail.
13   Q. And the next e-mail above is your response
14 to Mr. Magidson, correct?
15   A. Uh-huh.
16   Q. And do you see on the second paragraph, it
17 states, "We cannot tie out to the 300 number in the
18 attached deck, we were able to validate 169 reported
19 incidents in that time frame with the total net loss
20 of over $3 million," correct?
21   A. Okay.
22   Q. Were you performing your job

Page 183

1  responsibilities when you wrote this e-mail?
2    A. Yes.
3    Q. And Mr. Magidson's response to you starts,
4  "Thanks for the updated counts," correct?
5    A. Yes.
6    Q. And if you look at Exhibit 58, just to
7  sort of close the loop, this was the exhibit that was
8  referenced in that e-mail and on page 2, the first
9  bullet references the over 300 technology-attributed
10 operational incidents that was discussed in that
11 e-mail. Is that correct? Is that your understanding
12 as well?
13   A. I'll take your word for it.
14     MR. WOODFIELD: Take a look at it instead
15 of taking his word for it.
16     THE WITNESS: I question the
17 technology-attributed operational incidents.
18     BY MR. BLONDER:
19   Q. What do you mean by you question it?
20   A. This is part of a software development
21 lifestyle presentation, and you're talking about 300
22 technology attributed operational incidents in 2008

Page 184

1  and 2009 which caused some dollar financial loss and
2  significant reputational impact on the company.
3    Q. What are you questioning?
4    A. There was at this point no correlation
5  between SDLC and technology incidents.
6    Q. Can you look at the e-mail in Exhibit 57?
7    A. Yes.
8    Q. The e-mail you sent to Mr. Magidson
9  states, "We cannot tie up the 300 number in the
10 attached deck. We were able to validate 169 recorded
11 indents in that time frame," correct?
12   A. Uh-huh.
13   Q. Is there anywhere there where you're
14 questioning the technology-attributed operational
15 incidents portion of that?
16   A. This is going to go back to the executive
17 summary, going back to that previous month where it
18 was a review of operational incidents, not
19 technology-based incidents.
20   Q. But you're looking at that deck and
21 reporting back to Mr. Magidson in this e-mail, but
22 there is nothing in your e-mail that's telling him

Page 185

1  that that number is wrong. You're saying we were
2  able to validate 169 reported incidents in that time
3  frame. Is that not right? Am I misunderstanding
4  what you're saying to him?
5    A. I can only read what I see here.
6    Q. And do you see anywhere here where you're
7  questioning whether the 169 reported incidents were
8  improperly connected to technology-attributed
9  operational incidents?
10   A. I know at this point we did not work on
11 any incidents that had anything to do with the SDLC.
12   Q. Do you recall reviewing this deck that's
13 in 58?
14   A. I don't remember specifically.
15   Q. Can you look at page 7 of that deck?
16   A. In 58?
17   Q. Yes. It's FM 339.
18   A. I got it.
19   Q. Do you see the bullet at the bottom?
20   A. Uh-huh.
21   Q. It says technology-related operational
22 incidents are down 60 percent in 2010 relative to

47 (Pages 182 to 185)

Arbitration Day 1                                      December 10, 2012

Washington, D.C.

| Page 186 | Page 188 |

**Page 186**

1  2009, is that correct?

2      A.  Uh-huh.

3      Q.  And is that the 60 percent number that you

4  talked about on direct as Mr. Magidson having derived

5  from the information you sent him?

6      A.  Uh-huh.

7      Q.  Is there anything in your e-mail on

8  October 11, 2010 in Exhibit 57 where you question

9  that 60 percent number?

10     A.  I would have to see what the 169 is

11  referring to to be able to answer your question.

12     Q.  Take your time and look at it.

13     A.  So I can't answer that question based on

14  what I've seen.

15     Q.  I don't understand what you're saying.

16     A.  You're asking is there anything in there

17  that says incidents are down 60 percent in that

18  e-mail.

19     Q.  Is there anything in this e-mail where you

20  questioned the 60 percent number that's on page 7 of

21  that deck?

22     A.  No.

**Page 187**

1      Q.  If you turn to Exhibit 54, this is an

2  e-mail from Jill Oliver -- the top of Exhibit 54 is

3  an e-mail from Jill Oliver to the RMO team on

4  September 24th, 2010 at 2:26 p.m., correct?

5      A.  Uh-huh.

6      Q.  Do you need time to read it?

7      A.  I read the first part of it.

8      Q.  Take your time.  I don't want to interrupt

9  you if you're reading it.

10     A.  Not a problem.  It was referencing the

11  framework message, that I was going to the next page

12  to look at the framework message.  I'm ready.

13     Q.  So again, so this e-mail was sent to you

14  by Ms. Oliver on September 24th, 2010?

15     A.  Yes, sir.

16     Q.  And as you testified on direct, Jill

17  Oliver was your boss?

18     A.  Yes.

19     Q.  Do you recall receiving this e-mail?

20     A.  I'll say yes, because my name is on it.

21  Yes.

22     Q.  And was it your practice to completely and

**Page 188**

1  thoroughly review e-mails that you received from your

2  manager?

3      A.  Completely and thoroughly?

4      Q.  Yes.

5      A.  I'll say yes but -- yeah.

6      Q.  Now, if you could go back to earlier in

7  this chain of e-mails that was sent as part of this

8  e-mail from Mr. Oliver to you and the rest of the RMO

9  team, the first e-mail in the chain is from Lynn

10  Rykowski to a group of people.  Do you know who Lynn

11  Rykowski is?

12     A.  312 is what you're looking at?

13     Q.  Yes, 312.

14     A.  No, I don't know who she is.

15     Q.  In the e-mail, the main three primary

16  recipients are Pascal Boillat -- do you know who he

17  is?

18     A.  Yes.

19     Q.  Who is that?

20     A.  He was a VP.  I don't recall his specific

21  title but within the Operations and Technology

22  division.

**Page 189**

1      Q.  So he's an officer at Fannie Mae at that

2  time?

3      A.  Yes.

4      Q.  Another recipient is Joe Giunta?

5      A.  Uh-huh.

6      Q.  And I think you've testified he was a

7  senior VP?

8      A.  Yes.  He was in my direct reporting chain.

9      Q.  So the chain was you reported to Jill

10  Oliver --

11     A.  Uh-huh.

12     Q.  -- who reported to David Magidson and then

13  Mr. Magidson reported to Mr. Giunta, correct?

14     A.  Correct.

15     Q.  So Mr. Giunta would essentially be your

16  boss's boss's boss?

17     A.  Correct.

18     Q.  And the third recipient is Andrew Huffman.

19  Do you know who that is?

20     A.  He was a director reporting to

21  Mr. Magidson so a peer of Jill Oliver.  I don't know

22  the two other people.

48 (Pages 186 to 189)

Page 194

1      A.   That eventually we would look at the SDLC
2   data to see if there was complete improvement.
3      Q.   And what do you mean by eventually?
4      A.   We, to this point, had not looked at any
5   SDLC data to be able to answer this question.
6      Q.   Well, when she says please advise, isn't
7   she asking you to look at that data?
8      A.   I don't see that here. That's not how I
9   interpret or recall the conversation.
10     Q.   When you say recall, I mean, you're
11  looking at the e-mail as we speak, correct?
12     A.   Yes.
13     Q.   So this e-mail was sent by Ms. Oliver on
14  September 24th?
15     A.   Yes.
16     Q.   Then on September 27th, David Magidson
17  called you, correct?
18     A.   Yes.
19     Q.   And he asked you for information regarding
20  the trending of operational incidents, correct?
21     A.   Yes.
22     Q.   Let's look at Exhibit 1. Let's look at

Page 195

1   page 30.
2      A.   Okay.
3      Q.   So after Mr. Magidson called you and asked
4   for information regarding the trending of operational
5   incidents, this is the material that you sent in
6   response?
7      A.   Uh-huh.
8      Q.   Did you in any way connect this request to
9   the e-mail that was sent on September 24th by Jill
10  Oliver?
11     A.   No, sir, because there was no correlation
12  between the operational incidents that were performed
13  in the executive summary to SDLC. In fact, it
14  specifically says that there is -- they were not part
15  of the report.
16     Q.   But the answer is no, you did not connect
17  in any way Mr. Magidson's request for information on
18  operational incidents to the e-mail you had received
19  on September 24th from Jill Oliver?
20     A.   That's correct.
21     Q.   Now, you testified -- what was the primary
22  reason that the 60 percent number was incorrect in

Page 196

1   your mind?
2      A.   That it's trying to draw a correlation
3   that SDLC was the root cause or a major contributing
4   cause for the reduction of operational incidents from
5   one year over to the next.
6      Q.   And why was that not correct in your mind?
7      A.   The report on FM 31 and 32, the chart that
8   was included and subsequently referred to
9   specifically does not include technology incidents.
10     Q.   So what does it include?
11     A.   Operational incidents that were either --
12  the root cause was manual, or would be deemed
13  systems.
14     Q.   But it was just in the operations space,
15  correct?
16     A.   That's correct.
17     Q.   So the information is not really
18  company-wide. It only related to Fannie Mae's
19  operations division?
20     A.   Yes.
21     Q.   Is there anything in this e-mail that you
22  sent on September 27th, 2010 that would indicate that

Page 197

1   the data you were giving Mr. Magidson only related to
2   the operations space?
3      A.   Yes. It says, "Here is the chart from the
4   August executive summary (page 3) that speaks to the
5   OI," which stands for operational incident, "trending
6   and the type and number of incidents compared to
7   2009."
8      Q.   But nowhere in the sentence you've read
9   does it say this information only applies to the
10  operations division, correct?
11     A.   Yes, it does.
12     Q.   Where does it say that?
13     A.   Here's the chart from the August executive
14  summary, page 3, that speaks to the operational
15  incident trending on the type and number of incidents
16  compared to 2009.
17     Q.   And where in what you just read does it
18  say this data is limited to operational incident
19  trending in the operations space?
20     A.   It refers to the August executive summary
21  page 3 that speaks to --
22     Q.   If you didn't have the August executive

Page 198

1  summary in front of you, how would you know that it
2  only referred to operations?
3          MR. WOODFIELD:  Objection, calls for
4  speculation.  Go ahead.
5          THE WITNESS:  Because --
6          ARBITRATOR SINGER:  You said go ahead, you
7  want him to answer?
8          MR. WOODFIELD:  Well, I'm doing it as a
9  depo, but objection, calls for speculation.
10         ARBITRATOR SINGER:  It's not a depo.
11         MR. WOODFIELD:  No.
12         ARBITRATOR SINGER:  If you don't want him
13  to answer, then he shouldn't answer until --
14         MR. WOODFIELD:  Force of habit in depos.
15  It doesn't feel like we're in court.
16         ARBITRATOR SINGER:  -- until I rule.
17  What's the question?
18         THE REPORTER:  "Question:  If you didn't
19  have the August executive summary in front of you,
20  how would you know that it only referred to
21  operations?"
22         ARBITRATOR SINGER:  You may answer that

Page 199

1  question.
2          THE WITNESS:  Okay.  I specifically copied
3  and pasted from the August executive summary,
4  referenced back where I got the information from to
5  show, hey, I got this from page 3 that speaks to the
6  operational incident trending on the type and number
7  of incidents compared to 2009.
8          I copied and pasted directly from the
9  report.
10         BY MR. BLONDER:
11     Q.   But the point is if you didn't know that
12  the report only talked about operations, this e-mail
13  wouldn't tell you that it only referred to
14  operations?
15         MR. WOODFIELD:  Objection.  That's an
16  argument.
17         ARBITRATOR SINGER:  Sustained.
18         BY MR. BLONDER:
19     Q.   Now, do you see from the data that you
20  copied and pasted --
21     A.   Yes.
22     Q.   -- in bold, it says trending of

Page 200

1  operational incidents, dash, type and number of
2  incidents?
3      A.   Yes, sir.
4      Q.   Nothing in that bold would inform you that
5  this is only trending of operational incidents for
6  the operations space, correct?
7      A.   Not in that bold.
8      Q.   And it references -- the last sentence
9  references, "At the same time last year, 122
10  incidents were also reported in the ACORD system."
11  Do you see that line at the bottom of the page?
12     A.   Yes, sir.
13     Q.   What is the ACORD system?
14     A.   That is the system of record for reporting
15  operational incidents.  I don't know if it's still at
16  Fannie Mae now.
17     Q.   And does ACORD only record incidents in
18  the operations space?
19     A.   No, sir.
20     Q.   So the ACORD database encompasses all
21  operational incidents throughout the company,
22  correct?

Page 201

1      A.   Yes, sir.
2      Q.   Including technological operational
3  incidents?
4      A.   Yes, sir.
5      Q.   So in your mind, so the key issue was that
6  the information you provided only encompassed the
7  operations space, not the entire Operations and
8  Technology division of Fannie Mae?
9      A.   I challenge part of your question, that
10  you're trying to say it's in my mind.
11     Q.   Okay.  The crucial issue, the reason his
12  number was incorrect is that he used that 60 percent
13  reduction as if it were throughout the entire company
14  when the data you gave him was only for the
15  operations space?
16     A.   I can't answer why he used them.
17         ARBITRATOR SINGER:  Why was the 60 percent
18  incorrect?
19         THE WITNESS:  The 60 percent number was
20  incorrect because you're taking it from one subset
21  and using it for another.
22         BY MR. BLONDER:

Page 210

1  operational incidents in Operations and Technology
2  for 2010, correct?
3      "Answer: Yes."
4      Did I read that correctly?
5      A.  Yes, sir.
6      Q.  So let's look at Exhibit 56.  Could you
7  tell me what this document is?
8      A.  It is the executive summary for August
9  2010 prepared by the RMO for Joe to present at the
10  risk forum.
11     Q.  And is this the report that you pulled the
12  chart that you sent to Mr. Magidson?
13     A.  Yes.
14     Q.  Now, on the first page of the report,
15  FM 318, the first bullet point states that RMO
16  reviewed 670 operational incidents (OIs) logged by
17  O&T over the period of January 2008 through August
18  2010; the majority of incidents, 59 percent, relate
19  directly to business operations.
20     A.  That's correct.
21     Q.  Did I read that correctly?  So the RMO
22  reviewed the operational incidents logged by both

Page 211

1  Operations and Technology, is that right?
2      A.  We tried to go back to review all of the
3  operations logged by someone who was in the reporting
4  chain of Operations and Technology over that
5  three-year period.
6      Q.  Now, if we go to page 319, in the upper
7  right-hand corner, there is a large heading that says
8  Operations and Technology, correct?
9      A.  Yes, sir.
10     Q.  And then there is a heading that says
11  Remediation Management Office, Executive Summary,
12  dash, as of August 31st, 2010, and then RMO
13  Historical Trending of Operational Incidents?
14     A.  Yes, sir.
15     Q.  Is there anything in that heading that
16  would indicate that this review only related to the
17  operations space?
18     A.  No, sir.
19     Q.  And then below that, there is a heading in
20  bold that says Operational Incident Review, January
21  2008 Through August 2010.  Is there anything in that
22  heading that would indicate that this only related to

Page 212

1  the operations space?
2      A.  No, sir.
3      Q.  Would you agree that the first reference
4  to the fact that this analysis only related to the
5  operations space is in the second bullet point on
6  that list?
7      A.  No, sir.
8      Q.  What previously would tell you that?
9      A.  On page 318, bullet point number 1, the
10  headline, RMO reviews 670 operational incidents
11  logged by O&T over a period of January 2008 through
12  August 2010.  The majority of incidents, 59 percent,
13  385, relate directly to business operations.
14     Q.  And how would that tell you that what you
15  looked at was only in the operations space?
16     A.  It ties it back to this first page.  What
17  you're asking for is that the first time it was
18  referenced.  Further on, in bullet point 3, we are
19  referencing the 385 again in terms of identifying two
20  primary root causes for majority of incidents
21  relating to operations at 50 percent, for employee
22  behavior for 50 percent, and 23 percent for training

Page 213

1  respectively.
2      Q.  And how does that relate, how does that
3  inform you --
4      A.  It keeps referencing back to the --
5      Q.  Can I just finish the question?
6      A.  You're right.  I'm sorry.
7      Q.  How does that relate to inform someone
8  that you're only looking at the operations space?
9      A.  It shows the consistency of what we're
10  talking about in terms of typically the headlines
11  were bullet point items that were going to reference
12  throughout our report and the 385 is the number of
13  incidents to be able to do apples-to-apples review in
14  what we're talking about.
15     Q.  So could we turn back to Exhibit 1?
16     A.  Okay.
17     Q.  So you sent -- on page 31 then moving
18  on to page 32, you cut and pasted from the chart that
19  we just looked at, correct?
20     A.  Yes, sir.
21     Q.  Then David, Mr. Magidson, responded to you
22  and Ms. Oliver and he said, "Thanks, Keith.  Can you

54 (Pages 210 to 213)

Page 214

1   give me a count of technology and nontechnology
2   issues for the 'same time last year' 122 and the 68
3   OITs this year?"
4       A.   Uh-huh.
5       Q.   And when he says OITs, what is that
6   reference?
7       A.   Operational incidents -- I don't remember
8   the T off the top of my head.  Technology.
9       Q.   Then the next sentence of this e-mail is,
10  "I would like to report the percent reduction in
11  nontechnology and technology OITs.  Thanks again,
12  David."
13          What did you understand he was asking you
14  for, when he asked for a count of technology and
15  nontechnology issues?
16      A.   My understanding is he was looking for
17  information relating back to the executive summary
18  and wanted to have -- I guess comparing the manual
19  versus system from the executive summary.
20      Q.   But where in his e-mail does he reference
21  manual versus system?
22      A.   Where he says technology and nontechnology

Page 215

1   issues.
2       Q.   In your opinion, are manual and system
3   analogous to technology and nontechnology?
4       A.   In reference back to the executive summary
5   of the data that was performed.
6       Q.   You testified on direct that the
7   information you provided Mr. Magidson had no
8   connection to technology, correct?
9       A.   That is correct.
10      Q.   But Mr. Magidson is specifically asking
11  you for information regarding technology and
12  nontechnology operational incidents.  Can you explain
13  why he would ask you for technology and nontechnology
14  operational incidents if he understood that what you
15  gave him had nothing to do with technology
16  operational incidents?
17          MR. WOODFIELD:  Objection, calls for
18  speculation on why Mr. Magidson would do something
19  that he did.
20          ARBITRATOR SINGER:  Sustained.
21          BY MR. BLONDER:
22      Q.   Did you ask Mr. Magidson what he meant

Page 216

1   when he asked you for technology versus nontechnology
2   issues?
3       A.   No, sir.
4       Q.   Did you ask Ms. Oliver what she understood
5   Mr. Magidson meant when he asked for technology
6   versus nontechnology issues?
7       A.   No, sir.
8       Q.   Did you understand that Mr. Magidson was
9   asking you for a count of technology and
10  nontechnology issues for the same time last year?
11      A.   I understood that he wanted information
12  related back to the executive summary that was
13  delivered in September 2010.
14      Q.   Is there anywhere in this e-mail where he
15  references that executive summary?
16      A.   Yes, sir.
17      Q.   Where is that?
18      A.   The 122 and 68 come directly from the
19  executive summary.
20      Q.   Why didn't you tell Mr. Magidson that the
21  RMO didn't have information related to
22  technology-related operations incidents?

