## JAMS ARBITRATION

| | |
|---|---|
| KEITH TAYLOR | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | )   Ref No.: 1410005919 |
| | ) |
| FEDERAL NATIONAL MORTGAGE | ) |
| ASSOCIATION (FANNIE MAE) | ) |
| | ) |
| Respondent. | ) |
| | ) |

## FINAL AWARD

I. Procedural History

Claimant Keith Taylor filed a Demand for Arbitration with JAMS on April 19, 2012, following a March 20, 2012, Order of the U.S. District Court of the District of Columbia compelling arbitration.  Claimant's Demand alleged that his former employer, Respondent Fannie Mae, selected him for termination in a reduction in force ("RIF") in retaliation for his whistleblowing, thus violating the anti-retaliation protections of the Sarbanes-Oxley Act ("SOX"), as incorporated into the Dodd-Frank Wall Street & Consumer Protection Act ("Dodd-Frank"); violated his first amendment rights; and discharged him in violation of public policy.

Following the close of discovery, the undersigned Arbitrator held a hearing on December 10-14, 2012.  The parties submitted post-hearing briefs on March 1, 2013, and made closing arguments on May 7, 2013.  This Award resolves all

outstanding issues raised, pursuant to Fannie Mae's Dispute Resolution Policy (effective March 16, 1998).

## II.  Findings of Fact

Claimant was hired originally by Fannie Mae in 2006.  He was laid off in a RIF in 2009.  Fannie Mae rehired him on March 15, 2010, as an Operational Risk Analyst III in the Remediation Management Office ("RMO"), supervised by Jill Oliver.  The RMO was an organization within Fannie Mae's Operations and Technology Division, which monitored the remediation of activities involving risk and controls.

During Claimant's second term of employment, Fannie Mae was implementing a process called the software development life-cycle ("SDLC"). The SDLC project was spearheaded by Executive Vice-President Edward Watson and Senior Vice President Joseph Guinta, to whom Ms. Oliver reported through David Magidson, her direct supervisor. The purpose of the SDLC was to reorient the internal culture of Fannie Mae concerning the development of technology.  The goal was to ensure early input from business users in creating and developing software in order to reduce costs and operational incidents.

According to Mr. Guinta's testimony, the SDLC was viewed initially within Fannie Mae as just "another layer of bureaucracy" and the business users "resisted the regimentation that [it] was" trying to put into place."  Consequently, senior executives within the Operations and Technology Division began a campaign to "sell" the program within Fannie Mae so that internal members of

the business could understand its benefits.  To that end Fannie Mae's Communication Director drafted an email on September 24, 2010, to be sent to officers within the company in order to show that the SDLC was working and important.

At Mr. Guinta's suggestion Mr. Magidson added Ms. Oliver to the email chain and responded that his team would work to add data showing that the SDLC had reduced operational incidents.  Two months earlier Mr. Magidson had been moved into the position of Vice President in charge of Operations and Technology.  Ms. Oliver responded to Mr. Magidson by stating, "David, we would have to look at the data to determine if this conclusion can be supported."

Ms. Oliver forwarded the string of e-mails to her team, including Claimant, on September 24, 2010, with the statement that "FYI, we would have to look at the data to determine improvement but based on what we've seen, I'm not sure this conclusion can be supported.  Please advise."   Claimant did not interpret the e-mail as asking him to look at the data in question.

In August 2010, the RMO had developed an Executive Summary, which was presented at a risk forum to senior managers in the Operations and Technology Division, among others. This meeting took place approximately 30 days after Mr. Magidson had been moved from Technology to his new position. It was the first risk forum that Mr. Magidson had attended and the Executive Summary presented by the RMO was the first Executive Summary that he had reviewed.

The first page of the Executive Summary stated that the RMO had reviewed operational incidents logged by both Operations and Technology from 2008 through 2010.  In the upper right hand corner of the report was a heading that stated "Operations and Technology."  On page 3 of the report the RMO analyzed the trending of operational incidents from January through August of 2009, as well as the number of operational incidents during that same time period in 2009 and 2010.  On the top of the page was a heading that stated "RMO Historical Trending of Operational Incidents."  Below that heading was the following statement: **"Operational Incident Review, January 2008 through August 2010."**  As Claimant acknowledged in his testimony, nothing in either of those two headings indicated that the RMO's review was limited to Fannie's Mae's operations department and did not include a review of technological operational incidents.  Indeed the first reference that arguably implied that technological operational incidents were excluded from the review was the second bullet point on page three of the report, which states that "Technology incidents do not provide clear transparency into the business impact; RMO focused its review on Operations."  On the other hand, the second arrow under that heading states, "At the same time last year, 122 incidents were already reported in the ACCORD system."  It is undisputed that the ACCORD system was used to track operational incidents from across the enterprise.