Page 217

1       A.   He knew.
2       Q.   How do you know that?
3       A.   He previews the executive summary before
4   it's delivered, he was present at the delivery of the
5   report and he was the VP at that space.
6       Q.   And he had been in that job for three
7   weeks, correct?
8       A.   I don't know the length of time he was in
9   the job.
10      Q.   This was a very short time after he took
11  over the business?
12      A.   It was a very short time.  Three weeks --
13  I think it was longer than that.
14      Q.   So after Mr. Magidson asked you for a
15  count of technology and nontechnology issues, you
16  sent him back the data that starts on FM 30 and then
17  goes over to FM 31 which is a breakdown of manual
18  versus system issues, correct?
19      A.   Yes.
20      Q.   But as you testified earlier, the manual
21  versus system issues is not a breakdown of technology
22  versus nontechnology issues, correct?

Alderson Reporting Company
1-800-FOR-DEPO

Page 218

1    A.   It is a breakdown from the report that
2  referenced manual versus system.
3    Q.   My question is, is manual versus system
4  issues a breakdown of technology versus nontechnology
5  issues?
6    A.   The manual versus system is relating back
7  to the ACORD root causes.
8    Q.   Mr. Taylor, is manual versus system issues
9  a breakdown of technology versus nontechnology
10  issues?
11    A.   The information there is manual versus
12  system from the executive summary, August 2010.
13    Q.   Is that a no?
14        ARBITRATOR SINGER:  You can answer the
15  question, please.
16        THE WITNESS:  Ask it again.
17        BY MR. BLONDER:
18    Q.   Is manual versus system issues a breakdown
19  of technology versus nontechnology issues?
20    A.   The manual versus system.  I don't know
21  how else to answer the question.
22        ARBITRATOR SINGER:  Yes or no?

Page 219

1        BY MR. BLONDER:
2    Q.   It's a yes or no.
3    A.   The manual versus system was taken from
4  the report.
5        ARBITRATOR SINGER:  You've said that.
6        MR. WOODFIELD:  You can say yes or no with
7  an explanation if you cannot shoehorn into one or the
8  other.
9        ARBITRATOR SINGER:  But please start with
10  a yes or no and then explain.
11        THE WITNESS:  The manual versus system,
12  what I gave him was a response, yes, to what he
13  asked.
14        BY MR. BLONDER:
15    Q.   And the reason that you gave him manual
16  versus system is because you were not focused on
17  technology versus nontechnology, correct?
18    A.   I'm not sure that's correct.  The reason I
19  use manual versus system is to be consistent with how
20  the terms were used in the report because I
21  referenced the report in responding to his e-mail.
22    Q.   Can you turn to Exhibit 104?

Page 220

1    A.   Yes, sir.
2        MR. WOODFIELD:  What page?
3        MR. BLONDER:  138.
4        THE WITNESS:  Got it.
5        BY MR. BLONDER:
6    Q.   On line 2:  "Question:  Did you believe
7  that this breakdown was a breakdown of technology
8  versus nontechnology issues when you sent this to
9  Mr. Magidson?
10        "Answer:  I believe that the information I
11  gave is referenced back to the report that the
12  analysis came from.
13        "Question:  But that's not my question.
14  My question is did you believe that the manual versus
15  system breakdown was a breakdown of technology versus
16  nontechnology issues when you sent it to
17  Mr. Magidson?
18        "Answer:  I was not focused on technology
19  versus nontechnology.  I was focused on relating
20  information back from the report as was his
21  question -- asked."
22        Did I read that correctly?

Page 221

1    A.   Yes, sir.
2        MR. WOODFIELD:  Can we take a five-minute
3  break?
4        ARBITRATOR SINGER:  Sure.
5        (Recess.)
6        BY MR. BLONDER:
7    Q.   Mr. Taylor, prior to your termination at
8  Fannie Mae, did you ever report Mr. Magidson's
9  conduct to Fannie Mae's ethics line?
10    A.   No, sir.
11    Q.   And you're familiar with that ethics line
12  because you corresponded with Fannie Mae's ethics
13  team subsequent to your termination, correct?
14    A.   Yes.
15    Q.   Are you familiar with Fannie Mae's code of
16  conduct?
17    A.   I remember reading it.  It's been a long
18  time.
19    Q.   Do you recall that every year you
20  certified that you reviewed the code of conduct?
21    A.   Yes, sir.
22    Q.   Do you understand that you have an

Page 222

1   obligation as a Fannie Mae employee to report any
2   time that you reasonably suspect an employee has
3   violate a law to the Fannie Mae ethics team?
4       A.   I didn't recall that, no, sir.
5       Q.   And during your time at Fannie Mae, you
6   did not report Mr. Magidson to Fannie Mae's ethics
7   team in any way, correct?
8       A.   Yes, sir, you're correct.
9       Q.   Did you report Mr. Magidson's behavior to
10  anyone at Fannie Mae in their Compliance and Ethics
11  group?
12      A.   In Compliance and Ethics, no, sir.
13      Q.   Did you report Mr. Magidson's behavior to
14  anyone in HR at Fannie Mae?
15      A.   No, sir, I did not.
16      Q.   Now, we talked a little bit earlier about
17  the ACORD database?
18      A.   Yes, sir.
19      Q.   Can you just explain once again what that
20  is?
21      A.   To my recollection, it is the place where
22  operational incidents are reported and housed for

Page 223

1   Fannie Mae.  I don't know what ACORD stands for.
2       Q.   Are you aware that Fannie Mae's SOX team
3   reviews ACORD to find SOX-related issues to
4   remediate?
5       A.   That sounds familiar, yes, sir.
6       Q.   Did you at any time, when you were at
7   Fannie Mae, report Mr. Magidson's behavior to the
8   ACORD database?
9       A.   No, sir.
10      Q.   Are you familiar with the management
11  self-identified issue database?
12      A.   I've heard of the MSI database but I was
13  not -- I didn't work on that area.
14      Q.   Are you familiar with what types of items
15  are reported in the MSI database?
16      A.   No, sir.
17      Q.   So I take it you did not report
18  Mr. Magidson's behavior to the MSI database?
19      A.   No, sir.
20      Q.   And I referenced Fannie Mae's SOX team.
21  What's your understanding of their function at Fannie
22  Mae?

Page 224

1       A.   The SOX team was involved in monitoring
2   the SOX deficiencies in their severity.  I think
3   there was a severity depending on the rating.  I
4   don't recall now.  We reported the remediation
5   activities primarily on ones that were high or had
6   numerical materiality.
7       Q.   And you would agree with me that in order
8   for the SOX team to remediate a SOX issue, they first
9   have to be aware that the issue exists, correct?
10      A.   That makes sense, yes, sir.
11      Q.   And you did not report Mr. Magidson's
12  behavior to anyone on the SOX team, did you?
13      A.   No, sir.
14      Q.   Did you report Mr. Magidson's behavior to
15  the Department of Labor prior to your termination
16  from Fannie Mae?
17      A.   No, sir.
18      Q.   Did you report it to the SEC?
19      A.   Yes, I did.
20      Q.   I'm sorry, prior to your termination from
21  Fannie Mae?
22      A.   No.

Page 225

1       Q.   During your time at Fannie Mae, did you
2   ever get a rating better than fully meets
3   expectations during your tenure at Fannie Mae?
4       A.   No, sir.
5       Q.   Can we look at Exhibit 35?  I think you
6   testified these are the talking points for the FHFA
7   retraction?
8       A.   Yes, sir.
9       Q.   What's the basis for your testimony that
10  this was approved by David Magidson?
11      A.   From what I recall, we sent this to him
12  when we prepared it.  I think he had some minor
13  changes to some of the language and we updated the
14  language based on some of his feedback.  That's the
15  nearest I can recall.
16      Q.   Is it your recollection that his feedback
17  was provided by e-mail?
18      A.   I don't remember.  I don't remember.
19      Q.   What was your basis for your testimony
20  that these talking points were approved by Joe
21  Giunta?
22      A.   Because he delivered the talking points to

```
 1                      JAMS ARBITRATION

 2    - - - - - - - - - - - - - - - X

 3    KEITH TAYLOR,                       :

 4         Claimant,                      :

 5              v.                        :    Reference No.

 6    FEDERAL NATIONAL MORTGAGE           :    1410005919

 7    ASSOCIATION (FANNIE MAE), et        :

 8    al,                                 :

 9         Respondents.                   :

10    - - - - - - - - - - - - - - - X

11                              Washington, D.C.

12                              Tuesday, December 11, 2012

13              Arbitration before ARBITRATOR LINDA R.

14    SINGER, in the above-entitled matter, the witnesses

15    being duly sworn by MARY GRACE CASTLEBERRY, a Notary

16    Public in and for the District of Columbia, taken at

17    the offices of JAMS, 555 13th Street, N.W.,

18    Washington, D.C., at 10:09 a.m., Tuesday, December

19    11, 2012, and the proceedings being taken down by

20    Stenotype by MARY GRACE CASTLEBERRY, RPR, and

21    transcribed under her direction.

22
```

Page 302

1  why the inconsistency would be there?
2      A.   I would expect that the managers would
3  question that.
4      Q.   And why is that?
5      A.   Because there is a set -- you know, there
6  is a limited amount of dollars for the organization.
7  You want the organization to continue to move forward
8  and you want to compensate the folks that are helping
9  to move the organization forward.  And there are
10  people that go way above and beyond the call of duty
11  and we need to make sure that we keep those people
12  motivated and they are appropriately compensated for
13  the work that they're doing.
14      Q.   Now, if, subsequent to your -- still
15  staying with the same hypothetical, if, subsequent to
16  your discussion with that manager, you're satisfied
17  with his or her answer as to why the compensation
18  recommendation is inconsistent with the performance
19  ratings, and that manager tells you, well, this
20  person, based on additional information, the lower
21  ranked performing person actually, for whatever
22  reason, there was some performance-based reasoning as

Page 303

1  to why the compensation decision would be where you
2  would compensate that lower performing person
3  higher -- if then, subsequent to this discussion, you
4  as the manager are informed that you need to reduce
5  head count, would it then be appropriate for you as a
6  manager to use the information from the compensation
7  discussion with your direct report in a determination
8  of which of the two people that you end up having to
9  reduce -- your direct reports employees, two of
10  them -- and to differentiate between which one's
11  position would be eliminated?
12      Would that be appropriate to use the
13  information from your discussion around compensation
14  in that decision, if you can follow that question?
15      A.   There are many reasons for differences in
16  compensation and I wouldn't typically use that -- I
17  would say I would not use that as a means for me to
18  determine who I should reduce.  I mean, if someone
19  wasn't carrying their weight, you would see that in
20  their performance rating.  The performance rating is
21  indicative of --
22      Q.   What if the compensation decision -- the

Page 304

1  compensation decision occurs later, correct?
2      A.   The compensation decision occurs later,
3  yes.
4      Q.   And in that compensation decision, the
5  manager tells you that there is some
6  performance-based reason as to why they're
7  recommending more compensation for the lower ranked
8  person and you're satisfied with the reasons.
9      A.   If I'm satisfied, I will go with that.
10      Q.   At that time?
11      A.   Yes, I will go with that.
12      Q.   And then subsequent to that discussion,
13  you have to make the decision around which of the two
14  people, one of those folks, their position needs to
15  be eliminated -- and you cannot, for one reason or
16  another, you're not able to talk to your direct
17  report about what distinguishes those people, okay?
18      Do you follow me?
19      A.   I hear what you're saying.
20      Q.   Now, in that scenario, would it be
21  appropriate to use your later conversation about
22  compensation in a determination as to which of the

Page 305

1  two people's positions could be eliminated?
2      A.   In the conversation, not about the numbers
3  specifically but about the performance that supports
4  the compensation discussion, I believe that that
5  would be appropriate.
6      Q.   You talked about the SDLC and what it was
7  on direct.  Do you recall that testimony?
8      A.   Yes, I do.
9      Q.   And you also mentioned something called
10  the Project Quality Office and PMAP.
11      A.   Yes.
12      Q.   Can you describe what is the function of
13  the Project Quality Office and the PMAP and what it
14  was about?
15      A.   Sure.  The Project Quality Office and its
16  predecessor, the PMAP, were set up to put up toll
17  gates.  As we were moving from one phase of a project
18  to the next, the Project Quality Office would inquire
19  about the quality of the work that had been done
20  around requirements, what type of testing are you
21  seeing, are you testing upstream and downstream
22  systems, do you have the right business involvement,

18 (Pages 302 to 305)

Page 306

1  is the extent of your change fully documented?
2          So truly a quality function that would ask
3  questions about the development process and about the
4  risks associated with the software development.  So
5  it's really meant as a quality control, to make sure
6  that people weren't just blindly checking off the
7  requirement; I did requirements, I did testing.
8          But it was a group that would drill into
9  the findings to get a better understanding of what
10  was transpiring, what was happening.
11      Q.   And when you talk about these gateways,
12  who is it -- who are the individuals who have to make
13  certain representations at these gateways?
14      A.   Let me step back and explain who the
15  players were.  The Project Quality Office was -- is
16  an independent function ran by the risk and control
17  group which was managed by David Magidson.  The folks
18  that they would be interfacing with would be the
19  folks responsible for the actual development of the
20  technology, the business people responsible for the
21  business requirements, the folks responsible for
22  testing of the new technology and the technology

Page 307

1  changes, both on the technology and the business
2  side.
3      Q.   Now, was the SDLC standard and this
4  emphasis on project quality, was that well received
5  when you rolled it out?
6      A.   Initially it was viewed as being another
7  layer of bureaucracy and we had a real cultural issue
8  within the organization.  We had situations where
9  testing was waived and never in my career have I ever
10  seen that.  And it was a risk-based approach.
11          So what they did that I think about was,
12  well, I'm going to -- this is a simple test or this
13  is a simple change, but it may be in a high-risk
14  patient, or a high-risk application for the firm.
15          So there was inconsistency across the
16  organization in terms of how testing requirements and
17  development was being pursued, and it was causing us
18  you know, a great deal of pain in terms of
19  fire-fighting and the quality of the code that was
20  being delivered.
21          It wasn't just a technology issue.  It was
22  a business issue.  And folks initially resisted the

Page 308

1  regimentation that we were trying to put in place but
2  regimentation that actually exists throughout
3  industry.
4      Q.   Let me ask you, without the regimentation
5  that is required by the SDLC and the project quality,
6  could there be financial impacts or productivity
7  impacts to the production of technology without that
8  regimentation you speak of?
9      A.   So the answer to that is yes.  Let me --
10  productivity.  I'm going to deal with productivity
11  first and then I'll deal with financial.
12          On the productivity side of things, it's a
13  lot easier to make the change to an application or to
14  a design of an application when you're thinking about
15  the analysis and the requirements than if the project
16  had gone forward and you implemented the wrong thing.
17          I mentioned before, once something has
18  been implemented, it's over 100 times more expensive
19  to make that change, pull it out of production, get
20  everybody together, trying to understand what the
21  impact is of this system gone haywire.
22          Financially, we're dealing with, you know,

Page 309

1  billions and billions of dollars of money.  We've
2  got, you know, over two and a half trillion dollars
3  on our balance sheet.  We've got billions of dollars
4  that come in and out of the organization on a daily
5  basis.  If we make a mistake in terms of how we're
6  coding a change to a cash management system or to a
7  wire transfer system and it doesn't get caught before
8  the testing, money can go out the door.
9          Think about what happened with Night
10  Trading about three or four months ago.  This was a
11  company that was an electronic trading firm and they
12  implemented new technology and what had happened was
13  the system started putting erroneous trades into the
14  marketplace; the exchanges would let them get out.
15  The company had to be bailed out and now ownership is
16  diluted, all the equity in that company is gone.  Now
17  new people own that company, putting the company at
18  risk if you don't properly test the changes in
19  technology, especially in the type of business that
20  we're in.
21      Q.   Now, the technology -- and you were part
22  of the Operations and Technology group at Fannie Mae