On September 27, 2010, Mr. Magidson contacted Claimant to request information regarding the trending of operational incidents.  Claimant did not connect "in any way" Mr. Magidson's request to Ms. Oliver's email three days

earlier regarding data indicating the reduction of operational incidents. In response to the latest email, Claimant cut and pasted a chart that provided the number of operational incidents from the August Executive Summary from January through August for 2008, 2009, and 2010.  Although Claimant's response characterized the data as "incidents reported by "Operations," nothing clarified for Mr. Magidson that the information provided was limited to Fannie Mae's Operations and did not include any analysis of technological operational incidents.

Christian Baer, also a member of Ms. Oliver's team, reviewed Claimant's response and concurred that it was correct.  He too did not believe that the Executive Summary or Claimant's email covered technology-based operational incidents.

Despite the fact that the information provided did not include technological operational incidents, Mr. Magidson responded to Claimant's email, with a copy to Ms. Oliver: "Thanks, Keith.  Can you give me a count of technology and nontechnology issues for the 'same time last year' 122 and the 68 OITs this year."  Claimant did not ask Mr. Magidson what he meant by asking for a breakdown of technology versus nontechnology operational incidents.  Nor did he consult with Ms. Oliver about what she understood Mr. Magidson to be requesting.  Instead, he responded by providing a breakdown of manual versus systems operational incidents, also derived from the August Executive Summary. Claimant explained that he had responded with a breakdown of manual versus system because he "was not focused on technology versus nontechnology."

After confirming with another Fannie Mae officer that an alternative explanation for the drop in operational incidents was unlikely, Mr. Magidson used the information provided by the RMO to calculate that technology-related operational incidents had dropped 60% from 2009 to the same time period in 2010.  He then added that statistic, which he testified that he believed to be accurate, to a draft of the email being developed to go out internally within Fannie Mae.

On October 1, 2010, Mr. Guinta reviewed the draft email edited by Mr. Magidson and sent a response to a large group working on the matter, including Mr. Magidson and Ms. Oliver.  Mr. Guinta suggested removing a statistic that applied only to Operations and Technology because he wanted to be certain that recipients of the email throughout Fannie Mae would not view the issue as relating only to O&T.  He also stated that the "relevant statement is that Technology-related operational incidents are down 60 percent."

Mr. Guinta then asked the entire distribution list, including Ms. Oliver, if there was any disagreement with his suggestion to keep the 60% statistic in the company-wide communication.  Ms. Oliver did not respond with an email questioning the accuracy of the statistic or alerting anyone in the e-mail chain that she had a concern about the operational risk information.  Mr. Magidson then responded to Mr. Guinta's email by agreeing with the proposed suggestion to keep the 60% number.  Again, Ms. Oliver did not respond with an email to Mr. Magidson, Mr. Guinta, or anyone else disputing the use of that number.  In fact Ms. Oliver did not reply to either email.

In early October 2010 Mr. Guinta and the Chief Information Officer developed a presentation regarding the status of the SDLC to be presented to Fannie Mae's Senior Management Group. On page 7 of the 12-page PowerPoint presentation was a reference to a 60% reduction in operational incidents. On October 11, 2010, Mr. Magidson sent the presentation to Ms. Oliver and her team, including Claimant. Claimant responded by correcting a different statistic within the presentation, stating, "We cannot tie out to the 300 number in the attached deck, we were able to validate 169 reported incidents in that time frame with the total net loss of over $3 million." Claimant did not, however, dispute the 60% statistic contained in the same presentation. Nor did Ms. Oliver question the continued use of the 60% statistic.

On October 20, 2010, Mr. Magidson and Ms. Oliver had a conversation in which she asked where Mr. Magidson had obtained the 60% number. Mr. Magidson responded by forwarding her the September 27, 2010, email from Mr. Taylor. Ms. Oliver did not question the number, instead responding by email stating, "Thanks. I did have this info. This is general information about ops incident volumes. You must have derived the 60 percent number from the information. I understand. Jill."

The day after receiving confirmation from Ms. Oliver that she understood the basis for the stated 60% reduction in operational incidents, Mr. Magidson participated in a regular meeting with representatives of FHFA, Fannie Mae's regulator. Ms. Oliver and members of the RMO, including Claimant, also attended the meeting. During this meeting Fannie Mae referenced the 60%

statistic as part of a general update to FHFA about the progress of the SDLC project.  The goal of the update was to convey that Fannie Mae was communicating with employees and management about the SDLC and seeing positive results.   The meeting had no connection to an earlier "Matter Requiring Attention" issued by the FHFA in relation to the SDLC.  Nor was the trending of operational incidents ever presented to FHFA as part of Fannie Mae's efforts to remediate the SDLC MRA.

Following the meeting with FHFA in which Claimant testified that he believed Mr. Magidson had "misrepresented" the Executive Summary," Claimant said that he became concerned about his own reputation and that of the RMO:

> Q.  What concern if any did you have that Fannie Mae was giving inaccurate information, inaccurate data to its regulator and that you were involved with that process?
>
> A.  I wanted no part of lying to a regulator.
>
> Q.  Why?
>
> A.  I thought it was illegal.
>
> Q.  Why?
>
> A.  Because you're lying to the government.