Page 326

1      Q.   On FM 21 is in Exhibit 1, there is a
2  message from you on October 21st, 2010 to Lynn
3  Rykowski, Pascal Boillat, Andrew Huffman, David
4  Magidson with a CC to Jill Oliver and Rich Licato.
5  Do you see that?  Correct?
6      A.   Yes.
7      Q.   Can you just review that e-mail to
8  yourself and then let me know what it is you're
9  conveying in this message?
10      A.   Part of the problem and issues that I
11  mentioned before was getting folks to understand that
12  this is not just a technology issue or an operations
13  issue.  This is an enterprise wide issue for the firm
14  as a whole.
15         And my suggestion was to remove operations
16  out of there because if we had operations in there,
17  it was my view that they would be looking at it
18  strictly as an O&T issue.  I wanted to drive home the
19  point that this was a technology-related issue at the
20  enterprise level and that was my purpose for making
21  that statement.  I wanted people to have
22  accountability for what was occurring in their space

Page 327

1  or what was going on in their own home.  And then I
2  asked if there were any disagreement.
3      Q.   And when you were asking for any
4  disagreements, you were asking the recipients of your
5  communication whether they had any?
6      A.   Yes.
7      Q.   And that included Ms. Oliver?
8      A.   Everyone on the e-mail.
9      Q.   And did Ms. Oliver, on or around October
10  21st, 2010, respond to your message and let you know
11  that there was an issue with the data set from which
12  that 60 percent number related?
13      A.   I don't remember.
14      Q.   Do you have any specific recollection of
15  her coming to you on October 1st and saying, Joe, the
16  60 percent number is invalid?
17      A.   Not as part of this.
18      Q.   Did Mr. Taylor come to you and say, Joe,
19  the 60 percent number is invalid?
20      A.   I have no recollection of that ever
21  happening.
22      Q.   If Ms. Oliver or Mr. Taylor had come to

Page 328

1  you and they had an issue with the 60 percent number,
2  would you have expected them to come to you and raise
3  that as an issue?
4      A.   Absolutely.  You're on the distribution of
5  the e-mail.  If you've got a seat at the table, there
6  is a purpose and reason for you to have a seat at the
7  table.
8      Q.   Would that be consistent with what you
9  understood their job responsibilities to be?
10      A.   Yes.
11         MR. WOODFIELD:  I don't have a copy of
12  this.  I didn't want to buy one.  I just wanted to
13  see what it says.
14         MR. STEWART:  Do we have an issue?  Could
15  we go on?
16         ARBITRATOR SINGER:  He wanted to see a
17  copy of the exhibit, which he said he doesn't have.
18         MR. WOODFIELD:  I didn't want to buy the
19  binder.
20         MR. STEWART:  Do we want this on the
21  record or not?
22         ARBITRATOR SINGER:  I don't know.  Yeah,

Page 329

1  let's keep it on the record.
2         MR. STEWART:  Because counsel has all of
3  the documents that we produced.
4         MR. WOODFIELD:  I do.  But I was offered
5  the opportunity to buy the big binder and I'm not
6  going to pay for exhibits.
7         MR. STEWART:  You could print them off.
8  You have all the documents.
9         MR. WOODFIELD:  I have them.  But I just
10  want to see what we're looking at.
11         MR. STEWART:  You have all the documents.
12  You didn't have to buy it.  You could have printed
13  it.
14         MR. WOODFIELD:  Common courtesy at every
15  trial I've ever been to is you show a copy you
16  present.  Telling people to bring their own exhibits
17  is something I've never seen.
18         MR. STEWART:  We had a conversation with
19  counsel -- I don't know if the witness needs to hear
20  this.  Joe, you might want to step out.
21         MR. WOODFIELD:  I think we've covered this
22  point.

```
 1                        JAMS ARBITRATION

 2     - - - - - - - - - - - - - - - X

 3     KEITH TAYLOR,                     :

 4          Claimant,                    :

 5               v.                      :    Reference No.

 6     FEDERAL NATIONAL MORTGAGE         :    1410005919

 7     ASSOCIATION (FANNIE MAE), et      :

 8     al,                               :

 9          Respondents.                 :

10     - - - - - - - - - - - - - - - X

11                              Washington, D.C.

12                              Wednesday, December 12, 2012

13               Arbitration before ARBITRATOR LINDA R.

14     SINGER, in the above-entitled matter, the witnesses

15     being duly sworn by MARY GRACE CASTLEBERRY, a Notary

16     Public in and for the District of Columbia, taken at

17     the offices of JAMS, 555 13th Street, N.W.,

18     Washington, D.C., at 10:15 a.m., Wednesday, December

19     12, 2012, and the proceedings being taken down by

20     Stenotype by MARY GRACE CASTLEBERRY, RPR, and

21     transcribed under her direction.

22
```

Page 511

1       MR. WOODFIELD:  We have a different Bates
2   number on ours.
3       THE WITNESS:  I see 282.
4       BY MR. WOODFIELD:
5       Q.   Okay.  The e-mail that was sent by
6   Mr. Magidson at 9:34 a.m., what prompted, if you're
7   aware, Mr. Magidson writing back to you this e-mail,
8   if you know?
9       A.   I have no idea.  That's 23 days later.
10      Q.   When if ever did you and Mr. Taylor meet
11  with Mr. Magidson to discuss his representations --
12      A.   Oh, this one?  He was responding -- this
13  was an ongoing issue between he and I.  So I don't
14  know what prompted him to respond because I was at
15  the point that, again, where did you get this
16  information?  Why are you making this correlation?
17  It has nothing to do with our group.  We never
18  represented that information.  And I think it's just
19  a series of continuously going back and forth on that
20  issue.
21      Q.   When if ever did you and Mr. Taylor meet
22  with Mr. Magidson to discuss his 60 percent

Page 512

1   representations?
2       A.   We did meet with him.  I don't remember
3   the exact date that we met with him.  And he, again,
4   was still -- he apologized.  He actually apologized
5   at that point in the meeting.
6       Q.   Was that meeting on or about November 4th,
7   2010 roughly, to your recollection?
8       A.   It's around that point.  Around that point
9   is when the realization was that what was represented
10  to the regulator was inaccurate and they needed to
11  retract it.
12      Q.   And what exactly did you all say to --
13  what did you say and/or Mr. Taylor say to
14  Mr. Magidson in the meeting?
15      A.   At that point, I said to him -- and I had
16  said prior to that -- we can try and do the analysis.
17  It will be very difficult to do because of how the
18  data is structured, but this report only covered a
19  small subset of information.
20          And so I reiterated the same points that
21  were stated when I presented the report, when I sat
22  down with him, and then the movement was around,

Page 513

1   okay, well, I'm finally -- between Keith and I, we
2   really didn't budge.  This is what it is, right?
3       Q.   Was Mr. Taylor reporting to Mr. Magidson
4   that the number was not supported?
5       A.   Yes.
6       Q.   What exactly was Mr. Taylor telling
7   Mr. Magidson?
8       A.   I mean, I can't tell you his exact
9   language but it was consistent with what I said.  We
10  were both in tandem about the fact that this is just
11  a subset of information, it cannot support the 60
12  percent, we don't know where you got the 60 percent
13  because in none of our reports did we ever list 60
14  percent as anything.
15          And in order to truly understand whether
16  that 60 percent is really real or not, you would have
17  to do a full-blown review of the entire universe of
18  operational incidents.
19      Q.   In that meeting, did Mr. Taylor reference
20  Exhibit Number 55, the e-mails that were sent, the
21  September 27, 2010 e-mails, to explain what in his
22  view he was representing?

Page 514

1       A.   Yes, I'm pretty sure he brought -- because
2   we brought, like, as much data as we could.
3          I think we brought our report, we brought
4   the e-mails, we sat him down, we explained it, but we
5   had done that -- I had done that several times with
6   David.  This was kind of the tail end when Keith was
7   involved as well.
8       Q.   And it was at the tail end when Mr. Taylor
9   was involved that Mr. Magidson then responded by
10  telling you both that he had made a mistake?
11      A.   Yes.
12      Q.   Now, was that before but after the FHFA
13  presentation?
14      A.   It was a day before he went in and
15  misrepresented the information again.
16          Well, no, when was the meeting?  It had to
17  be after.  It was after.
18      Q.   Why do you say that?
19      A.   I don't remember the exact date that we
20  met with David but I think why it was after is
21  because at that point, during that process, I
22  escalated and ended up talking to Joe Giunta, which

Page 567

1  the ones I had requested, so there was no surprise
2  getting those.
3      Q.   Were there two resources in addition to
4  Ms. Olivieri?
5      A.   Yes, there were.
6          ARBITRATOR SINGER:  Would you let us know
7  when you're moving on to another topic?
8          MR. WOODFIELD:  I'm done with this witness
9  at this point.
10         ARBITRATOR SINGER:  Why don't we take a
11  10-minute break.
12         (Recess.)
13      EXAMINATION BY COUNSEL FOR RESPONDENTS
14         BY MR. STEWART:
15      Q.   Good afternoon, Ms. Oliver.  I'm Damien
16  Stewart.  We've met before.  I'm counsel for Fannie
17  Mae in this matter.  I'm just going to ask you a
18  couple of questions on cross-examination, okay?
19      A.   Uh-huh.
20      Q.   On direct, you talked about an employee
21  who came to your organization following Mr. Taylor's
22  separation from the company whose name was Yolanda

Page 568

1  Olivieri?
2      A.   Uh-huh.
3      Q.   And I just want to be clear.  She came to
4  you as a result of a reorganization?
5      A.   Yes.  When they let Rich Licato go, her
6  function was then moved within my organization, so
7  she was doing a specific function around helping
8  to -- the management of reporting for operational
9  risk incidents.
10      Q.   So she was an existing Fannie Mae employee
11  at the time she came to you?
12      A.   Yes, she was.
13      Q.   And when she came to you, the salary that
14  she was earning in the organization that she had
15  previously been reporting to continued when she
16  joined your organization?
17      A.   Right, because she was reorg'd into me.
18  We were all in the same organization at that point.
19      Q.   And you participated in reorganizations
20  before, correct?
21      A.   Uh-huh.
22      Q.   Now, in a reorganization, is it typical

Page 569

1  that somebody brings a salary that they were earning
2  in their prior organization to the new organization
3  -- imposed to your cost center, is that accurate?
4      A.   Right.  Accurate.  But that was not the
5  position, the ops risk II position she actually
6  applied for.
7      Q.   So she applied for the ops risk II
8  position at some subsequent time?
9      A.   Yes, subsequently she did, because we were
10  getting ready to be moved over as well to the
11  corporate group.
12      Q.   So when she applied for the ops risk II
13  position, was that before or after you joined the
14  enterprise risk organization?
15      A.   I think it was just -- I think it was
16  before or just before -- it was like probably in the
17  middle of that transition.  I can't remember exactly.
18      Q.   And when you joined --
19      A.   I think it was before.
20      Q.   It is possible it could have been after?
21      A.   It could have been, but during that time
22  when it was aligned, the position was put in place

Page 570

1  under David because we needed the resource to replace
2  when Keith was let go, because we were one man down
3  so we had to add staff.
4      Q.   And who did you report to when you joined
5  the enterprise risk organization?
6      A.   Stephanie Bahr.
7      Q.   And what was her position, if you know?
8      A.   Chief risk officer for operational risk.
9      Q.   Now, I don't know if we were clear.  What
10  were your responsibilities as the director of the
11  RMO?
12      A.   It was to put together inventory of risk
13  information, different inputs about risk and provide
14  data and metrics on what was -- on this information
15  to senior management.  And I'm sure you have the
16  roles on me.  I can get into the details, I want to
17  make sure --
18      Q.   No, you've answered sufficiently for now.
19      A.   Okay.
20      Q.   Did you consider yourself an operational
21  risk lead?
22      A.   Yes.

22 (Pages 567 to 570)

Page 575

1  to Fannie Mae's approach to identifying, reporting,
2  notifying, escalating, and tracking operational
3  incidents, including significant operational
4  incidents.  This policy applies to all employees,
5  term employees, contractors and consultants in all
6  company business units."  Did I read that accurately?
7      A.  Yes, you did.
8      Q.  And is that consistent with what you've
9  testified to, as an operational risk lead, you would
10  identify operational risk incidents?
11      A.  We didn't identify as a risk lead.  What
12  we did was provide information relative to trending
13  and information relative to trending of operational
14  incidents.
15          We weren't the execution arm.  The
16  execution arm were other people who were embedded in
17  the business areas and there was a process and
18  infrastructure for those people, for them to manage
19  the reporting of operational incidents.
20          We didn't manage reporting of operational
21  incidents until Keith was let go and Yolanda Olivieri
22  was moved into our area because her director was also

Page 576

1  let go.
2      Q.  And that's when you joined the enterprise
3  risk group, the central group?
4      A.  That was after.
5      Q.  And there is a definition of an
6  operational incident at 3.1, do you see that, under
7  terminology?
8      A.  Uh-huh.
9      Q.  And that's a failure or breakdown in
10  people, process, Technology or external event that
11  results in financial, reputational or other impacts
12  for Fannie Mae?  Did I read that accurately?
13      A.  Yes.
14      Q.  And is that consistent with what your
15  recollection is of what an operational incident is at
16  Fannie Mae?
17      A.  Yes.  I mean, it has since been updated to
18  include a control failure.
19      Q.  But at the time, this was the definition?
20      A.  As far as I know, yes.
21      Q.  Now, you've talked about the 60 percent
22  figure a lot in your direct testimony and I would

Page 577

1  like to ask, you were aware, weren't you, that the
2  management team in Operations and Technology wanted
3  to market the effectiveness of the software
4  development life cycle and the PMAP process to the
5  other officers and business units at Fannie Mae,
6  correct?
7      A.  Yes, through the launch into the SVPs,
8  they wanted to bring attention to the effectiveness
9  of those programs.
10      Q.  Do you have an understanding of why they
11  wanted to do that?
12      A.  Well, I understood that -- I don't know
13  exactly why.  I just know that there was a need to
14  close out an MRA, matters requiring attention,
15  relative to the SDLC process.
16      Q.  Had you participated in any discussions or
17  communications about why senior management within
18  Operations and Technology wanted to market the
19  effectiveness of the software development life cycle
20  and the PMAP process?
21      A.  I didn't know to what extent they wanted
22  to market it, no, I didn't.

Page 578

1      Q.  But my question is, did you participate in
2  any communications where they explained why they
3  wanted to do this?
4      A.  I participated in the decks that they were
5  creating where they used the 60 percent number to
6  market that information.
7      Q.  And to what extent did you participate in
8  the creation of any -- and a deck is a PowerPoint
9  presentation?
10      A.  Right.  The PowerPoint, I did not create
11  it.  The information was listed there and that's
12  where I raised my hand and said the information
13  around 60 percent was not accurate, based on my
14  knowledge of the data.
15      Q.  So when the PowerPoint presentation --
16  we'll get to that.  Your testimony is that you raised
17  your hand and said the 60 percent number is invalid?
18      A.  I raised my hand on the 60 percent number
19  well before -- from the point in time that I saw that
20  listed as something that would be included in the
21  deck.  And that was discussed with David.  The e-mail
22  was sent to that -- you know, reflecting that

24 (Pages 575 to 578)

Page 619

1  60 percent' (keep)."
2       And then he says, "Any disagreement?" Do
3  you see that?
4       A.   Uh-huh.
5       Q.   And did I read that accurately?
6       A.   Yes.
7       Q.   Now, in Mr. Giunta's communication which
8  you received on or about October 1st, 2010 -- and did
9  you receive this document on or about that time?
10      A.   I guess I did.
11      Q.   Do you have any reason to believe you
12 didn't receive it on or about that time?
13      A.   I can only go by what's in the e-mail
14 stated here. I don't recall seeing this one but if I
15 received it, fine.
16      Q.   And Mr. Giunta clearly states, "This is a
17 firm-wide communication" and he says that the
18 relevant statement is that Technology-related
19 operational incidents are down 60 percent, correct?
20      A.   Right.
21      Q.   And he keeps the Technology-related
22 operational incidents, because that is the

Page 620

1  enterprise-wide as opposed to the prior statement,
2  total Operations and Technology operational incidents
3  down 44 percent from 2009 which he says "remove."
4       The clear impact of what he's saying is
5  what's relevant is that enterprise-wide operational
6  incidents are down 60 percent, correct?
7       A.   No, he said technology-related operational
8  incidents are down 60 percent.
9       Q.   Is that technology with a little T or
10 Technology with a big T?
11      A.   I don't know.
12      Q.   Did you voice any disagreement when he
13 add -- Mr. Giunta is asking for any disagreement to
14 his statement that technology-related operational
15 incidents are down 60 percent, and he's stating here
16 it is a firm-wide communication. Did you voice any
17 disagreement, as Mr. Giunta asked for, in response to
18 this October 1st e-mail?
19      A.   I had already spoken on the issue that
20 linked to my report. This, I didn't know what that
21 was linking to. Was it technology reported
22 incidents, was it firm-wide? Rich Licato at the time

Page 621

1  was managing operational incidents for Technology.
2  So it could have been something that he reported at
3  that time. I didn't know where it was coming from.
4  The 60 percent I had already made clear with David
5  did not link back to the report that we had done in
6  August.
7       Q.   Mr. Magidson didn't ask for whether there
8  was any disagreement to the message. The messages
9  comes from Mr. Giunta. So my question is, did you
10 say anything to Mr. Giunta on or about October 1st,
11 2010 to alert him that the information that we have,
12 that your group had -- the RMO -- would not support
13 the information that he wants to keep in this
14 message, that technology-related operational
15 incidents are down 60 percent?
16      ARBITRATOR SINGER: That's a yes or a no.
17      THE WITNESS: No.
18      ARBITRATOR SINGER: Thank you.
19      THE WITNESS: No, no. Because I didn't
20 believe it was relevant to me alone. Obviously there
21 were other people on there.
22      BY MR. STEWART:

Page 622

1       Q.   But you had information that wouldn't
2  support that?
3       A.   And I had already shared that information
4  with David Magidson.
5       Q.   You shared that with Mr. Magidson.
6       A.   So quite frankly, he should have
7  responded, we have an issue. But instead he
8  responded for me.
9       Q.   Mr. Giunta is sending this message and he
10 includes you on the message.
11      A.   As a cc on the e-mail. The chain of
12 command was David Magidson. He should have
13 responded.
14      Q.   Mr. Giunta is asking for any disagreement
15 and he doesn't limit it to the folks who are on the
16 "to" line.
17      MR. WOODFIELD: Objection.
18      THE WITNESS: I think you're making an
19 assumption --
20      ARBITRATOR SINGER: Just a minute.
21      MR. WOODFIELD: The document talks for
22 itself as to what the document says. It doesn't need

Page 631

1    came later from folks who had experience working for
2    David or working in his organization.  They felt that
3    he had been a poor performer and that he had done a
4    lot of things from -- he had a very long HR file for
5    doing -- when they heard that Keith had been let go
6    and how it happened, I had folks who used to work
7    directly for David who had been in the past his
8    direct reports and others who worked in his
9    organization just saying, you know, they weren't
10   surprised, he's a vindictive type person, and that he
11   had a HR file as long as New York, from here to New
12   York.
13           And so that's when I was like, whoa, okay,
14   I didn't know that.  Because I had been struggling
15   with the back and forth with David and I really
16   didn't understand why.
17       Q.   Let's turn to Exhibit 56.  This is the
18   August executive summary.  And is -- this document
19   was presented at a risk forum, in or around August of
20   2010?
21       A.   Uh-huh.
22       Q.   And you testified on direct that

Page 632

1    Mr. Magidson was present for that?
2        A.   Yes, he was.
3        Q.   Are you certain that he was?
4        A.   Oh, I'm very certain he was.
5        Q.   How do you know that?
6        A.   He was there.  I saw him.
7        Q.   And you went over this report?
8        A.   Yes.
9        Q.   And on direct, you talked about that this
10   document, particularly at page 3 at FM 319, that it
11   is clear to you that this document and the
12   information contained therein refers to operational
13   incidents that occurred within the Operations space,
14   correct?
15       A.   Yes, where it said "RMO focused its review
16   on Operations," yes.  And "Technology incidents do
17   not provide clear transparency into the business
18   impact; RMO focused its review on Operations."
19       Q.   Now, where it says RMO focused its review
20   on Operations, that's not synonymous with the
21   statement that this report only refers to operational
22   incidents which occurred within Operations, does it?