On October 20, 2010, Mr. Magidson, Ms. Oliver and Mr. Guinta participated in a risk forum in which they discussed reclassifying some operational incidents.  In light of these potential reclassifications, Mr. Guinta asked Ms. Oliver to "reconcile the OI's related to tech to the 60 percent reduction of tech related issues we spoke about with the SMG . . . ."  On November 3, Ms.

Oliver provided the requested report to Mr. Magidson and Mr. Guinta.  The report included a statement that technological-related operational incidents had dropped 35% from January through September 2009 when compared to the same time period in 2010.  Upon receiving the report, Mr. Magidson responded by stating, "Jill, I am having trouble mapping these numbers back to Keith's prior analysis . . . .  Anastasia, please schedule time to for (*sic*) Jill and Keith to take me through their analysis, David."

In response to Mr. Magidson's email, Ms. Oliver stated, "The numbers you are referencing only represent a subset of operational incidents.  The numbers were used for our analysis in the August report that only focused on operational incidents reported by Operations."  That message, sent on November 3, 2010, is the first email or written communication of any kind sent by Ms. Oliver, Mr. Taylor or anyone else from the RMO informing Mr. Magidson that the 60% statistic related only to a subset of the data.

Six minutes after notifying Mr. Magidson that the statistic was inaccurate, Ms. Oliver sent an email to Mr. Guinta stating that Mr. Magidson had referenced the inaccurate 60% statistic in an FHFA meeting two weeks earlier and that she was concerned about retaliation.  Mr. Guinta responded to Ms. Oliver's November 3 email by forwarding the reference to retaliation to Cheryl Sember, a Vice President of Human Resources, so that Ms. Oliver could have a "safe place" to discuss her concerns.

Although Ms. Oliver testified that she had told Mr. Magidson "ten times" before November 3 that the 60% statistic represented only a subset of the full

data, no documentary or other witness testimony supports her statement.  No email exists between September 27 and November 3 in which anyone points to the inaccuracy of the number being used.

Ms. Oliver testified repeatedly concerning her strong dislike of Mr. Magidson and her dislike and distrust of Fannie Mae.  Other witnesses also confirmed her antipathy during the period in which Mr. Magidson was Ms. Oliver's supervisor.  Although she had resigned from Fannie Mae and was employed elsewhere at the time of the hearing, she refused to identify her current employer because she did not want anyone from Fannie Mae to know where she is working.

On November 4, Ms. Oliver and Mr. Taylor met with Mr. Magidson at his request.  Mr. Magidson noted that this was the first time that he had been told that the 60% statistic represented only a subset of the total data.  He also testified that "I was most concerned that Jill had not clearly brought it to my attention.  Please consider that I was in my job for less than 75 days at the time, and so I was still learning the space, had a lot of information flowing at me, and I said, you know, if I am unable to understand that there is an error and the error is of any materiality, you know, I'd ask you to go to my management and tell my management that there is an error. I said, 'it's really important if we have an error that it be identified, acknowledged, and rectified." And so, you know, I said, 'I wish you guys had gone to the management if you felt like I wasn't hearing you.'"

According to Mr. Magidson, Claimant was very quiet during this conversation.  Indeed, Mr. Magidson could not recall him saying anything of substance; most of

the discussion was with Ms. Oliver. Claimant did not discuss his own participation in the November 4 meeting, testifying simply that Mr. Magidson admitted at the meeting that he had made a mistake in misunderstanding the data at issue.

Once Mr. Magidson and Mr. Guinta understood that the 60% statistic was only a subset of the relevant data, they requested the RMO to review all of the information and determine the actual reduction in technology-related operational incidents from 2009 to 2010. The RMO concluded that there had been a 32% reduction. Mr. Guinta provided a clarification of the accurate number to Elizabeth Scholz of FHFA during a brief conversation with her (lasting about ten seconds, according to his testimony) in November 2010. Ms. Scholz testified that she could not remember the retraction and that "I would like to think that things that were significant, I would recall fairly quickly."

After the meeting Ms. Oliver testified that she noticed a change in the way Mr. Magidson behaved towards Claimant, "targeting" him with "aggressive behavior" and "nitpick[ing]" his performance. Yet in November 2010, shortly after the incidents described, Mr. Magidson approved Ms. Oliver's ratings of Claimant, along with Jennifer Ray and Chris Baer, all three of them Operational Risk Analyst IIIs, as "3," or "Meets Expectations." This rating permitted Claimant to be eligible for a Long Term Incentive bonus. Ms. Oliver also performed a "force rank" calibration of the Operational Risk Analyst IIIs at the time, in which she determined that Ms. Ray was the best performer (later described as "off the

charts"), Claimant second, and Mr. Baer a close third.   Mr. Magidson was aware of this ranking.