Page 633

1        A.   Yes, it does.
2        Q.   You think that that's synonymous?
3        A.   Yes, it's the operational incidents that
4    were reported by Operations that impacted their
5    business were the ones that we reviewed.
6        Q.   Now, is a new -- given that Mr. Magidson
7    was new to the risk area and new to this function, do
8    you allow for the possibility that he may have
9    misinterpreted the data which is contained on page 3
10   of Exhibit 56?  That he may not have understood that
11   what was contained here was only operational
12   incidents within Operations?
13       A.   It would be very surprising to me if he
14   did not understand that seeing that he had been with
15   the company for 25 years.  He had been a vice
16   president in the Technology space.  He knew the
17   difference between Operations and Technology.  And I
18   had given, provided the methodology and the scope of
19   the report at the risk forum.
20           In addition to that, I had -- why I knew
21   there was no real issue around confusion is because
22   every time I talked to him about it to make sure that

Page 634

1    he understood, because initially I said, okay --
2        Q.   Before you go on, let's just talk about
3    the document itself.
4        A.   I was trying to give him the benefit of
5    the doubt.
6            ARBITRATOR SINGER:  Stay on the document,
7    please.
8            BY MR. STEWART:
9        Q.   The document itself.  These documents,
10   these executive summaries are presented at risk
11   forums, correct?
12       A.   Uh-huh.
13       Q.   And the risk forums occur monthly?
14       A.   Right.
15       Q.   And who are the participants at the risk
16   forums?
17       A.   Senior management and risk leads.
18       Q.   Had Mr. Magidson attended any risk forum
19   prior to this August executive summary where this
20   document was presented?
21       A.   He was at the risk forum when this
22   document was presented.  I don't know if he

38 (Pages 631 to 634)

Arbitration Day 3                                          December 12, 2012
Washington, D.C.

Page 635

1  attended -- I hadn't seen him at any other risk
2  forums.
3      Q.   So it's possible this is the first one
4  that he ever attended?
5      A.   It's possible.
6      Q.   And typically on the third page of these
7  summaries where we talk about the -- where we have
8  these headlines, this is where the RMO discusses the
9  deep dives that it conducts, correct?
10     A.   Correct.
11     Q.   And in this deep dive, you were looking at
12 Operations, correct?
13     A.   Yes, we looked at Operations.
14     Q.   Now, Mr. Magidson, new to the risk forum
15 and new to the risk area, this would have been
16 presumably the first executive summary that he would
17 have seen, correct?
18     A.   Presumably, yes.
19     Q.   And would you allow for the possibility,
20 given that -- because you've talked about his 25
21 years at the company and as a Technology vice
22 president, but this would have been the first time he

Page 636

1  ran into this document?  Do you allow for the
2  possibility that he didn't understand that this page,
3  page 3 of Exhibit 56, was referring to a deep dive
4  solely within Operations?
5      A.   I would allow for that possibility.  I
6  would say it's a stretch.  And the problem is, I did
7  explain that to him following -- had follow-up
8  conversations to make sure that he wasn't
9  misinterpreting, and he continued to represent false
10 information.
11     Q.   Let's look at the section.  If you go down
12 below the headlines, where it talks about trending of
13 operational incidents, type and number of incidents,
14 do you see that section?
15     A.   Uh-huh.
16     Q.   Now, if you read that section without
17 reference to the headlines above it, there are two
18 bullets or arrows.  The first talks about 168
19 incidents in 2009 and that the trend is towards 68 in
20 2010.  The second talks about at the same time last
21 year, there were 122 incidents already reported in
22 the ACORD system.  Do you see that?

Page 637

1      A.   Yes.
2      Q.   We talked about the ACORD system earlier.
3  What is ACORD?
4      A.   ACORD is the system of record where
5  operational incidents are filed.
6      Q.   And that's operational incidents from
7  anywhere in the company, correct?
8      A.   From anywhere.  But they are filed and
9  reported by the particular business units.
10     Q.   From the business units that could be
11 anywhere in the company, correct?
12     A.   Right.
13     Q.   And Mr. Magidson was a Technology vice
14 president before he joined the Risk and Controls
15 function, correct?
16     A.   Correct.
17     Q.   Presumably he would be familiar with
18 ACORD.  That's something that anybody in Technology
19 at his level would have been familiar with, correct?
20     A.   Correct.
21     Q.   And so would it be reasonable for him to
22 presume that since the second bullet talks about

Page 638

1  operational incidents within the ACORD system,
2  without reference to the headlines, that this is
3  talking about operational incidents anywhere in the
4  company?
5          MR. WOODFIELD:  Objection, calls for
6  speculation.
7          ARBITRATOR SINGER:  Sustained.
8          BY MR. STEWART:
9      Q.   Ms. Oliver, why wasn't this second bullet
10 point, where it talks about 122 incidents reported in
11 the ACORD system, why did it reference reported in
12 the ACORD system from the Operations department?
13     A.   Because it referenced it in the headline
14 section.  And it also referenced it -- Keith's e-mail
15 stated Operations.
16     Q.   Oh, Keith's e-mail.
17     A.   Yes, stated Operations.
18         ARBITRATOR SINGER:  Exhibit --
19         BY MR. STEWART:
20     Q.   Let's look at Keith's e-mail.  Take a look
21 at Exhibit 55 and I'll direct your attention to FM
22 315, the second page.  Are you with me?

                              39 (Pages 635 to 638)

Arbitration Day 3                                          December 12, 2012

Washington, D.C.

Page 747

1  operational incidents and it was a subset, so I was
2  concerned about that, and I was concerned that it had
3  been shared publicly and that it had not been
4  identified as being used incorrectly. I expressed
5  that concern in the meeting with -- or in early
6  November with Jill and with Keith. I was most
7  concerned that Jill had not clearly brought it to my
8  attention. I said to both Jill and Keith, Please
9  consider that I was in my job for less than 75 days
10 at the time, and so I was still learning the space,
11 had a lot of information flowing at me, and I said,
12 you know, if I am unable to understand that there is
13 an error and the error is of any materiality, you
14 know, I'd ask you to go to my management and tell my
15 management that there is an error. I said, it's
16 really important if we have an error that it be
17 identified, acknowledged, and rectified. And so, you
18 know, I said, I wish you guys had gone to the
19 management if you felt like I wasn't hearing you."
20     A.  I agree with that statement, yes.
21     Q.  Ms. Oliver had been telling you the number
22 was wrong, is that correct?

Page 748

1      A.  You know, I don't think that she -- I
2  didn't understand that she was telling me that the
3  number was wrong. What I understood her to say was,
4  gee, there may be other facts -- she didn't say these
5  words, but my interpretation was there may be other
6  factors that are driving operational incidents down
7  and so I never understood from her that what she was
8  saying was, David, you're looking at a subset of the
9  data.
10         That was never clear to me. And in fact,
11 I don't recall Jill coming to me and expressing
12 concerns on a number of occasions. There were a
13 number of e-mails -- and the record is clear -- where
14 this information was being used by management, Jill
15 was copied, Jill and I were responsible for providing
16 this number. Jill seemed unclear at times where the
17 60 percent came from and so I think that the issue
18 was I didn't understand that it was a subset of the
19 population.
20         I would have hoped that they would have
21 understood and if they saw that it was being used as
22 representing the full population, that they would say

Page 749

1  to me, David, it's not representing the full
2  population. And they would go to management and say
3  it's not representing the full population. I mean, I
4  run the unit. Ultimately it's my responsibility but
5  I didn't know until that day that it was a subset of
6  the population.
7          ARBITRATOR SINGER: Mr. Woodfield, would
8  you tell me when you've reached a point where we
9  could take a break?
10         MR. WOODFIELD: Yes, give me about 10
11 minutes and we can take a break.
12         BY MR. WOODFIELD:
13     Q.  Please look at Exhibit Number 40. On
14 Friday, November 5th, 2010, Ms. Oliver did in fact go
15 to Joe Giunta, your supervisor, and say, "David
16 wanted to see the e-mail correspondence where I
17 cautioned against drawing conclusions relative to the
18 correlation between the operational incidents and the
19 SDLC. He did not recall that I had raised the issue,
20 but I did on multiple times during our one-on-ones."
21         Do you deny that you spoke to her multiple
22 times during one-on-ones in which she tried to tell

Page 750

1  you the data did not support the 60 percent figure?
2      A.  May I just read this e-mail, please?
3      Q.  Yes. Go ahead.
4      A.  So I see that there is only one occasion
5  in writing where Jill raised any concern about the
6  correlation of the incidents to SDLC or improvements
7  in SDLC and the only time she raised that concern, we
8  didn't even know what the 60 percent number was. We
9  didn't even have the data.
10         So there is a lot of time that passed
11 between the time that Jill expressed this concern and
12 there is no written record of her expressing any
13 concern about the 60 percent number.
14     Q.  I didn't ask you about a written record.
15 My question was, do you deny that Ms. Oliver told you
16 multiple times during your one-on-ones verbally that
17 you had gotten the data wrong and that she couldn't
18 support it?
19     A.  I do not recall any time when she said to
20 me the 60 percent number was wrong. I do recall on
21 at least two occasions where she expressed concern
22 about correlation and I said to her, let's get the

Alderson Reporting Company
1-800-FOR-DEPO

Page 751

1   data, I will follow up to confirm that the changed
2   volumes in the environment are not a driving factor
3   and what we looked at -- I looked at with another
4   officer in the company was, are the change volumes
5   going down from 2009 to 2010, could that be
6   explaining the reduction as opposed to improvements
7   in practice?
8          I did get back to Jill. I don't recall
9   her raising any concern that there was additional
10  action. She never said to me that the 60 percent
11  number was wrong. She never said to me that it
12  represented a subset of the data. So no, I don't
13  recall a number of conversations where she reflected
14  concerns about the 60 percent number.
15     Q.  Do you recall her ever asking you where
16  you got the 60 percent number from, and that the RMO
17  could not support it?
18     A.  I do recall her asking me and I recall
19  sending her an e-mail showing her where it came from
20  and I recall her acknowledging that she understood
21  where it came from and there is no record of her
22  saying that it was wrong. There are electronic

Page 752

1   records saying that she's -- I don't have the
2   exact -- I haven't memorized the e-mail but it's
3   okay, I understand.
4      Q.  This is an e-mail in Exhibit 55, October
5   20th, 9:34 where you told her what the stats were.
6   You referred her to Keith Taylor's e-mail even though
7   she told you --
8          MR. STEWART: It's not 55.
9          BY MR. WOODFIELD:
10     Q.  42. Forgive me. 42. An e-mail that you
11  sent saying, "Jill, these are the stats that I used
12  to conclude," and you sent this on October 20th, 2010
13  when she told you the RMO could not support this
14  data, is that correct?
15         MR. STEWART: Objection, mischaracterizes
16  the testimony and the record.
17         ARBITRATOR SINGER: Could I have the
18  question read again?
19         THE REPORTER: "Question: You sent this
20  on September 20th, 2010 when she told you the RMO
21  could not support this data, is that correct?"
22         MR. STEWART: Maybe the witness should

Page 753

1   step out so I can voice what the specific --
2          (Witness exits arbitration room.)
3          MR. STEWART: The question is predicated
4   on Mr. Magidson hearing from Ms. Oliver that the RMO
5   would support the data. This witness has never
6   stated and in fact he's denied that up until --
7   between September 24th through November 3rd was there
8   any inference that he was looking at anything other
9   than the full data set.
10         The question now that counsel has raised
11  is predicated on Ms. Oliver having told him, some
12  time ahead of time now, that the RMO can't support
13  the data. This witness has never verified that.
14         MR. WOODFIELD: Well, let me get the
15  e-mail.
16         ARBITRATOR SINGER: You mean an e-mail
17  other than Exhibit 42.
18         MR. WOODFIELD: Well, I'll have him look
19  at the e-mail where she says the RMO can't support
20  the data.
21         MR. BLONDER: That's from before.
22         MR. STEWART: That's September 24th.

Page 754

1          MR. BLONDER: That's before he got the
2   numbers.
3          MR. STEWART: Which he just said.
4          MR. WOODFIELD: Well, let's bring him in
5   and I'll ask him whether he had ever said that to
6   him before.
7          MR. STEWART: Okay.
8          MR. BLONDER: I think that's what he just
9   talked about.
10         (Witness re-enters arbitration room.)
11         BY MR. WOODFIELD:
12     Q.  Taking a look at number 42, what was it
13  that Ms. Oliver had said to you on or before October
14  20th, 2010 that precipitated or predicated you
15  writing back saying these are the stats that I used
16  to conclude there was a 60 percent reduction in
17  system issues (40 greater than 16) from 2009 to 2010,
18  Thanks, David?
19     A.  I don't recall specific -- you know, where
20  it happened but Jill asked me where the 60 percent
21  number came from.
22     Q.  When she was asking you, did she ever tell

68 (Pages 751 to 754)

Page 755

1    you the RMO could not support that number?
2        A.   I don't recall what she said.  I do recall
3    her asking where did the number come from.  I
4    explained it came from her team and I said I could
5    forward it to her.
6        Q.   And what did she say when you forwarded
7    this to her, either verbally or in writing?
8        A.   I mean it says right here she responded.
9    "Thanks.  I did have this info.  This is general
10   information about ops incident volumes.  You must
11   have derived the 60 percent number from the
12   information.  I understand, Jill."  Expressed no
13   level of concern.
14       Q.   When did you learn that she was expressing
15   concern?
16       A.   I didn't learn until the meeting in my
17   office early November.
18       Q.   And then at that point, you believed that
19   the confusion was caused by Mr. Taylor and
20   Ms. Oliver, is that correct?
21       A.   No.
22       Q.   What did you think was the cause of the

Page 756

1    error?
2        A.   I thought it was -- it was unclear to me
3    that the data I was looking at was a subset of the
4    total population.
5        Q.   Did you believe the error was an error in
6    your interpretation?
7        A.   I believe that I incorrectly understood
8    that it was a representation of the full population.
9    I wasn't interpreting the data.  I was just looking
10   at the labeling of the chart and the chart itself.  I
11   thought it was representative of the full set of
12   data.  It was not.  It was representative of a subset
13   of the data.
14       Q.   When you learned that on November 4th,
15   2010, did you believe that it was the responsibility
16   of Jill Oliver and Keith Taylor to have corrected the
17   issue before it had been published?
18       A.   I think that Jill -- and I largely looked
19   to Jill because she was supervising the unit.  She
20   was copied on a number of the e-mails.  She was
21   present in discussions where the information was
22   used.  I would have expected that she would have

Page 757

1    raised the issue sooner.
2            And to me, if I wasn't raising appropriate
3    action, take it to my supervisor, put it in writing
4    to be sure that it was clear.  But I was really
5    looking more to Jill.  Keith was not involved in the
6    development of any materials where the numbers were
7    used.  He had very little visibility.  He was not in
8    sessions with senior management so I would not have
9    expected Keith to be able to raise the issue,
10   although he might have had an opportunity to.  But I
11   think it really fell to Jill since she was copied in
12   the communication thread.  And she and I were the
13   ones responsible for providing the number in response
14   to the Chief Information Officer's request for
15   information.
16       Q.   Do you believe that the responsibility
17   fell upon Jill Oliver and Keith but more to Jill
18   because she had supervisory responsibility, is that
19   correct?
20           MR. STEWART:  Objection, asked and
21   answered.
22           ARBITRATOR SINGER:  Sustained.