In early 2011, Mr. Magidson was instructed by his manager, Mr. Guinta, and his second level supervisor, Mr. Watson, that he needed to "shape-shift" his organization.  Fannie Mae's organizational structure in early 2011 resembled a diamond, in which there were relatively few employees in leadership or managerial roles at Fannie Mae and relatively few employees in the lower levels of the organization but a large "bulge" of mid-level employees.  Mr. Watson instructed his team, through restructuring or reduction-in-force ("RIF") to change the shape of the organization to resemble more closely a pyramid with larger numbers of employees at the lower ranks.

In order to carry out the instructions to change the shape of his organization, Mr. Magidson decided to engage in a RIF, in which he would terminate two of the four Directors that he supervised, as well as four "Level III" positions within Risk and Controls.  These terminations were a small part of a larger RIF, which affected positions on the other teams that reported to Mr. Magidson, as well as in other areas of Fannie Mae.  At the time of the RIF, Mr. Magidson supervised four Directors, one of whom was Ms. Oliver.  Despite the fact that Ms. Oliver had been involved with the development of the 60% statistic and had reported the incorrect statistic to Mr. Guinta, Mr. Magidson decided to keep her as one of his two remaining Directors, and instead terminated two other Directors.

Mr. Magidson decided in addition to terminate one of the Operational Risk Analyst IIIs in the RMO.  At the time, the RMO was a classic example of a diamond shaped organization, with Ms. Oliver at the top, Claimant, Mr. Baer, Ms. Ray and Mr. Hidalgo in the middle, and another employee at the bottom.  In light of the structure of the organization, senior people were performing junior and mid-level work.  Mr. Hidalgo was an Operational Risk Manager and had separate management responsibilities from the Operational Risk Analyst IIIs, so he was not considered for the RIF.  Ms. Oliver consistently had cited Ms. Ray as the strongest performer on her team so she too was not considered.

In light of these facts, Mr. Magidson decided that he must terminate either Chris Baer or Claimant.  Mr. Magidson initially determined that Mr. Baer would be subjected to the RIF because he had been ranked lower than Claimant during the calibration session conducted in November.  In February 2011, however, Fannie Mae conducted its annual process to determine how much the company's eligible employees would receive as a Long Term Incentive ("LTI") award.  At Fannie Mae an employee's LTI award is based explicitly on the employee's quality of work during the preceding year.

When Ms. Oliver recommended the LTI amounts to be granted to the employees that she managed, she proposed that Mr. Baer receive a higher amount of LTI than Claimant.  She later testified that she had believed that all of her direct reports had put in strong work and wished to reward them with the same bonus.  Consequently, she recommended a higher percentage bonus for Mr. Baer, the lowest compensated, than for Claimant or Ms. Ray.  According to

Mr. Magidson's testimony, he twice asked Ms. Oliver  whether she wanted to award Chris Baer the highest percentage bonus of the group and she said yes, without telling him that she intended to equalize the amounts of the bonuses among her group.  Indeed, in discussing her recommendation for Mr. Baer, Ms. Oliver stated that he had a really strong performance, was a valued member of the team, and she wanted to go forward with a higher percentage for him.

In making his determinations regarding which employees would be subject to the RIF, Mr. Magidson was instructed by his HR Business Partner, Megan Gaither, not to consult with the Directors who supervised the Level III employees who would be terminated because he had decided that he must terminate two of his four Directors in the RIF.  It is standard protocol at Fannie Mae not to discuss an upcoming reduction-in-force with employees who are peers of those being impacted by the RIF.  Ms. Oliver was one of the Directors who consequently could not be consulted.

Without the ability to consult with Ms. Oliver, Mr. Magidson concluded that, in the intervening months between calibration in November 2010 and the LTI discussions in February 2011, Ms. Oliver had changed her opinion concerning which employee had performed at a higher level in 2010.  Mr. Magidson testified that he also had personally observed Claimant's need for greater supervision than would be appropriate for an employee at his level, his poor quality of work with regard to a follow-up from FHFA, and his lack of skill and knowledge regarding technology controls.  Although Mr. Watson and Mr. Guinta testified that

they did not see a relationship between bonus decisions and the RIF, they had prescribed no criteria other than "shape-shifting" to govern the RIF.

On April 21, 2011, Mr. Magidson personally notified Claimant that his employment was terminated. Claimant was allowed to gather his belongings and was walked out of Fannie Mae by security in accordance with what the HR representative described as Fannie Mae's standard procedure.

After Claimant was terminated, the RMO added Yolanda Olivieri, an Operational Risk Analyst II. (Claimant was an Operational Risk Analyst III.) Because Ms. Olivieri already was a Fannie Mae employee under Mr. Magidson's supervision, Ms. Oliveri testified that shifting her to the RMO did not add to Mr. Magidson's budget.