Page 758

1            MR. WOODFIELD:  I'm about to impeach him
2    with it.
3            ARBITRATOR SINGER:  Well, you can use his
4    previous answer.
5            MR. WOODFIELD:  I'll impeach him with the
6    prior one.
7    BY MR. WOODFIELD:
8        Q.   Please turn to 101, line 10 of Exhibit
9    103.
10       A.   What page?  I'm sorry.
11       Q.   102, line 10.
12       A.   What section am I in?
13       Q.   103.  Exhibit 103, page 102, line 10.
14       A.   Okay.
15       Q.   "Question:  Okay.  But you believe your
16   error was caused, in whole or in part, by
17   Mr. Taylor's representation of the data; is that
18   correct?
19           "Answer:  No.  I believe the error was an
20   error in my interpretation.  I think that once it was
21   clear to folks that I was interpreting it as a full
22   set as opposed to a subset of the data, I do think

69 (Pages 755 to 758)

Arbitration Day 3                                    December 12, 2012

Washington, D.C.

Page 775

1       A.   No, they didn't tell me that there were
2   allegations of retaliation.  I don't recall
3   allegations of retaliation.  I recall them raising
4   concerns.
5           It was an investigation.  I don't remember
6   exactly what was driving the investigation but we
7   talked a lot about this topic.  So I don't recall if
8   those were specific words that were used.  And they
9   may have been used, and I'm not saying they weren't
10  used, I'm just saying I don't recall the specifics.
11  I know that I was interviewed, I know I shared
12  information about my work with Jill.
13      Q.   Being interviewed by HR about claims of
14  retaliation, is that something that happens to you
15  all the time?
16      A.   No.
17      Q.   So tell me what you can recall about this,
18  if you can recall anything other than there were
19  questions asked.
20      A.   Questions asked about the things that
21  we're talking about here?
22      Q.   Were you asked were you retaliating

Page 776

1   against Ms. Oliver?
2       A.   No, the question was what are the facts
3   around this 60 percent number.
4       Q.   And were you asked whether you were
5   retaliating against Ms. Oliver?
6       A.   I don't recall a question about was I
7   retaliating against her.  I recall a question about
8   what were the circumstances around this and how were
9   they handled.
10      Q.   Were you asked whether you were
11  retaliating against Mr. Taylor?
12      A.   I don't recall a question like that.  I
13  recall questions about conversations, I recall
14  questions about facts and events.  I turned over all
15  of my records, all the records that they requested.
16  I don't recall specific questions, though, about
17  behavior and my behavior.
18          MR. WOODFIELD:  I have no further
19  questions.
20          ARBITRATOR SINGER:  Thank you.
21      EXAMINATION BY COUNSEL FOR RESPONDENTS
22      BY MR. STEWART:

Page 777

1       Q.   Mr. Magidson, you testified on direct that
2   your concern about this discrepancy with the 60
3   percent figure went more towards Ms. Oliver than
4   Mr. Taylor, is that correct?
5       A.   Uh-huh.
6       Q.   And can you explain why that was?
7       A.   I had much more interaction with Jill,
8   both meeting-wise and in written communications.  And
9   at the start of the work to get this number,
10  understand the reduction in operational incidents in
11  2010, Jill and I were responsible, based on an e-mail
12  reply sent to the CIO, to generate the number.
13          So there was an e-mail where I said -- we
14  were asked for information or asked to help the
15  development of this communication to the
16  organization, and I believe I said in response to it
17  Jill and I would follow up when we get the
18  information.  So that was really Jill and I that were
19  responsible for this.
20      Q.   When you became the vice president of the
21  Risk and Controls area, did you have a background in
22  operational risk management?

Page 778

1       A.   My only background was in working with my
2   predecessor, but really more in addressing issues
3   that were part of his job in terms of controls
4   oversight.  I did not have training in the Risk and
5   Controls function, so running an organization like
6   Risk and Controls was a new responsibility for me.
7       Q.   Had you worked with Ms. Oliver or any
8   other member of the RMO team prior to your becoming
9   the VP of Risk and Controls in August of 2010?
10      A.   I had worked with some members of the Risk
11  and Controls organization, mostly Andy Hoffman
12  because he was developing SDLC and applied to the
13  software development work that my team was doing and
14  many other teams were doing at the company.
15      Q.   Is that your team in technology?
16      A.   Yes, exactly.  So Andy's work really
17  applied to Technology.  I had not done any work with
18  Jill prior to coming over to run the Risk and
19  Controls organization.  In fact, not long after I
20  came over, I said to Jill that she really should come
21  and talk to the Technology officers and explain what
22  she does because I said I didn't even know that the

Arbitration Day 3                                           December 12, 2012

Washington, D.C.

---

**Page 779**

1   organization existed and what they were doing.  And I
2   said, it would be good for the rest of the
3   organization to know what you do, it would be good
4   for you to have visibility with the Technology
5   officers.
6       So I asked her to and she made a
7   presentation to the Technology officers.  I can't
8   remember when that was but it was a weekly meeting
9   that they hold and she was one of the outside
10  speakers who I asked to bring.
11      Q.  The 60 percent figure, why were you
12  looking for any percentage or any number when you
13  asked for that information, when the request for the
14  information came from the RMO?
15      A.  We wanted to use facts to help people in
16  the organization understand that quality was
17  important and that we wanted to be able to show that
18  the work that they were putting in to follow this new
19  process was having a real benefit.
20      And it wasn't so much to justify the work,
21  but there are two aspects to this effort.  One is to
22  define the process, the SDLC process, because there

**Page 780**

1   was a lack of clear process and that was contributing
2   to quality issues.  But the other piece was sort of a
3   cultural issue of people embracing a consistent way
4   of doing work and that the lack of sort of a
5   consistent repeatable process was -- and when I say
6   we believe, based on industry study and based on
7   experience of people inside the company, both new and
8   been there for a while, it was really sort of a
9   cultural issue around, hey, let's focus on quality as
10  a way of doing this, let's make it repeatable.
11      And so there was some resistance in the
12  organization to following their process, and what we
13  wanted to do was show them that there is a reward to
14  the organization.  We wanted to sustain that change
15  and so we wanted to overcome the resistance to the
16  notion that we follow a consistent process, and we
17  were looking for data in order to help reinforce some
18  of the cultural aspects of change as well as this
19  process, getting this process change.
20      Q.  Would you just turn to Exhibit 56?  This
21  is the August 2010 executive summary.
22      A.  Okay.

**Page 781**

1       Q.  Now, this summary was presented at a risk
2   forum that you testified probably came in or around
3   September -- after September 21st, 2010, correct?
4       A.  It's around that time, correct.
5       Q.  And had you attended a risk forum prior to
6   that September 2010 risk forum?
7       A.  I think that was my first risk forum.  I
8   did not attend risk forums before then.
9       Q.  And had you seen any executive summary
10  published by the RMO prior to that risk forum?
11      A.  No, I don't believe so.
12      Q.  Were you familiar with the content and the
13  style of these reports from the RMO?
14      A.  No.  I actually didn't know the function
15  existed and, as I mentioned, I asked Jill to come and
16  talk to the Technology officers -- I was a former
17  Technology officer -- because this was new.  So no, I
18  was not familiar.
19      Q.  Counsel directed you to page 3 of the
20  document which is Bates Number FM 319, the lower
21  right-hand corner.  Do you see that?
22      A.  Yes.

**Page 782**

1       Q.  And that's the page where the chart is
2   contained?
3       A.  Yes.
4       Q.  Did you have an understanding that this
5   information contained on this page referred to a deep
6   dive that had been performed by the RMO?
7       A.  Did I know when this was presented that it
8   was from a deep dive?
9       Q.  Yes.
10      A.  I imagine I probably didn't even know what
11  a deep dive was at that time.
12      Q.  You were unfamiliar with the term deep
13  dive?
14      A.  I don't know when I became familiar with
15  it.  I must admit I was 30 days into the job.  The
16  job oversees all the activities in Operations and
17  Technology and this is probably about 2,000 people.
18  There was a lot of data coming at me.  So I can't say
19  that I was familiar with the process that was used to
20  pull this data and to produce this report.
21      Q.  Would you turn to Exhibit 55?  And keep
22  your hand on Exhibit 56.

75 (Pages 779 to 782)

Arbitration Day 3                                                December 12, 2012

Washington, D.C.

Page 783

1    A.   Okay.

2    Q.   And I want to direct your attention to FM

3  315 which is the second page of Exhibit 55.  This is

4  Mr. Taylor's e-mail to you with a cc to Ms. Oliver.

5  Do you see that?

6    A.   Yes.  On the 27th you're talking about, at

7  2:27?

8    Q.   Yes.

9    A.   Yes.  Okay.

10    Q.   And in this e-mail it appears that

11  Mr. Taylor is presenting you with information with a

12  section of the August executive summary.  Do you see

13  that?

14    A.   Right.

15    Q.   Now, when you reviewed Mr. Taylor's e-mail

16  to you, is there anything in this e-mail, this

17  communication, that indicated to you that the subset

18  of data you were looking at only pertained to

19  operational incidents from the Operations group?

20    A.   That I can see, it says here is a chart

21  from the August executive summary, page 3 that speaks

22  to the OI trending on the type and number of

Page 784

1  incidents compared to 2009.  Trending of operational

2  incidents, type and number of incidents.

3        And then it gives some counts but it

4  doesn't say whether it's a subset of a full set.  I

5  assumed it was a full set when I read the e-mail.

6    Q.   Do you see in the last line it talks about

7  something referred to as the ACORD system?

8    A.   Yes.

9    Q.   Are you familiar with what that ACORD

10  system is?

11    A.   Yes.  The ACORD system is a place where we

12  were reporting, I think, operational incidents.  I

13  think it was also used to report other like

14  procedures and things of that nature.  I must admit

15  I'm not that familiar about the operational incident

16  recordation in ACORD because I think there is another

17  system that was used after that.  So I don't have a

18  lot of history there, because that was early in my

19  job at that point.

20    Q.   And do you know now or at the time whether

21  the ACORD system pertained only to operational

22  incidents within the Operations division or

Page 785

1  operational incidents across the enterprise?

2    A.   I assume that it covered all -- the ACORD

3  system is an enterprise system, so I assume that it

4  covers all of the incidents.

5    Q.   In your subsequent message to Mr. Taylor

6  at 4:21 p.m., you're asking for a count of technology

7  and nontechnology issues for the same time last year.

8  And when you sent this e-mail, did you have an

9  understanding of whether -- let me strike that.

10        Your response to Mr. Taylor, you're asking

11  for technology and nontechnology issues.  Do you see

12  that?

13    A.   Yes.

14    Q.   His initial e-mail to you, the information

15  talks about system and manual.  Did you have an

16  understanding of whether "system" referred to

17  technology and "manual" referred to nontechnology?

18    A.   I thought we were looking at all of the

19  issues for Operations and Technology so I was asking

20  for a breakout between the technology ones and the

21  nontechnology ones.

22    Q.   And when you received Mr. Taylor's e-mail

Page 786

1  at the bottom at 2:27, did you have the August

2  executive summary when you reviewed it?

3    A.   I'm sorry, say again.

4    Q.   Mr. Taylor -- I directed you to

5  Mr. Taylor's e-mail at the bottom of that page.  He

6  refers to a chart from the August executive summary.

7  Do you see that?

8    A.   Right.

9    Q.   Did you have that August executive summary

10  or did you review it when you received Mr. Taylor's

11  e-mail?

12    A.   I don't recall if I went back and reviewed

13  the August executive summary at the time I received

14  this e-mail.

15    Q.   Let's go to Exhibit 42.

16        Let's go to Exhibit 1.  Just take a moment

17  and look at the front page of Exhibit 1 which is at

18  FM 2 and let me know if you've seen this document

19  before?

20    A.   Okay.  Yes.

21    Q.   Are you familiar with this document?

22    A.   Yes.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                                December 12, 2012

Washington, D.C.

Page 791

1   expectations of her and her responsibilities as a
2   director of the RMO to raise that concern to your
3   manager?
4      A.   My expectation would have been that she
5   would just respond directly to who was asking her
6   about concerns.  If she felt uncomfortable doing so,
7   she could have come to me.  But there is no protocol
8   that requires her to go through levels of management.
9   The expectation is that we communicate directly with
10  each other when there is a specific question asked.
11     Q.   Would you turn to Exhibit 2?  This is a
12  September 24th communication from Ms. Oliver to you.
13  Do you see that?
14     A.   Yes.
15     Q.   And it was sent seven minutes after your
16  message to Ms. Oliver and a number of other people
17  about the development of this HomeSite message,
18  correct?
19     A.   Yes.
20     Q.   And Ms. Oliver tells you, "David, we would
21  have to look at the data to determine if this
22  conclusion can be supported."  Do you see that?

Page 792

1     A.   Yes, I do.
2     Q.   What did you understand her to be saying
3  to you in this September 24th e-mail?
4     A.   I think she was saying that she wanted to
5  look at the data to see if SDLC and PMAP efforts have
6  reduced operational incidents.  So I think that she
7  was really just commenting on that first sentence.
8     And at that time, I think that's an
9  appropriate statement because I don't think that -- I
10  don't think that there was an analysis other than
11  there had been some information reported in the risk
12  forum that was published on September 21st, but I
13  don't think there was any analysis other than that
14  data that was there.
15     Q.   And did you expect that Ms. Oliver would
16  conduct further analysis?
17     MR. WOODFIELD:  Objection, calls for
18  speculation.
19     MR. STEWART:  I'm asking what his
20  expectation was.
21     ARBITRATOR SINGER:  As her manager.  You
22  may answer.

Page 793

1     THE WITNESS:  She said we would have to
2  look into the data to determine if this conclusion
3  could be supported.  My expectation was that she is
4  looking into the data to determine whether it could
5  be supported.
6     BY MR. STEWART:
7     Q.   And when you received data from Mr. Taylor
8  on the following Monday, which would have been
9  September 27, 2010, was that consistent with your
10  expectation that Ms. Oliver would have provided
11  information to you based on this series of
12  communications?
13     A.   Yes, expected the information to come
14  back.  I would have expected if there were concern
15  that it would have been expressed then or, if there
16  wasn't concern then, it would have been expressed
17  when there was concern that developed.
18     Q.   Now, the communication that was -- the
19  HomeSite message, was that to be distributed internal
20  or external to Fannie Mae?
21     A.   Internal.
22     Q.   And to whom specifically?

Page 794

1     A.   I would have to look at the communication
2  but my recollection was it was out to employees.  I
3  believe it was a general employee mailing list.
4     Q.   Subsequent to the September 24, 2010
5  e-mail from Ms. Oliver to yourself, did Ms. Oliver
6  raise any concern that she had relative to the
7  correlation between SDLC and PMAP and the reduction
8  of operational incidents?
9     A.   I recall a conversation where she
10  expressed concern about correlation and my conclusion
11  was that she was concerned that another factor like a
12  change in the volume of projects being implemented,
13  and what that means is the amount of change made in
14  the environment, that if we reduced the change in the
15  environment, that that might be driving operational
16  incidents down.
17     So I thought she was saying that there
18  might be something other than SDLC responsible and I
19  agreed to rule that out by asking for the data to
20  show whether there was a change year-over-year 2009
21  to 2010.  I was not aware of any other factors other
22  than change in volumes that Jill was concerned or

78 (Pages 791 to 794)

Arbitration Day 3                                              December 12, 2012

Washington, D.C.

Page 795

1    might have been concerned about driving a reduction.
2         Do you mind if I take a two-minute break?
3         ARBITRATOR SINGER:  No.
4         (Recess.)
5         BY MR. STEWART:
6    Q.    Would you turn to Exhibit 57, please?
7    A.    Okay.
8    Q.    Would you just review Exhibit 57 and once
9    you've done that, I would also like you to look at
10   Exhibit 58.  Let me know if you're familiar with
11   these documents.
12   A.    Okay, I'm familiar.
13   Q.    Can you describe very briefly what these
14   two documents represent?
15   A.    So the document, Exhibit 58, represents a
16   presentation that was being developed for the senior
17   management group at Fannie Mae.  These would be the
18   senior vice presidents.  They're two levels down
19   reporting from the CEO of the company.  And the
20   presentation was being developed for my supervisor
21   and the Chief Information Officer to talk with this
22   group of senior leaders about SDLC and the importance

Page 796

1    of us implementing it, implementing not only the
2    process but having it embraced, getting the culture
3    changed.
4         So the e-mail thread you see in 57 is
5    really an exchange of communication about building
6    this presentation and gathering the data to support
7    the different aspects and elements of the
8    presentation.
9    Q.    And the first page of Exhibit 57 is a
10   communication from you to Mr. Taylor and to other
11   members of the RMO team as well as Mr. Huffman?
12   A.    That's correct.
13   Q.    Why are you sending this information to
14   Mr. Taylor?
15   A.    Well, I sent it out to -- I can't recall
16   at the time how many different people were involved
17   in the analysis, but I wanted to make -- there was an
18   ask about values for the slide and I also wanted to
19   give him the full context so I gave him the whole
20   presentation.
21   Q.    When they asked for values in the slide,
22   is that your e-mail to the RMO team reflected at the

Page 797

1    last full e-mail on this chain?
2    A.    Yes.
3    Q.    And then Mr. Taylor responds with the
4    answers to the information that you requested,
5    correct?
6    A.    That's correct.
7    Q.    And then the last one is your response?
8    A.    Yes.
9    Q.    Is it typical for you as an officer to
10   review materials that are going to be prepared for
11   your office that would then be presented to the
12   senior management group?
13   A.    It's pretty typical to share information.
14   There is no restriction on the flow of information,
15   sure.
16   Q.    And when you shared your information with
17   the RMO team, including Ms. Oliver, did you expect
18   that she would be reviewing the attachment which is
19   the Exhibit 58?
20   A.    Yes, I would have expected that -- you
21   know, the SDLC was a big focus.  She and I were
22   working on gathering some statistics that would be

Page 798

1    used to explain SDLC.  So yes, I would have expected
2    that she would have looked at the attachment.
3    Q.    And on the seventh page of the attachment,
4    you can take a look at it, there is a reference to
5    the 60 percent reduction in technology-based
6    operational incidents.  That's at the seventh page of
7    Exhibit 58.
8    A.    Yes.
9    Q.    Do you see that?
10   A.    Uh-huh.
11   Q.    And on or about October 11, 2010, did
12   Ms. Oliver or Mr. Taylor or anyone else in the RMO
13   come to you and tell you that the 60 percent figure
14   that's referenced in Exhibit 58 could not be
15   supported by data accumulated by the RMO?
16   A.    No.  There was no concern that was raised
17   about that 60 percent number.
18   Q.    Exhibit 42, if you would.  And this is the
19   e-mail from Ms. Oliver to you on October 20, 2011 at
20   11:14 a.m.  It's the document that you reviewed on
21   direct, is that correct?
22   A.    At 11:14 a.m., yes.