Subsequent to his termination, Claimant filed a claim with the company's independent investigations unit, alleging that Mr. Magidson had violated Fannie Mae's Code of Conduct. This was the first time that either Claimant or Ms. Oliver had alleged any violation of the Code against Mr. Magidson. Claimant subsequently filed suit protesting his termination against Fannie Mae in the Federal District Court for the District of Columbia. Chief Judge Royce Lamberth remanded the claim to arbitration.

III. Legal Analysis

In order to establish a *prima facie* case of whistleblower retaliation under SOX or Dodd-Frank, Claimant must prove by a preponderance of the evidence that: (1) he engaged in protected activity; (2) Fannie Mae knew or could

be presumed to know of his protected activity; (3) he suffered an adverse personnel action; and (4) circumstances exist to raise the inference that the protected activity was a contributing factor in the unfavorable action.   29 C.F.R. § 1980.104(b)(1); *Gattegno v. Admin. Rev. Bd,* 353 Fed. Appx. 498, 500 (2d Cir. 2009), *Vodopia v. Koninklijke Philips Electronics, N.V.,* 398 Fed. Appx. 659, 662 (2d. Cir. 2010); *Johnson v. Stein Mart, Inc.,* 440 Fed. Appx. 795, 801 (11th Cir. 2011); *Allen v. Admin. Review Bd.,* 514 F.3d 468, 475-76 (5th Cir. 2008).

If Claimant successfully establishes a *prima facie* case, Fannie Mae may avoid liability by showing with clear and convincing evidence that it would have taken the unfavorable personnel action regardless of the Claimant's protected activity. *Allen,* 514 F.3d at 476; *Welch v. Chao,* 536 F.3d 269, 275 (4th Cir. 2008); *Livingston v. Wyeth, Inc.,* 520 F.3d 344, 352-53 (4th Cir. 2008); *Pearl v. DST Sys. Inc.,* 2008 U.S. Dist. LEXIS 123131 (W.D. Mo. 2008); *see also,* 49 U.S.C. § 42121(b)(ii) ("[N]o investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.").

A. *Protected Activity*

The SOX and Dodd-Frank whistleblower provisions protect employees of publicly-traded companies who provide information or assist in an investigation regarding any conduct the employee reasonably believes constitutes a violation of one of six enumerated federal fraud provisions, namely: (1) section 1341 (fraud and swindles); (2) section 1342 (fraud by wire, radio, or television); (3)

section 1344 (bank fraud); (4) section 1348 (securities fraud); (5) any rule or

regulation of the Securities and Exchange Commission; or (6) any provision of

federal law relating to fraud against shareholders. 18 U.S.C. §1514A; 29 C.F.R.

§1980.102(a); *Hendrix v. American Airlines, Inc.*, 2004-SOX-00023 (ALJ Dec. 9,

2004).

Beyond the subject matter of the employee's complaint, the legal standard

of protected conduct under SOX (and thus Dodd-Frank) is unsettled.  Most courts

that have considered the issue to date have determined that a claimant must

have alerted superiors or regulators of conduct that "definitively and specifically"

relates to one of the six enumerated categories of fraud or securities violations

listed in 18 U.S.C. § 1514A(a)(1) as protected under SOX.  *Welch v. Chao,* 536

F.3d 269, 275 (4th Cir. 2008); *Barker v. UBS*, 2012 U.S. Dist. LEXIS 71234 at *11

(D. Ct. May 22, 2012); *Nordstrom v. U.S. Bank, Inc.*, 2012 U.S. Dist. LEXIS

102267 at *9 (S.D. Ca. Jul. 23, 2012); *Miller v. Stifel, Nicolaus & Co.*, 812

F.Supp.2d 975, 987 (D. Mn. 2011); *Mann v. Fifth Third Bank*, 2011 U.S. Dist.

LEXIS 44853 (S.D. Ohio 2011); *Xie v. Hospira, Inc.*, 2011 U.S. Dist. LEXIS

100537 at *4 (N.D. Il. Sept. 2, 2011).

The Third Circuit, in *Wiest v. Lynch,* 2013 WL 11784 (3d Cir. March 19,

2013), and the Administrative Review Board of the Department of Labor, in

*Sylvester v. Parexel Int'l LLC*, ARB Case No. 07-123, 2011 DOL SOX LEXIS 39

(May 25, 2011) (*en banc*), have determined that the "definitive and specific"

standard is no longer required but that a complainant must express a

"reasonable belief" that corporate managers have taken action that could run

afoul of one of the enumerated anti-fraud or securities laws.  The District of
Columbia Circuit has not yet ruled in the issue.

Under either standard the employee must subjectively believe that his
employer violated one of the protected categories, and his belief must be
objectively reasonable. *Day v. Staples, Inc.*, 555 F.3d 42, 54 (1st Cir. 2009);
*Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008); *Allen*, 514 F.3d at 477 (5th Cir.
2008); *Harp v. Charter Comm., Inc.*, 558 F.3d 722, 723 (7th Cir. 2009); *Van
Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1000 (9th Cir. 2009); *Gale v. U.S. Dept.
of Labor*, 384 Fed. Apps., 926, 929 (11th Cir. 2010).