79 (Pages 795 to 798)

Arbitration Day 3                                                          December 12, 2012
Washington, D.C.

Page 799

1    Q.   And after you received this communication
2  from Ms. Oliver, did you have an understanding that
3  she harbored a concern that the 60 percent figure
4  could not be supported by data in the RMO?
5    A.   No.  I assumed that she had forgotten the
6  details behind the 60 percent number, so I assumed
7  when she sent this back that she now understood and
8  that she was okay with it.  I didn't interpret from
9  this and I didn't hear from any conversations that
10  the 60 percent number was incorrect or might be
11  incorrect.
12    Q.   So on or about October 20, 2010, did you
13  have in your mind, in your head at that time any
14  belief or suspicion that Ms. Oliver or Mr. Taylor had
15  a concern that the 60 percent number was invalid?
16    A.   I had no concerns about that number
17  because there were no concerns that were raised to
18  me.
19    Q.   Had Mr. Taylor come to you and raised any
20  concern about the 60 percent number any time prior to
21  October 20, 2010?
22    A.   Again, I didn't think the 60 percent

Page 800

1  number was in question.  It had been already out and
2  used and there were no comments indicating it was not
3  correct, either written or verbal comments.
4    Q.   Did you attend the SMG luncheon where the
5  60 percent figure was presented?
6    A.   I did not.
7    Q.   Why not?
8    A.   It was a luncheon for the next level of
9  management.  I'm a vice president of the company and
10  so there are occasions where vice presidents are
11  invited as guest speakers, but this was really a
12  topic that really had to be driven by the Chief
13  Information Officer.  He's a senior vice president.
14  He's a member of the senior management group.  And he
15  wanted to bring his peer who headed up a large part
16  of Operations for them to co-present.
17        So it was a way of saying, you know, I was
18  working on the topic but this topic is so important
19  that these two senior leaders are here to speak about
20  it.  So no, I did not attend.
21        (Discussion off the record.)
22        BY MR. STEWART:

Page 801

1    Q.   Do you recall the meeting which occurred
2  on or about October 21st, 2010 with the FHFA where
3  the 60 percent number was referenced?
4    A.   In the initial presentation, you're
5  referring?
6    Q.   Yes.
7    A.   Yes.  I sat in a meeting where the
8  presentation that we were looking at before for the
9  senior management group, where that was delivered.
10  Was that the question that you're asking?
11    Q.   Mr. Woodfield asked you about the meeting
12  with FHFA.
13    A.   Right.
14    Q.   Where there was some reference, and I
15  believe you testified you weren't sure whether it was
16  you or somebody else --
17    A.   Right.
18    Q.   -- made a reference to the 60 percent
19  figure.
20    A.   The 60 percent figure was actually shared
21  when that SDLC presentation was shared.  So after it
22  was shared at the senior management group lunch, it

Page 802

1  was as an informational update, so by the way, this
2  presentation, we're driving change for SDLC in the
3  company.  We said that we had this broad
4  communication out to the entire team.
5        We had this meeting with the entire
6  team -- I shouldn't say we but I was involved.  But
7  there was a meeting with the senior management group
8  where this presentation was given.  We said we think
9  it's a useful update.  So I was in attendance at a
10  meeting with FHFA where that information was shared
11  subsequently with the FHFA, and that's where that 60
12  percent number was quoted.
13    Q.   Who attends that meeting from the FHFA
14  where this number was presented?
15    A.   At the time, it was Liz Scholz who headed
16  an exam team and some of her examiners.  And the
17  examiners who attended varied depending on the topics
18  because there were examiners who examined aspects of
19  Technology and there were examiners who examined
20  aspects of Operations.  So sometimes they all
21  attended and sometimes a subset attended and it
22  really depended on the topic and their calendars and

Alderson Reporting Company
1-800-FOR-DEPO

Page 803

1    their interests.
2        Q.   Why, to your recollection, was there any
3    reference to the 60 percent figure in that meeting?
4        A.   I think it was a way of communicating that
5    we're having some impact with what we're doing. And
6    so it was not only to say, you know, we think that
7    we're having an impact in terms of -- you know, we're
8    communicating with the employees, we're communicating
9    with management, we reinforcing this process change
10   but also, by the way, we're seeing more positive
11   results around our software development.
12       Q.   To your recollection, was that 60 percent
13   number specifically referenced in order to resolve
14   any pending MRA?
15       A.   No, there was no expectation that that 60
16   percent number was going to resolve the MRA. We
17   were -- in fact, there was no specific date that we
18   were trying to close the MRA.
19           The FHFA said this was one area where they
20   were going to treat it as something that required
21   continuous supervision, and so they wanted to see --
22   their concern was that we might not continue to

Page 804

1    follow and advance SDLC and embrace it and actually
2    drive it as a common and consistent and repeatable
3    practice.
4            So this was just an update. We had no
5    knowledge at that time when we were going to be
6    closing the MRA. We had no agreement about what we
7    had to show to close it, and so it was just an
8    update.
9        Q.   We've heard a lot about MRA but from your
10   vantage point, what did the MRA relate to or require?
11       A.   The MRA required that we establish a
12   software development life cycle practice -- that's
13   SDLC -- to address concerns about stability in the
14   production environment. The production environment
15   is the place where the systems that are used to run
16   the company's business operate, and so FHFA expressed
17   through this MRA and it's a matter of record that
18   they had concerns that we didn't have a consistent,
19   repeatable practice that allowed for sufficient
20   quality to be delivered in the area of the computer
21   systems that are used to run the company's business.
22       Q.   If I understand you correctly, they wanted

Page 805

1    to see that this practice was repeatable and that
2    Fannie Mae was following it and they wanted to see
3    that over a period of time?
4        A.   That is correct. And they also wanted to
5    see that not only was it repeatable and followed, but
6    that the management team was supporting its
7    advancement over time as well. And this is not an
8    uncommon thing for not only regulators but auditors
9    to say, okay, so you've defined it and you've
10   implemented it but are you actually providing
11   management oversight to continue it? So yes, that's
12   absolutely correct.
13       Q.   And is that in part the reason why you
14   were sending out the communication about SDLC and its
15   effect on operational incidents? You were presenting
16   information to the senior management group to gain
17   buy-in from other officers at Fannie Mae about SDLC?
18       A.   It was to gain not only the buy-in but
19   sort of a level of embrace around SDLC so that it was
20   repeatable. We wanted people to not only understand
21   it but to follow it. And so in order to give people
22   incentives to follow it, they have to see that there

Page 806

1    is value, that there is benefit.
2            Also, we wanted to make sure that we were
3    seeing the value and if the number said that we
4    weren't seeing the value, then that would indicate
5    that maybe there were some things that we needed to
6    do differently in addition to what we were doing.
7        Q.   Now, ultimately -- you've seen it from the
8    documents that Mr. Woodfield showed you on direct --
9    the RMO reported initially a 35 percent reduction in
10   technology-based operational incidents, correct?
11       A.   Uh-huh.
12       Q.   And from your vantage point, did it
13   make -- the percentage reduction of operational
14   incidents, whether that was 60 percent or 30 percent,
15   did that make any difference for what you were trying
16   to achieve?
17       A.   The magnitude of the number, I mean, a
18   larger reduction is good but I don't think that there
19   was any one number that was important. If we saw
20   that in fact quality was degrading, that would have
21   caused us to say, hey, maybe we need to do something
22   different. But if it was 15 percent, okay, we're

Page 827

1    through this Live Meeting.
2          But we had a meeting ongoing so we could
3    all talk on the phone together and we could all look
4    at this presentation on line.  And we were going
5    through and just at the start, early on when we were
6    looking at the numbers, you saw this -- I call it an
7    anomaly because I was just surprised to see that
8    Chris Baer would have a larger percent number than
9    Keith Taylor.
10         And so I had a conversation with Jill
11   about that, just -- we've talked about it before but
12   asked Jill why she was awarding a higher percentage
13   amount for Chris given that he had a lower ranking in
14   the calibration.
15     Q.   And what do you recall her telling you?
16     A.   I recall her telling me that Chris has had
17   really strong performance, he's a valued member of
18   the team.  I just remember her making very positive
19   statements and I reminded her that the compensation
20   reflects performance and performance should be
21   reflected in the compensation and so I said to her,
22   I'm surprised to see a higher amount and that I asked

Page 828

1    her whether a higher amount is justified given his
2    performance and reminded her that Chris was
3    calibrated at a lower level.
4          And she said, no, she thought that it was
5    right and that she wanted to continue with the
6    higher -- when I say amount, percentage for him.
7      Q.   And did you tell her at that time that you
8    were contemplating eliminating either Mr. Taylor or
9    Mr. Baer's position?
10     A.   I did not talk with Jill or any of the
11   other directors at that time or any other time about
12   eliminating positions.
13     Q.   And at the time you had this discussion
14   with Ms. Oliver about compensation, did you know that
15   you were going to have to eliminate one of the
16   positions on your team?
17     A.   I knew that I was going through a
18   restructuring and that I was going to be eliminating
19   positions and I had already preliminarily concluded
20   that I was going to eliminate Chris Baer's position.
21   When I say preliminarily, I hadn't gone through the
22   full thought process, I hadn't documented the

Page 829

1    information and reviewed it with HR but I had drawn a
2    preliminary conclusion that I was going to eliminate
3    Chris Baer's position.
4          And so that's why I hung on to and I asked
5    and I reinforced, you know, do you really want to
6    give this higher amount to Chris because he was
7    calibrated at a lower level.  And so I was trying to
8    have the conversation about who do you value more
9    without having that conversation, because we weren't
10   there to recalibrate, but I knew that what I was
11   seeing was going to be inconsistent with -- in terms
12   of compensation, was going to be inconsistent with at
13   least where I was at that point in time on the
14   restructure.
15     Q.   And had you disclosed to Ms. Oliver in
16   January of 2011 that you were contemplating reducing
17   head count that might affect individuals on her team,
18   were you concerned that she would maybe be concerned,
19   as well as other directors could be concerned that
20   reduction in force was in the air and that they might
21   start migrating outside of Fannie Mae?
22     A.   I did not share any information about the

Page 830

1    reduction in force in my area with the directors or
2    anyone in the organization.  My supervisor was aware
3    that I was working on the plan and HR was aware, but
4    that was it.
5          The company had acknowledged that it was
6    going to be shrinking in size and so there was a
7    general awareness across the company that positions
8    were going to be eliminated but there was no
9    discussion about the specifics, about where that
10   might happen and when that might happen, and I was
11   not sharing it.
12     Q.   Do you recall how many positions were
13   eliminated from your organization on or about April
14   21st, 2011?
15     A.   I talked about the five positions.  You
16   have Keith, Bill Walter, Rao, R-a-o, Michael Scott,
17   Peggy Wenneman and Rich Licato.  So it's actually
18   six.
19     Q.   Now, was it just your organization where
20   there were positions eliminated on April 21st, 2011?
21     A.   No, there were a number of positions
22   eliminations across the company and the company felt

Page 831

1    it important that we minimize the impact on the
2    employees and we minimize the risk on the
3    organization in the way that we did this.
4         So rather than have, you know, every
5    organization go through restructuring and pick its
6    day and handle its own way and so people feel like
7    every day something is going to happen, the company
8    synchronized on, I think it was April 21st was the
9    date, so those organizations who were doing
10   restructures worked to do them on the same day so
11   that there could be one communication, employees
12   could know what happened and why.
13        And then as difficult as these things are
14   for organizations and for the people in them, that we
15   could go through it and then move on to the
16   post-restructure period.
17        Q.   Now, you informed Mr. Taylor that his
18   position had been eliminated, correct?
19        A.   That's correct.
20        Q.   Did you tell the other individuals who
21   were impacted in the reduction in force within your
22   organization that their positions had been

Page 832

1    eliminated?
2         A.   I communicated all of the position
3    eliminations except for one and that was Bill Walter
4    and the reason for that was a logistical reason.  I
5    could not get around to -- we agreed -- when I say we
6    agreed, the company wanted the communication to be
7    done in a very tight period and so we were to start
8    in the morning and I think that -- I believe it was 1
9    o'clock but I think that we wanted it to be done by 1
10   o'clock with all the individual conversations that
11   people impacted knew, because there were a large
12   number across the company.  It was by morning or
13   early afternoon.
14        And people were in different physical
15   buildings and so I couldn't get around to all the
16   buildings and so I asked very shortly before the
17   restructure announcement, I asked Andy Huffman, I
18   brought him into -- I made him aware that there was
19   going to be a restructure and I did this in
20   consultation with HR and there were others who needed
21   help as well communicating the restructure.
22        So there was an agreement that -- I don't

Page 833

1    know if it was 48 hours before or 36 hours before but
2    a certain amount of time before the day of the
3    restructure, those who had to communicate to
4    employees who were impacted participated in sort of a
5    walk-through of this is how we're going to
6    communicate, these are the materials you're going to
7    give to employees.
8         And so Andy had to go through that
9    training, if you will, so that he could deliver the
10   message.  But I asked him for help because I couldn't
11   get around to all the buildings and talk to all the
12   people.
13        Q.   And at that point, had you already decided
14   that Mr. Walter's position would be eliminated?
15        A.   Yes.
16        Q.   And at that time, you talked about you
17   couldn't get around to all the buildings, where was
18   your building located?
19        A.   So I work in Washington, D.C. but we also
20   have employees working in two buildings out in
21   Virginia.  And so I started the day in D.C.  I
22   couldn't get out to both buildings out in Virginia.

Page 834

1         Q.   And was Mr. Walter in the Virginia
2    facility?
3         A.   Yes.
4         Q.   And is that where Mr. Huffman was?
5         A.   That's where Andy was, yes.
6         Q.   And is that why you asked Mr. Huffman to
7    communicate to Mr. Walter that his position had been
8    eliminated?
9         A.   Yes.
10        Q.   And at that point, the decision had
11   already been made?
12        A.   Yes.
13        Q.   And Mr. Huffman didn't have an opportunity
14   to protest or lodge a complaint.  The decision was
15   going to happen; Mr. Walter's position was going to
16   be eliminated?
17        A.   Everything was done, not only the
18   decisions about whose positions would be eliminated
19   but all of the preparation.  There is a fair amount
20   of work that goes into preparing the documentation so
21   employees have materials that they understand.  Some
22   of those documents are specific to them, about their

Page 835

1    compensation and severance packages and things like
2    that.  So yes, all of that was finalized.
3        Q.  I just want to touch base on just a few
4    more points.  It will be very brief.  When
5    Ms. Oliver -- did you approve the LTI award that
6    Ms. Oliver -- or that ultimately got paid to
7    Mr. Taylor?
8        A.  Yes, I approved all the LTI awards in my
9    organization.
10       Q.  And did you have an understanding that
11   Mr. Taylor was leading discussions with the FHFA
12   towards the end of 2010?
13       A.  I wouldn't describe it that he was leading
14   discussions.  He was attending the weekly meeting
15   with FHFA.  Jill, I gave her responsibility for
16   running that meeting and she asked that Keith help
17   her and he kept track of action items, wrote them
18   down and there were agendas that had to be prepared
19   for the meeting.  So I'm assuming that that's what
20   you're referring to.
21       Q.  Did you voice any concern that Mr. Taylor
22   would be leading those meetings with FHFA, would be

Page 836

1    developing the action items, et cetera, for those
2    meetings?
3        A.  Concerns about that role for him?
4        Q.  Uh-huh.
5        A.  No, I did not.
6        Q.  Did you have any concern about him in that
7    role, about Mr. Taylor in that role?
8        A.  No, I did not.
9        Q.  At any point did Mr. Taylor inform you
10   that he was concerned about securities fraud?
11       A.  No.
12       Q.  Did Mr. Taylor inform you that he was
13   concerned about potential SOX violations?
14       A.  No.
15       Q.  Did he tell you that he was concerned --
16   did Mr. Taylor tell you that he was concerned about
17   any financial reporting errors?
18       A.  No.
19       Q.  Did the concern that Ms. Oliver raised to
20   you about the correlation between SDLC and reduction
21   in operational incidents, did that create for you a
22   concern that she was voicing a complaint about

Page 837

1    financial reporting errors?
2        A.  No, not at all.
3        Q.  To what extent if any does the correlation
4    between the SDLC and a reduction of operational
5    incidents have to potential financial reporting
6    errors?
7            MR. WOODFIELD:  Objection.  There is no
8    predicate that he knows what financial reporting
9    errors are.
10           BY MR. STEWART:
11       Q.  Do you have an understanding what a
12   financial reporting error is?
13       A.  Yes.
14       Q.  And to what extent if any does a
15   correlation between the SDLC and the reduction in
16   operational incidents have to financial reporting of
17   errors?
18       A.  The information about the number of SDLC
19   issues that we have and the number of operational
20   incidents is not part of the financial disclosures.
21   It's not part of the financial reporting.  It's not
22   information that's even reported outside the company.