Based on the entire record in this arbitration, the Arbitrator concludes that
Claimant did not engage in protected activity, regardless of which of the above
standards is applied.  The closest Claimant's testimony comes to describing
arguably protected activity is the following interchange:

> Q. What concern if any did you have that
>    Fannie Mae was giving inaccurate information,
>    inaccurate data to its regulator and that you were
>    involved with that process?
>
> A. I wanted no part of lying to a regulator.
>
> Q. Why?
>
> A. I thought it was illegal.
>
> Q. Why?
>
> A. Because you're lying to the government.

The quoted testimony refers to the meeting with FHFA, in which Mr.
Magidson cited the erroneous data, which he later sought to have corrected,
relating to the trending of operational incidents.  The Arbitrator finds that the

number was based on an error, which neither Claimant nor Ms. Oliver had

corrected in the intervening period between September 27 and November 3, and

that the error in any case did not relate to one of the six enumerated categories

under SOX. Claimant's concern appears to have been that Mr. Magidson's error

was attributed to Claimant:

> Q. Now, what did you do upon learning that
> Magidson had made the statements to the FHFA
> regarding the 60 percent reduction in
> technology-based incidents when you believed that
> information was not supported at all by the data that
> you had reviewed?
>
> A. I reported to my supervisor I had concerns
> that the information is inaccurate and it's being
> attributed to something that I had produced.

Nothing in Claimant's brief testimony indicates that he believed at the time

that Mr. Magidson's admitted error, later corrected after the RMO team produced

the correct data, was intentional. Indeed, there is no evidence that, when

Claimant told Ms. Oliver that he was concerned Mr. Magidson had used the 60%

statistic and given that inaccurate information to FHFA, he also conveyed to Ms.

Oliver his perception that Mr. Magidson was engaged in "illegal" activity.

Nor does it appear that Claimant believed that Mr. Magidson, in citing the

wrong figure for the reduction of operational incidents, had committed a violation

of SOX. Although Claimant was aware that the SOX Business Team was the

designated internal organization with subject matter expertise regarding whether

an identified risk had SOX implications, he failed to notify the SOX team about

his concerns. Nor did he comply with Fannie Mae's policy that requires

operational risk professionals who suspect that they are confronted with an

operational incident that has SOX and/or financial reporting implications, to log the incident into the operational incident database ACCORD, so that the SOX Team can assess whether the incident has SOX implications.

Claimant's failure to notify Fannie Mae's Compliance and Ethics department of his suspicions also indicates that he did not believe that Mr. Magidson was violating the law.  In this regard, the Code of Conduct requires all employees to report any suspicions about potential violations of law.  Claimant admits that he certified his compliance with the Code every year of his employment with Fannie Mae, including 2010, the year in which Magidson used the 60% statistic.

Dismissal of a SOX complaint is appropriate where an employee's conduct shows that he did not subjectively believe that the employer engaged in unlawful conduct of the type prohibited by the statute.  *E.g., Gale v. U.S. Dep't of Labor*, 384 Fed. Appx. 926, 2010 U.S. App. LEXIS 13104 (11th Cir. June 25, 2010).  To satisfy the subjective reasonableness test, "the employee must actually have believed that the conduct he complained of constituted a violation of relevant law." *Harp v. Charter Comm'ns*, 558 F.3d 722, 723 (7th Cir. 2009). The subjective component requires that the alleged whistleblower "actually believed the conduct complained of constituted a violation of pertinent law." *Day v. Staples*, 555 F.3d 42, 54, n.10 (1st Cir. 2009) (*citing Welch v. Chao*, 536 F.3d at 277, n.4); *Gladitsch v. Ogilvy*, 2012 U.S. Dist. LEXIS 41904, at*23 (S.D.N.Y. Mar. 21, 2012).

Nor would such a belief on Claimant's part have been objectively reasonable.  Objective reasonableness is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the complainant.  *Mozingo v. The South Financial Group, Inc., et al.*, 2007-SOX-0002 at 10 (ALJ Dec. 6, 2006); *Melendez v. Exxon Chems. Ams.*, ARB Case NO. 96-051 at 27 (ARB July 14, 2000).

Jill Oliver, whose testimony generally supported Claimant, testified that she did not believe, and therefore never informed Fannie Mae, that Mr. Magidson's use of the 60% statistic constituted a potential SOX violation. Ms. Oliver, like Claimant, was an operational risk professional at Fannie Mae. She was aware that operational risk is an umbrella consisting of many types of risks faced by Fannie Mae, one of which is a financial reporting risk, *i.e.,* a SOX risk.  She also was aware that the SOX Business Team had the expertise to evaluate whether an operational risk issue had the potential to be a SOX risk. Yet she viewed Mr. Magidson's continued use of the 60% statistic to be "just a management issue," and did not suspect that it was a SOX issue.