Page 838

1    So any accuracy issue on any of that data does not
2    change the financial reports.
3            If we had corrected -- the 60 percent
4    number that was an error, if that error wasn't
5    identified until a month after the year-end
6    financials were produced, there would have been no
7    change to the financials.  So it's not as if that was
8    a number that was disclosed in the financials and, if
9    disclosed incorrectly, would have been corrected
10   or -- it was not part of the financial reporting.
11       Q.  And to what extent if any were you aware
12   that Mr. Taylor had voiced any complaints or concerns
13   of any kind to you?
14       A.  About the 60 percent?
15       Q.  About the 60 percent or about anything
16   else.
17       A.  He did not raise any concerns to me about
18   the 60 percent number.  He didn't raise any concerns
19   to me about SDLC.  He didn't raise any concerns to me
20   about his assignments.
21       Q.  What about when you met with him on
22   November 4th, 2010, right after you found out that

Page 839

1  you had in fact looked at the subset of the data?
2  When you met with him, did Mr. Taylor raise any
3  concerns?
4      A.  I will say that when I met with Jill and
5  with Keith, Keith was very quiet and most of the
6  conversation was really -- actually, I can't actually
7  recall him saying anything. I'm sure that he said
8  something in the meeting but it was really Jill and I
9  who had the conversation.
10      I'm sure that I looked to Keith for
11  validation. And when I say validation of something,
12  it's not that I didn't believe Jill but Jill was
13  saying to me, David, this is not the full -- there is
14  something wrong here with these numbers. 60 percent,
15  I can't tell you that that's the right number and we
16  started to get into so what does that number
17  represent.
18      And when I started to understand it as
19  validation, I'm sure I said to Keith -- to both of
20  them, am I understanding this correctly? This number
21  represents only the incidents that were reported by
22  the Operations and Technology group. I'm sure he

Page 840

1  said to me, yes.
2      But I do not really remember him saying
3  very much. I think most of the discussion was really
4  with Jill.
5      Q.  Did you ever understand that Mr. Taylor
6  was accusing you of lying to the FHFA?
7      A.  No.
8      Q.  What about Ms. Oliver? Did you understand
9  that Ms. Oliver was accusing you of lying to FHFA?
10      A.  No. I never heard anyone say that I was
11  lying to FHFA. As far as I'm concerned, the numbers
12  that we shared were the organization's numbers. And
13  I'm not saying the RMO's numbers. That was a paper
14  that -- the SDLC paper that had the 60 percent number
15  was put together by the Operations and Technology
16  organization. So I didn't think that it was
17  necessarily mine.
18      It was a collaborative effort and we
19  thought we produced the right document and it had an
20  error in it and so an error was conveyed. So this
21  notion that I lied to FHFA, nobody ever said that to
22  me. I find it surprising that anyone would draw that

Page 841

1  conclusion.
2      Q.  Do you supervise any members of the RMO
3  today?
4      A.  No, I don't.
5      MR. STEWART:  No further questions.
6      ARBITRATOR SINGER:  Thank you. Do you
7  have any questions?
8      MR. WOODFIELD:  I do, yes.
9      EXAMINATION BY COUNSEL FOR CLAIMANT
10      BY MR. WOODFIELD:
11      Q.  You testified that you knew what financial
12  reporting errors were. Tell me what necessarily
13  needs to be reported about misrepresentations to
14  regulators on a federal 10-K. Do you know? Do you
15  know what a 10-K is?
16      A.  I certainly know what a 10-K is.
17      Q.  Do you know if misrepresentations, either
18  errant or intentional, have to be reported on a 10-K?
19      A.  I can't say that I am an expert in all of
20  the conditions that require changes to a 10-K, so I
21  can't answer with specificity. I will tell you that
22  my belief is this number is not of any material

Page 842

1  significance and would have no bearing on Fannie
2  Mae's financial reporting.
3      Q.  Do you know what financial documents
4  Fannie Mae files with the SEC other than a 10-K?
5      A.  We file 10-Qs and we file -- there are
6  other notifications that are required outside of the
7  regular filings around certain changes.
8      Q.  How many?
9      A.  There are changes in management and other
10  things but I can't say that I follow them to know --
11  I'm not responsible for the financial reports, so I
12  can't give you details of Fannie Mae's filings.
13      Q.  So it's fair to say that it may have to be
14  reported, it may not; you don't have any idea, is
15  that correct?
16      MR. STEWART:  Objection.
17      BY MR. WOODFIELD:
18      Q.  If a misrepresentation is made to a
19  federal regulator, you don't know if that's
20  necessarily reported or not?
21      MR. STEWART:  Objection. I think that was
22  already answered.

Page 855

1   to hear the one question about those two people.
2       MR. WOODFIELD:  Actually, because it's two
3   of them, I can make it compound.
4       ARBITRATOR SINGER:  Go ahead and make it
5   compound.  That way it's one question.
6       BY MR. WOODFIELD:
7       Q.   Did Mr. Licato and Ms. Wenneman, prior to
8   the time that you made the decision to terminate
9   them, ever file a retaliation complaint against you?
10      A.   I would have no knowledge.  I'm not aware
11  of any retaliation complaint that was filed against
12  me by them or anyone else.
13      Q.   But yes, you in fact are aware of other
14  people who did.  You know that Ms. Oliver filed a
15  retaliation complaint?
16      A.   I've acknowledged that.  I'm talking about
17  anyone other than Ms. Oliver.
18      Q.   Anyone you fired?
19      A.   I'm sorry, what is your question?
20      Q.   You didn't fire anyone -- you fired people
21  who didn't file retaliation complaints against you,
22  correct?

Page 856

1       A.   I'm not sure -- let me answer the question
2   about Peggy and Rich and then if you're asking about
3   other people, you've got to tell me who you're asking
4   about.
5       Q.   Mr. Licato did not file a retaliation
6   complaint about you during his employment with Fannie
7   Mae?
8       MR. STEWART:  Asked and answered.
9       THE WITNESS:  I'm not aware of a complaint
10  filed by Rich Licato.
11      BY MR. WOODFIELD:
12      Q.   But Ms. Oliver did file a retaliation
13  complaint?
14      MR. STEWART:  Objection, mischaracterizes
15  his testimony.
16      ARBITRATOR SINGER:  Asked and answered
17  anyway.
18      BY MR. WOODFIELD:
19      Q.   In your training, do you know whether it's
20  illegal to fire people who in whole or in part -- in
21  your EEO training, do you know whether it is
22  permissible to terminate people in whole or in part

Page 857

1   because they filed a retaliation claim against you?
2       A.   You can't fire -- you can't retaliate
3   against people.  I know you can't retaliate against
4   people.
5       Q.   And if someone claims that you retaliated
6   against them, you cannot engage in subsequent
7   terminations of that person unless you have a reason
8   that's completely inapposite to the retaliation
9   complaint, is that correct?
10      A.   I will tell you that if I have any issues
11  with performance of an employee, I work with my HR
12  partners to make sure that I am following not only
13  the company's guidelines but fully in compliance with
14  all legal requirements, and also doing not only the
15  right thing but doing it correctly.
16      Q.   During his employment, Mr. Taylor, like
17  Mr. Licato and Ms. Wenneman, did not file a
18  retaliation complaint against you with HR, to your
19  knowledge, is that correct?
20      MR. STEWART:  Objection.  It's unclear
21  that the witness even understands whether a complaint
22  had been filed against him.  The witness testified he

Page 858

1   was interviewed but he hasn't given anything about
2   why he was interviewed so there is no foundation.
3       ARBITRATOR SINGER:  He also said he wasn't
4   aware of any other retaliation claim filed against
5   him so the answer to your question is obvious.
6       MR. WOODFIELD:  Thank you.  I have no
7   further questions.
8       MR. STEWART:  Very briefly.
9       EXAMINATION BY COUNSEL FOR RESPONDENTS
10      BY MR. STEWART:
11      Q.   Do you understand or have an understanding
12  why you were interviewed by anyone at Fannie Mae
13  concerning these issues as you've described?
14      A.   I know there was a concern raised.  I
15  don't know what generated the concern.  I know that I
16  was asked about the circumstances around this 60
17  percent number but I actually don't know what
18  generated the investigation.  And I didn't ask what
19  generated the investigation because it's not really
20  an important thing for me.  What's important is to
21  fully cooperate and provide the information that I
22  know.

Alderson Reporting Company
1-800-FOR-DEPO

Page 859

1    Q.   So you have no specific knowledge of
2  whether Mr. Taylor filed any complaint against you?
3    A.  I do not know what complaints were filed
4  against me.
5    Q.  If any?
6    A.  That's true.
7    Q.  And Mr. Woodfield talked to you about your
8  deposition that you had given on August 30th, 2010
9  where you referred to a conversation that you had
10  with Ms. Oliver from a compensation discussion around
11  January 2011.  Do you recall that?
12    A.  I'm sorry, and it's just because it's
13  getting late.  Can you refer me to my testimony or my
14  deposition?
15    Q.  Exhibit 103, page 59 and it starts at line
16  15 of page 59 and continues to line 4 of page 60.
17    A.  Okay.
18    Q.  And this is where Mr. Woodfield had asked
19  you a question, you responded with what Ms. Oliver
20  told you about the performance and that Keith Taylor
21  should get a higher bonus.  Do you recall that?
22    A.  That Chris Baer should get a higher LTI

Page 860

1  percent?
2    Q.  I'm sorry, that's right.  And did you
3  reflect that discussion from January of 2011 in your
4  justification for terminations which is at Exhibit
5  78?
6    A.  No, I did not.
7    Q.  Would you look at the page FM 421?
8    A.  In which one?
9    Q.  78.
10    A.  Okay.  Yes.
11    Q.  In that second paragraph, first sentence,
12  you state, "Keith's Operations risk analyst peers
13  perform at higher levels in the quality and quantity
14  of work they produce, and they operate with less
15  direction than Keith requires."
16    A.  Yes.
17    Q.  As you wrote this in the justification
18  sometime in the spring of 2011, did you have in your
19  mind what Ms. Oliver had told you back in January of
20  2011?
21    A.  Well, I had that but I also had additional
22  information that was more recent to that and I

Page 861

1  referred to this in our discussions earlier, but
2  there was some work that Keith had to follow up on
3  with FHFA and it was about providing information
4  about our organization.  And it was poorly assembled,
5  it was incomplete when it was sent out, it wasn't
6  appropriately reviewed.
7         I had sent an e-mail to Keith asking that
8  a certain set of actions occur.  They didn't occur
9  and materials were sent out.  And I sent him some
10  written feedback, which is part of the record, saying
11  that I was disappointed and asking was there a
12  follow-up on the things that I had asked for.
13         So at the time that I wrote this, I was
14  thinking about that as a level of supervision because
15  I shouldn't have been involved.  I don't think Jill
16  should have been involved.  I think he should have
17  been able to take care of it without supervision.
18  Clearly that didn't happen.  And those deliverables
19  were actually late and they were significantly late
20  to the FHFA.
21         And so from a quantity, quality and
22  supervision standpoint, it took a lot more than I

Page 862

1  think should have been required for a person in a
2  senior position.  So that's what I was thinking about
3  when I wrote that.
4    Q.  In the next line, you talk about they also
5  demonstrate greater knowledge in technology and
6  technology controls, a significant area of focus for
7  the RMO.  What did you have in your mind when you
8  wrote that sentence, if you can recall?
9    A.  We do some training, we bring in some
10  outside trainers on risk and control practices, and
11  we also allow employees to sit for certification
12  tests, and so we brought a trainer in to train on the
13  different types of controls that would be part of an
14  examination that we were all sitting for, I was going
15  to sit for and Keith and others were going to sit
16  for.
17         And Keith seemed to be challenged a lot
18  more than others around the concepts there and seemed
19  to be following a lot less than others and seemed to
20  express a level of challenge and difficulty that was
21  greater.  I wouldn't say it was a big point but he
22  did stand out for me in the class as having sort of a

95 (Pages 859 to 862)

```
 1                      JAMS ARBITRATION

 2    - - - - - - - - - - - - - - X

 3    KEITH TAYLOR,                    :

 4         Claimant,                   :

 5            v.                       :  Reference No.

 6    FEDERAL NATIONAL MORTGAGE         :  1410005919

 7    ASSOCIATION (FANNIE MAE), et     :

 8    al.,                             :

 9         Respondents.                :

10    - - - - - - - - - - - - - - X

11                          Washington, D.C.

12                          Thursday, December 13, 2012

13            Arbitration before ARBITRATOR LINDA R.

14    SINGER, in the above-entitled matter, the witnesses

15    being duly sworn by MARY GRACE CASTLEBERRY, a Notary

16    Public in and for the District of Columbia, taken at

17    the offices of JAMS, 555 13th Street, N.W.,

18    Washington, D.C., at 9:47 a.m., Thursday, December

19    13, 2012, and the proceedings being taken down by

20    Stenotype by MARY GRACE CASTLEBERRY, RPR, and

21    transcribed under her direction.

22
```

Page 875

1  president.  He had weekly meetings with FHFA to keep
2  them informed around our activities relative to
3  improving our control environment.
4      Q.   And to what extent did Mr. Taylor have
5  exposure to the FHFA representatives?
6      A.   He had exposure every week.
7      Q.   And what was his responsibility vis-a-vis
8  those folks?  Was he reporting on issues?
9      A.   Sometimes we would report -- provide our
10  monthly report to them.  That was a requirement.  So
11  Rich Licato would be in those meetings.  Whoever --
12  it depended on the agenda items.  But we were always
13  -- the RMO, although we were facilitating the
14  meetings, we always presented once a month because we
15  would present our monthly report that was shared at
16  the risk forum to the FHFA as required.  Rich Licato
17  also presented once a month as well because he also
18  presented his reports at the risk forum and FHFA
19  wanted to see those reports.
20      The other -- we were kind of standing on
21  the agenda.  Then there were other groups that, based
22  on questions that FHFA had or inquiries, they would

Page 876

1  come in, they would report.  A lot of times they
2  would want to know about information security issues
3  and initiatives that were going on, so Ted Jestin was
4  pretty often in those meetings.  He was our security
5  officer for the company.  It depended on what topics
6  they were interested in.  The agenda was driven by
7  conversations with them and with David.
8      Q.   And the reports that the RMO would be
9  presenting on, were those the executive summaries
10  that were published on a monthly basis?
11      A.   Yes.
12      Q.   Now, can you explain the nature of
13  operational risk with respect to other risks that an
14  institution like Fannie Mae would deal with?
15      A.   Well, there many risk types, many risk
16  disciplines.  Operational risk is one of them.  So
17  you could have credit risk.  That's managed
18  differently than operational risk.  You could have --
19  it all depends on how the structure of the
20  organization is.
21      So at Fannie, I know they have operational
22  risk as a structured discipline that has officers and

Page 877

1  a whole structure around managing it.  Credit risk as
2  well, market risk as well and regulatory.  That's
3  under C&E.  They manage regulatory risk issues.  So
4  all of those disciplines are part of the structure
5  for -- as well as you have internal controls which
6  deals with SOX.  So that's also a piece of that with
7  internal audit.  So internal audit does their
8  auditing and they do SOX reviews which relates to
9  internal controls.
10      But what happens is all that information
11  is leveraged to look at the internal control
12  environment of the organization.
13      Q.   And does Fannie Mae deal with reputational
14  risk?
15      A.   As far as I know, they do.  Each
16  discipline is different.  Ops risk does look at
17  reputational risk relative to operational incidents.
18      Q.   And SOX risk, is that synonymous with
19  financial reporting risk?
20      A.   Yes.
21      Q.   And that's one aspect or one part of what
22  could be an operational risk at Fannie Mae?

Page 878

1      A.   Yes.
2      Q.   So you view operational risk as being sort
3  of an umbrella and then all these other risk types,
4  financial reporting, reputational, any others
5  come within that umbrella, is that how you think
6  about it?
7      A.   Yes, what happens is operational risk
8  works like this.  It interacts with the other risk
9  types because operational risk is based on a business
10  process failure, people, process, technology, but it
11  relates to the process failure.  So something in the
12  process has failed and impacted the controls which
13  then created risk to the organization.  And so it's
14  all about the business process.
15      And sometimes within the business process,
16  when you have a failure, it can manifest itself in
17  different ways.  It can manifest itself as a
18  financial failure, where something was reported
19  incorrectly in the financials; it can manifest itself
20  as a failure where there is some failure relative to
21  a counterparty where you did not identify an issue
22  within your process which then exposed you to risk to

Alderson Reporting Company
1-800-FOR-DEPO

Page 879

1    a counterparty or a lender, so some entity you were
2    doing business with.
3           Market risk is more external, so what's
4    driving the market. It's like you're not managing
5    that. That has less impact on operational risk
6    because operational is about what you control in your
7    environment from your business process and that
8    business process manifesting itself into -- a failure
9    within the business process manifesting itself as a
10   risk.
11       Q.   And as a risk professional, when you were
12   at Fannie Mae, if you had a suspicion, an issue you
13   saw was a SOX issue, it was your practice to reach
14   out to members of the SOX team to alert them to the
15   issue that you had seen, correct?
16       A.   It wasn't my practice based on my role.
17   You did have risk leads who had responsibilities to
18   do that and they were the execution arm. We were
19   research and analysis. So we were not as defined --
20   our role was not defined to do that. That role was
21   of the risk leads that were embedded in the business
22   to be able to report SOX issues.