B. *Contributing Factor*

Even if Claimant could prove that he engaged in protected activity, he has not sustained his burden of proving that his activity contributed to his termination five months later, as part of the RIF intended to achieve a "shape shift."  The parties agree that, in order to establish a *prima facie* case of retaliation, Clamant must prove that his allegedly protected activity was a contributing factor to his termination.  "A contributing factor is any factor, which

alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Klopfenstein v. PCC Flow Techs Holdings, Inc* ARB Case No. 04-149, 2006 DOLSOX LEXIS 59 at *38 (May 31, 2006).

Claimant was one of six Operations and Technology employees supervised by Mr. Magidson who were terminated on April 21, 2011, of whom four were at was Claimant's Level III.  Claimant himself testified that, in his opinion, all three of the Level III employees in RMO produced work of the same quality and quantity, but acknowledged that Mr. Baer had greater knowledge of technology than he.

Five months intervened between the use of the inaccurate data regarding the trending of operational incidents and the RIF.  Although neither the Supreme Court nor the D.C. Circuit has established a bright-line rule for the amount of time needed to prove retaliation through temporal proximity, *Hamilton v. Geithner*, 666 F.3d 1344, 1357-58 (D.C. Cir. 2012), this Circuit nonetheless has found that a two- or three-month lag between the protected activity and the adverse employment action generally does not establish the temporal proximity needed to prove causation. *See Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (rejecting interval of two and a half months as establishing temporal proximity and citing cases that did not find temporal proximity when two to three months elapsed between protected activity and adverse employment action); *Harris v. D.C. Water & Sewer Auth.*, 2013 U.S. Dist. LEXIS 19070 (finding five-month gap between alleged protected activity and adverse action "simply too long under this Circuit's authority to establish an inference of causation."); *Tressler v. Amtrak*,

No. 09-2027, 2012 U.S. Dist. LEXIS 170304, at *35 (D.D.C. Nov. 30, 2012) (five- or ten-month gap too lengthy to establish necessary temporal proximity).

Intervening events also argue against the alleged protected activity as a contributing factor to Claimant's termination.  In November 2010 Mr. Magidson approved Ms. Oliver's rating of Claimant as a "3," as high a rating as Claimant ever received at Fannie Mae and one that made him eligible for a Long-Term Incentive bonus.  Mr. Magidson did nothing to reduce Claimant's significant role in regular meetings with FHFA.  Nor did he object when Ms. Oliver later, in February 2011, proposed Claimant for an LTI bonus.

Mr. Magidson did question the reason why Ms. Oliver had recommended Claimant for a lower percentage bonus than she proposed for Chris Baer, who earned less than Claimant.  He testified that Ms. Oliver did not inform him that she was not basing the percentage bonus of each of her employee's LTI bonus on that employee's relative performance during the past year, the stated rationale for the LTI, but on an attempt to equalize the rewards among her team.  (Ms. Ray, by consensus the group's top performer, who never was considered for the RIF, received the same bonus as the other two.)

The final, and most convincing, reason for Claimant's failure of proof of the last prong needed to establish his *prima facie* case is the fate of Ms. Oliver in the RIF.  Mr. Magidson's testimony focused on Ms. Oliver, not Claimant, as the person most responsible for not raising the issue of the validity of the 60% statistic in a more timely and professional fashion.  Ms. Oliver was aware that the 60% statistic was being used to market internally the value of the SDLC.  She

was a recipient of all of the email communications in which the 60% statistic was communicated, believed the statistic to be inaccurate, and nonetheless failed to respond when Mr. Guinta invited everyone on the email to voice any comments or concerns.  When called upon by senior management to shape shift his organization, Mr. Magidson decided to that he must eliminate two director-level positions on his team. Yet, despite her heavy involvement in failing to alert him to the earlier error, Mr. Magidson retained Ms. Oliver as one of his two remaining Directors.  Neither of the two Directors Mr. Magidson decided to terminate was alleged to have voiced any concerns that Mr. Magidson had violated SOX or lied to a regulator.

Claimant alleges that Mr. Magidson shifted his explanation for selecting Claimant for the RIF, thus proving pretext.  The Arbitrator disagrees.  Although Mr. Magidson did not include in his original explanation to HR all of his reasons for deciding that Mr. Baer was more valuable to the RMO than Claimant, he relied on his own observations of their competencies, including Mr. Baer's acknowledged superior technical skills, which another Fannie Mae witness testified were needed for the remediation tracking system, a critical tool that was expanded within the RMO and throughout Fannie Mae in early 2011.

Mr. Magidson also relied on Ms. Oliver's recent request for a higher LTI award for Mr. Baer than for Claimant, several months after she had ranked Claimant above Mr. Baer.  He not unreasonably presumed that the timing indicated that she had changed her comparative ratings of the two employees. Because Ms. Oliver herself was in a group being considered for the RIF, Mr.