Page 880

1        Q.   Now, yesterday I believe you testified
2    that you considered yourself a risk lead?
3        A.   Yes. My role was different and it was
4    defined differently as a risk lead.
5        Q.   So my question, was it your practice to
6    reach out to members of the SOX team if you thought
7    that an issue you saw, you suspected that it related
8    to a SOX issue, that you would alert members of the
9    SOX team from internal audit, correct?
10       A.   No, because what would happen, internal
11   audit and the SOX team would work with the risk leads
12   to determine if there was a SOX issue, but they were
13   working with the folks who were at the execution
14   arms. Those were the people who were in the business
15   collecting operational incidents and then they would
16   have some -- they had an infrastructure for vetting
17   those operational incidents with the SOX team. I
18   wasn't in a reporting capacity to report incidents.
19       Q.   At any time when you were working at
20   Fannie Mae and you located a potential SOX issue, did
21   you not reach out to the SOX team?
22       A.   Because it wasn't really my role -- my

Page 881

1    role was to provide the research to senior management
2    who would then leverage that research if they felt
3    there was a potential SOX issue and connect with the
4    SOX team.
5        Q.   Let me try one more time. As an
6    operational risk professional, when you were working
7    at Fannie Mae and you located a potential SOX issue,
8    was there any instance where you didn't reach out or
9    alert the SOX team to that potential issue?
10           MR. WOODFIELD: Objection, asked and
11   answered.
12           THE WITNESS: Asked and answered, I agree.
13   It wasn't my role.
14           ARBITRATOR SINGER: I'm supposed to agree
15   or disagree.
16           THE WITNESS: I'm sorry.
17           ARBITRATOR SINGER: That's my role.
18           BY MR. STEWART:
19       Q.   What I've handed you is a transcript or
20   portion of the transcript of a hearing that took
21   place at the Department of Labor, and this was a SOX
22   case filed by a former employee for Farley Price.

Page 882

1    You see that on the front page of this document. And
2    the transcript is dated March 14, 2012 where you
3    testified. Do you remember giving testimony at that
4    hearing?
5        A.   Yes.
6        Q.   And you were called by Mr. Woodfield's law
7    firm, the Employment Law Group. Do you remember
8    that?
9        A.   Uh-huh.
10       Q.   And in that hearing, you were
11   questioned -- you were under oath. Do you recall
12   that?
13       A.   Uh-huh.
14       Q.   And you were questioned by my colleague,
15   Mr. Blonder, and I want to direct your attention to
16   page 858 of this transcript. It's on the top left
17   corner. Let me know when you get there.
18       A.   Okay.
19       Q.   Are you there?
20       A.   Uh-huh.
21       Q.   I'm going to direct you to line 8.
22       "Question: As an operational -- as a risk

Page 883

1    professional, if you suspect that there is a SOX
2    issue, would it be your practice to reach out to
3    members of the SOX team?
4         "Answer:  Yes.
5         "Question:  And can you just describe, why
6    would you want to do that?
7         "Answer:  Well, because there could be --
8    you know, if the issue relates to financial
9    reporting, you would want to work with the SOX team
10   to determine to what extent and define whether it is
11   a significant or material weakness, because it then
12   has a whole escalation pattern that has to happen.
13   And so you would need to actually validate with the
14   SOX team that this is an actual financial reporting
15   issue.
16        "Question:  Can you --
17        "Answer:  And so that's why you would work
18   in tandem with the SOX team.
19        "Question:  Can you think of any instance
20   in your time with Fannie Mae when you located a
21   potential SOX issue and did not reach out to the SOX
22   team?

Page 884

1         "Answer:  The challenge is, there is a
2    process within the RCSA, but there isn't a
3    necessarily documented process as to how to interact
4    with the SOX team if you surface a financial risk
5    issue.  So it's really case-by-case.  People handle
6    it differently."
7         And there's some back and forth with Judge
8    Stansell-Gamm.  And directing you to page 859, line
9    14, question from Mr. Blonder:  "Is there any
10   instance when you located -- as an operational risk
11   professional, located a SOX potential issue and
12   didn't reach out to or in some way alert the SOX team
13   to that issue?"  Your answer --
14        A.   You're on what, 859?
15        Q.   859.
16        A.   Okay, got it.
17        Q.   Line 14 through 18.  Your answer at line
18   18 was, "No.
19        "Question:  So you would do that in every
20   instance?
21        "Answer:  I would need to validate that
22   there's a issue there, right.  I can suspect it, but

Page 885

1    part of being --" and then there is a question from
2    Judge Stansell-Gamm.  "If you had validated an issue,
3    would you have taken it to -- notified the SOX
4    people?
5         Your answer, "Yeah."
6         Judge Stansell-Gamm asks, "Is that your
7    question?"
8         Mr. Blonder:  "Well, I think you need the
9    SOX team to validate."
10        And your answer was, "To validate."
11        Mr. Blonder says, "-- that this is a SOX
12   issue."
13        The judge said, "Okay."
14        You said, "Right, that's what I'm saying."
15        And the judge said, "I see."
16        You said, "I'm saying --"
17        The judge says, "So you provide --"
18        You say, "-- if I suspect there's an issue
19   --"
20        The judge asks, "You provide them the
21   information --"
22        Your answer, "Right."

Page 886

1         And the judge asks, "And let them do it?"
2         And your answer, "Yeah."
3         Did I read that correctly?
4         A.   I don't know if it's exact but I
5    definitely know why I answered that way and why I
6    answered this way today.
7         Q.   That's not the question.
8         A.   So what's your question?
9         Q.   I'm getting to it.  Did you alert the SOX
10   team that your issue with David Magidson and that his
11   representation about the 60 percent figure being
12   invalid, that you believe was invalid, did you alert
13   the SOX team that that was a potential SOX issue?
14        A.   No.
15        Q.   Did you alert compliance and ethics that
16   Mr. Magidson was reporting a 60 percent figure that
17   you believed he was doing -- that you believed didn't
18   represent the number -- was an invalid number?
19        A.   When they came to investigate, I did
20   report that.
21        Q.   When was that?
22        A.   That was at some point.  I don't know

Page 887

1  exactly when.  But they came to meet with me because
2  I had escalated it and I did report the fact that the
3  60 percent number was inaccurate and he was advised
4  that it was inaccurate.
5      Q.   And that was after Mr. Taylor had been --
6  his position had been eliminated from the company,
7  correct?
8      A.   I believe that's when that happened.
9      Q.   Now, why didn't you alert the SOX team
10 that you had a concern about Mr. Taylor's use of that
11 60 percent figure?
12     A.   Because I alerted his management.  I felt
13 that that was the proper escalation and they should
14 have alerted the SOX team, quite frankly, if they
15 felt that it was a SOX issue.  I had not determined
16 that it was a SOX issue at that point in time.
17     Q.   Did you suspect that it was a SOX issue?
18 Did you?  Did you suspect it was a SOX issue?
19     A.   I suspected it was a lie.  That's all I
20 suspected.
21     Q.   So let me ask you differently.
22     A.   I later on realized the connection where

Page 888

1  it could be a SOX issue.
2      Q.   Let me ask it to you this way.  When you
3  and Mr. Taylor were discussing this issue in or
4  around October/November 2010, did you consider that
5  Mr. Magidson's use of that 60 percent figure violated
6  any securities law?
7      A.   No.  I just at that point could not
8  understand why he continued to use that figure when
9  he was advised it was inaccurate.
10     Q.   And did you consider it to be a violation
11 of mail fraud or wire fraud, securities fraud or any
12 SEC rule or violation?
13          MR. WOODFIELD:  Objection, lack of
14 foundation as to whether she has familiarity with all
15 of those bases in law.
16          THE WITNESS:  I was going to say, I
17 wouldn't necessarily have familiarity with all of
18 that.  And I wasn't a SOX expert either so, quite
19 frankly, I just knew that there was incorrect
20 information being shared.
21          BY MR. STEWART:
22     Q.   And isn't that why you passed them along

Page 889

1  on to the SOX team, so that they can determine
2  whether this concern rises to that level?
3      A.   That's if you suspect that it was a SOX
4  issue.  At that point, I suspected it was just a
5  management issue so I needed to run it up the
6  flagpole.  Thereafter, I saw there was a correlation
7  with the MRA, the SDLC MRA.
8      Q.   When did that occur, where you thought
9  that there was a correlation with the SDLC and the
10 MRA?
11     A.   That was way down the line.  It was all
12 along my belief -- I just didn't understand why he
13 kept on pushing a point that was unsupported, and so
14 I think it was probably way after that point that I
15 realized that it was --
16     Q.   Way after what point?
17     A.   I don't know, I mean, to what extent.  I
18 just knew that he was trying to support some issues
19 relative to SDLC and there was an MRA out there that
20 they were trying to close.
21     Q.   So I'm just trying to get a time frame on
22 it.  When you realized that this had some impact or

Page 890

1  some relationship to SOX -- that occurred at some
2  point, correct?
3      A.   It may have even occurred after -- you
4  know, I'm trying to think.  I just connected it to
5  the SDLC MRA.  I didn't go any further around a SOX
6  issue.
7      Q.   You connected it to the SDLC MRA, that's
8  what your testimony is?
9      A.   Yes.
10     Q.   And when did you do that?
11     A.   It was probably way later.
12     Q.   Was it in 2010 or in 2011?
13     A.   It had to be around 2011 time frame, I
14 thought.  It may have been connected to the SDLC MRA.
15     Q.   Now, the RMO was reporting out about the
16 technology division's progress against that MRA even
17 in November of 2010, correct?
18     A.   Yes.  We were required to do that.
19     Q.   So you didn't make the connection -- your
20 testimony is you didn't make the connection to
21 Mr. Magidson's use of that 60 percent figure until
22 sometime much later in 2011, is that what your

6 (Pages 887 to 890)

Page 895

1   your knowledge?
2      A.   They review it to identify potential SOX
3   issues.
4      Q.   And what does the SOX team do with those
5   issues that are potential SOX issues?
6      A.   I don't know their internal process.
7      Q.   Do you know if they try to remediate those
8   issues, determine whether there is any materiality to
9   those issues?
10      A.   I know they work with the business people.
11      Q.   And so if an operational incident is
12   discovered at Fannie Mae, it's supposed to be placed
13   into the ACORD system, correct?
14      A.   Correct.  That's operational incidents,
15   not management issues.
16      Q.   That's not my question.  Now, did you have
17   any suspicion that Mr. Magidson's use of that 60
18   percent figure constituted an operational incident?
19      A.   At that point in time, no.  I knew -- I
20   was baffled myself why he was using it and I thought
21   it was more of an integrity issue and management
22   issue.  And that's why I went up the flagpole with

Page 896

1   it.
2      Q.   And at any point subsequent, did you
3   consider it to be an operational incident?
4      A.   That is not a defined -- that scenario is
5   not considered an operational incident.  As a matter
6   of fact, I would love to see any -- within Fannie
7   Mae's database, anything that has been filed similar
8   to that that's considered a -- no one would ever file
9   that as an operational incident.
10      Q.   Operational incidents contain reputational
11   risk, correct?
12      A.   True.  This is a management issue.  It may
13   have manifested itself into a SOX issue later on but
14   it wasn't an incident.  An incident is part of the
15   business process.  It is not the individual who
16   independently then -- performance is not in alignment
17   with what the management objectives are.  That's a
18   different path.  Now, it could have manifested itself
19   as something else later on, but at that point in
20   time, it was a management issue and I ran it as such.
21      Q.   You treated it as a management issue?
22      A.   Yes, I did.

Page 897

1      Q.   And at any point, did this issue that
2   Mr. Magidson was using that 60 percent figure, did it
3   become, in your view, an operational incident or have
4   any potential SOX implications?
5      A.   I found it to be problematic when he
6   raised that inaccurate information to the regulators
7   because it gave the impression that our control
8   environment was something that it may or may not have
9   been.  My position was I don't know.  Research has to
10   be done.  So my position was really, let's get the
11   research done and see if it can really prove, bear
12   out what he's saying.  But the fact that he was
13   hanging his hat on data that really was incomplete
14   and wasn't intended for that purpose was really not
15   accurate.
16      Q.   And you consider that to be a management
17   issue?
18      A.   I did unless -- that's why the research
19   needed to be done and I raised that issue at that
20   time.
21      Q.   And the research was performed?
22      A.   It was performed and it wasn't 60 percent.

Page 898

1      Q.   It wasn't 60 percent.  It was 32 or 35
2   percent?
3      A.   32 percent based on the -- as I said, we
4   put quite a few caveats in there because we did not
5   have a good structure or data set to really do
6   analysis that we could really feel strongly that we
7   could hang our hat on.  We were asked to do it but
8   there were caveats put in for that purpose.
9      Q.   And a clarification of that 60 percent
10   figure was made, FHFA was notified that the correct
11   number was approximately 32 percent, to your
12   knowledge, correct?
13      A.   To my knowledge, but it never happened
14   until it was escalated to management.  David
15   continued with the same story.  Only after Joe and Ed
16   really said -- or Joe specifically said, hey, can we
17   just do the research.
18      Q.   And at that point, once that research was
19   performed, the issue was corrected?
20      A.   The issue was corrected.
21      Q.   If you were having conversations with
22   Mr. Magidson informing him that the number is

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 4                                                   December 13, 2012

Washington, D.C.

|  | Page 1003 |  | Page 1005 |
|---|---|---|---|

**Page 1003**

1   finding has been made?

2        A.   I should be very clear.  The investigation

3   team directs discipline.  We are solely responsible

4   for that.  I don't need to get approval from

5   management.  Management has no say in that.  HR has

6   no say in that.  No one has any say in that.  The

7   only people we report to are the chief executive

8   officer and we have a dotted line -- my boss has a

9   dotted line to the board of directors.

10         The range of sanctions that we can

11   direct -- and again, it's within our sole discretion

12   to direct them and they absolutely have to be

13   enforced, go everything from the lowest level, which

14   is counseling or a change in actions, all the way up

15   to termination of employment.

16        Q.   So to be clear, if the investigations unit

17   determines that termination is the appropriate

18   sanction based on their findings of fact, that

19   employee at issue will be terminated even if that

20   employee is a member of senior management?

21        A.   Absolutely.  And we have directed the

22   termination, for example, of a director for engaging

**Page 1004**

1   in retaliation and I supervised that investigation.

2        Q.   You talked about the fact that you

3   interviewed Ms. Oliver.  To your knowledge, prior to

4   the termination of Mr. Taylor, did Jill Oliver ever

5   raise allegations of any kind against Mr. Magidson to

6   investigations?

7        A.   Prior to her raising these concerns in the

8   interview during the Taylor investigation, to my

9   knowledge, and based on my review of the FM ethics,

10   she had never filed a complaint with FM ethics or

11   with investigations about Mr. Magidson.

12        Q.   And to your knowledge, did Mr. Taylor ever

13   file such a complaint prior to his termination?

14        A.   No.

15        Q.   Could you just take a look at Exhibit 97?

16        A.   Okay.

17        Q.   Have you seen this document before?

18        A.   Let me read it.  Yes, I have seen this

19   e-mail before.

20        Q.   And who is this e-mail from?

21        A.   It's from Mr. Taylor.

22        Q.   And who is the e-mail sent to?

**Page 1005**

1        A.   It's sent to Lisa Brown and Michelle

2   McCarthy.  Lisa Brown is a member of our FM ethics

3   staff.  She's an intake person so she would be

4   responsible for receiving and documenting any

5   concerns or allegations of code of conduct or policy

6   violations.  Michelle McCarthy at that time was our

7   manager in our investigations group.

8        Q.   And can you turn to Exhibit 37?

9             ARBITRATOR SINGER:  Are we going back to

10   '97?

11             MR. BLONDER:  No.  I just wanted to

12   identify it for the record.

13             THE WITNESS:  Okay, I'm on Exhibit 37.

14             BY MR. BLONDER:

15        Q.   Exhibit 37 is a series of e-mails.  Could

16   you look at the second e-mail in the string on page

17   FM 267, the e-mail from Jill Oliver to Joe Giunta?

18   Have you seen that e-mail before?

19        A.   Let me read it.  I'm sorry --

20        Q.   I'm referring to the one at 2:19 p.m. just

21   from Jill to Joe.

22        A.   Okay.  I was looking at the one below

**Page 1006**

1   that.  I'm sorry.  I apologize.  Yes, I have seen

2   this e-mail before.

3        Q.   This e-mail, the text of which is, "Joe,

4   two weeks ago David represented the 60 percent number

5   to FHFA at our weekly standing meeting and they took

6   note of it.  I'm also very concerned about

7   retaliation.  Jill."  Did I read that accurately?

8        A.   Yes, that's an accurate recitation of the

9   e-mail.

10        Q.   And then who is Joe Giunta?

11        A.   Joe Giunta is -- I'm going to get his

12   title wrong but basically he was a senior vice

13   president in the operations and technology area.  He

14   supervised David Magidson and then indirectly Jill

15   Oliver, because he supervised the risk and controls

16   area.

17        Q.   And then Joe's response at 2:53 p.m. is,

18   "Jill, unclear on exactly what is meant by

19   retaliation.  I've asked Cheryl Sember (HR) to reach

20   out to you immediately and discuss in detail."  Is

21   that what Mr. Giunta responded?

22        A.   That is an accurate recitation of this

35 (Pages 1003 to 1006)