Magidson had been instructed not to consult with her about the RIF and thus was unable to question her apparent change of mind.  Megan Gaither, a seasoned HR professional with extensive experience regarding Fannie Mae's LTI policies, confirmed that she "would conclude that [Mr. Baer] performed higher than Keith Taylor based on Ms. Oliver's [LTI] input here."

The Arbitrator concludes that Claimant has not met his burden to prove two of the four elements needed to establish a *prima facie* case of whistleblower retaliation under SOX or Dodd-Frank: namely, that he engaged in protected activity or that his activity was a contributing factor to his termination.

C. *Other Claims*

Claimant appears to have abandoned his first amendment claim for damages against federal officers for violating certain Constitutional rights while acting under color of federal law. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  The U.S. District Court for the District of Columbia, in *Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 92 (D.D.C. 2012), recently ruled that Fannie Mae remains a private, not a federal actor.

Claimant's Demand, although not his proof, also asserts that he was terminated in violation of public policy. *See, e.g., Taylor v. Washington Metro. Area Transit Authority,* 109 F.Supp.2d 11, 16 (DDC 2000).  Under District of Columbia law there is a "very narrow" public policy exception to the traditional at-will doctrine governing termination of employment. *Wallace v. Skadden, Arps, Slate, Meagher & Flom, et al.*, 715 A.2d 873, 883-86 (D.C. 1998).  The termination must violate a mandate of public policy that is "firmly anchored in

either the Constitution or in a statute or regulation which clearly reflects the

particular 'public policy' being relied upon," and, most relevant in this case, it

must arise from a statute or regulation that does not provide its own remedy.

*Potts v. Howard Univ. Hosp.*, 736 F. Supp. 2d 87, 97 (*quoting Warren v. Coastal*

*Int'l Secs.*, Inc., 96 Fed. Appx. 722, 722-23 (D.C. Cir. 2004)); *see also Carter v.*

*District of Columbia*, 980 A.2d 1217 (declining to create a new exception to the

at-will employment doctrine in order to vindicate a public policy when a statute

specifically articulates the policy and creates a cause of action to enforce it).

Claimant identifies no public policy violated by his termination that cannot

be enforced by existing causes of action, nor does he allege that Fannie Mae

terminated his employment for refusing to violate a law, for testifying about a

matter of public policy, or for protesting a regulatory violation.  The only statute

that Claimant identifies is 18 U.S.C.A. Section 1001(a), which prohibits knowingly

and willfully making a materially false statement in any matter within the

jurisdiction of the executive, legislative, or judicial branch of the Government of

the United States. That statute specifically provides that if any individual violates

the provision, that person shall be fined or imprisoned, thus providing its own

remedy.

If Claimant had succeeded in proving his claims of unlawful termination in

retaliation for protected whistleblowing, a suitable remedy exists under the

Sarbanes-Oxley and Dodd-Frank statutes.  The District of Columbia Court of

Appeals decision in *Carter v. District of Columbia*, 980 A.2d 1217, 1226 (D.C.

2009), is directly on point.  The plaintiff in that case alleged that she was fired for

reporting violations of municipal personnel regulations governing hiring and promotion.  The court determined that there was "no need to create a new exception to the at-will employment doctrine," because there already was a framework in place "articulating an express public policy in favor of government employee whistleblowing and creating a specific, statutory cause of action to enforce it."


IV.  Conclusion

    1.  Claimant has not proven any of his claims against Fannie Mae.

    2.  This Award resolves all issues submitted for decision in this arbitration.


Dated: May 15, 2013

Linda R. Singer

Arbitrator

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Taylor, Keith / Fannie Mae
Reference No. 1410005919

I, Erin Condon, not a party to the within action, hereby declare that on  May 15, 2013 I served the

attached Final Award on the parties in the within action by Email and by depositing true copies thereof enclosed

in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Washington, DISTRICT OF

COLUMBIA, addressed as follows:

Mr. Scott Oswald
Nicholas Woodfield Esq.
Employment Law Group
888 17th Street, NW
Suite 900
Washington, DC  20006-3307
Phone: 202-331-2883
SOswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
   Parties Represented:
   Keith Taylor

Madonna McGwin Esq.
Seth Blonder Esq.
Fannie Mae
3900 Wisconsin Ave., NW
Legal Department/Employment
Washington, DC  20016-2892
Phone: 202-752-7000
madonna_a_mcgwin@fanniemae.com
seth_j_blonder@fanniemae.com
   Parties Represented:
   Fannie Mae

Damien G. Stewart Esq.
Fannie Mae
3900 Wisconsin Ave., NW
M.S. 1H-2S/05 Room #3221
Washington, DC  20016-2892
Phone: (202) 752-7000
damien_g_stewart@fanniemae.com
   Parties Represented:
   Fannie Mae

I declare under penalty of perjury the foregoing to be true and correct. Executed at Washington,

DISTRICT OF COLUMBIA on  May 15, 2013.

_____
Erin Condon